No. 10-7

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DUSTIN JOHN HIGGS,
*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the District of Maryland
Criminal No. PJM-98-0520, Hon. Peter J. Messitte, U.S.D.J.

_____

**INITIAL BRIEF OF APPELLANT**

Leigh Skipper
Chief Federal Defender
Angela Elleman
Matthew Lawry
Michael Wiseman
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
5 Roland Mews
Baltimore, MD 21210
410-532-8405

Dated:    December 21, 2010

# PRELIMINARY STATEMENT

The *Joint Appendix* is cited as "A" followed by the page(s).[*] The transcripts of the trial proceedings are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceeding transcripts are cited as "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. Sentencing transcripts are cited as "ST," followed by the date and page number. The District Court's *Opinion*, filed April 7, 2010, is cited as *DCO*, followed by a page citation to the *Joint Appendix* that is filed with this brief.

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

---

[*]Because Higgs does not seek reimbursement for the production of the *Joint Appendix*, it exceeds 250 double-sided pages, pursuant to Local Rule 32(a)

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    HIGGS IS INNOCENT OF CAPITAL MURDER.
        BUT FOR COUNSEL'S INEFFECTIVENESS AND
        GOVERNMENT SUPPRESSION OF EXCULPATORY
        EVIDENCE, NO REASONABLE JURY
        WOULD HAVE CONVICTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    Victor Gloria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        B.    Willis Haynes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        C.    Enidsia Darby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        D.    Dominick Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        E.    Richard Diolamou and Wondwossen Kabtamu . . . . . . . . . . . 24
        F.    CBLA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        G.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II.   HIGGS'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH SCIENTIFICALLY UNSOUND EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A.   The Use of CBLA at Higgs's Trial . . . . . . . . . . . . . . . . . . 27

    B.   CBLA is Scientifically Invalid and Therefore Inadmissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C.   The Government Suppressed Evidence Discrediting CBLA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    D.   Trial Counsel Ineffectively Failed to Challenge CBLA . . . . 41

        1.   Failure to hire and prepare an expert . . . . . . . . . . . . . . 42
        2.   Failure to timely raise new CBLA evidence . . . . . . . . 44

    E.   Prejudice and Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.   HAYNES'S CONFESSIONS WERE IMPROPERLY ADMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    A.   The First Confrontation Violation . . . . . . . . . . . . . . . . . . . 48

        1.   Higgs did not adopt Haynes's confession . . . . . . . . . . 48
        2.   Trial and Appellate Counsel Were Ineffective . . . . . . 49

    B.   The Second Confrontation Violation . . . . . . . . . . . . . . . . . . 53

IV.   THE PROSECUTORS DISCRIMINATED ON THE BASIS OF GENDER IN THEIR EXERCISE OF PEREMPTORY CHALLENGES . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    A.   Step One: *Prima Facie* Showing . . . . . . . . . . . . . . . . . . . . 57

    B.   Step Two:  Prosecutors' Gender Neutral Reasons . . . . . . . . 59

    C.   Step Three: Higgs has Proven Discrimination . . . . . . . . . . . 59

D.     Higgs Has Demonstrated Cause and Prejudice
Sufficient to Overcome Any Waiver . . . . . . . . . . . . . . . . . . . . 68

V.    COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE
AND PRESENT EXTANT MITIGATING EVIDENCE
DURING THE PENALTY PHASE . . . . . . . . . . . . . . . . . . . . . . . . 69

A.     Counsel's Deficient Investigation . . . . . . . . . . . . . . . . . . . . 72

B.     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

C.     District Court's Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

D.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

VI.   HIGGS'S PRIOR CONVICTIONS FOR (A) A DRUG
OFFENSE AND (B) ASSAULT AND RECKLESS
ENDANGERMENT DID NOT QUALIFY AS
STATUTORY AGGRAVATING FACTORS . . . . . . . . . . . . . . . . 94

A.     Higgs's 1997 Conviction for Violation of the
Federal Drug Statute Did Not Qualify as an
Aggravating Factor under 18 U.S.C. § 3592(c)(12)
Because it Was Not Previous to the Instant Offenses . . . . . . 95

B.     Higgs's 1997 Conviction for Assault and Reckless
Endangerment Did Not Qualify as an Aggravating
Factor under 18 U.S.C. § 3592(c)(2) . . . . . . . . . . . . . . . . . . 101

1.     The assault and reckless endangerment
conviction occurred after the instant offense,
and therefore does not qualify as a "previous"
conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

2.     The "categorical approach" applies to § 3592(c)(2), under
which the assault and reckless endangerment conviction
should not have counted as an aggravator . . . . . . . . . 105

C.      The Jury's Improper Consideration of the Above
        Convictions Requires Vacation of Higgs's Death
        Sentences  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

VII.  THE DISTRICT COURT ERRED IN SUMMARILY
      DISMISSING HIGGS'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . 112

      A.      The Court Below Improperly Denied Discovery . . . . . . . . . 112

      B.      The Court Below Erred in Summarily Dismissing
              Higgs's Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Ake v. Oklahoma, 470 U.S. 68 (1985) ................................................ 40

Arizona v. Fulminante, 499 U.S. 279 (1991) ................................... 52

Batson v. Kentucky, 476 U.S. 79 (1986) ...................................... 57, 59

Begay v. United States, 553 U.S. 137 (2008) ................................. 107

Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) ........................... 9

Bigelow v. Williams, 367 F.3d 562 (6th Cir. 2004) ........................... 10

Bracy v. Gramley, 520 U.S. 899 (1997) ...................................... 112

Brady v. Maryland, 373 U.S. 83 (1963) ........................... 9, 25, passim

Brown v. Sanders, 546 U.S. 212 (2006) ...................................... 111

Bruton v. United States, 391 U.S. 123 (1968) ............................ 47, 52

California v. Green, 399 U.S. 149 (1970) ...................................... 54

California v. Ramos, 463 U.S. 992 (1983) ...................................... 54

Chambers v. United States, 129 S. Ct. 687 (2009) .......................... 107

Ciak v. United States, 59 F.3d 296 (2d Cir. 1995) .......................... 117

Crawford v. United States, 212 U.S. 183 (1909) .............................. 50

Crawford v. Washington, 541 U.S. 36 (2004) ................... 47, 51, passim

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) ........... 32

Davis v. United States, 417 U.S. 333 (1974) ..................... 55, 100, 109

Deck v. Missouri, 544 U.S. 622 (2005) ........................................ 54

Douglas v. Alabama, 380 U.S. 415 (1965) .......................................... 50

Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995) .................................... 43

Eagle v. Linahan, 279 F.3d 926 (11th Cir. 2001) ............................... 69

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) .............................. 20

Fontaine v. United States, 411 U.S. 213 (1973) ................................ 117

Giglio v United States, 405 U.S. 150 (1972) ................................. 12, 24

Godfrey v. Georgia, 446 U.S. 420 (1980) ....................................... 110

Gray v. Branker, 529 F.3d 220 (4th Cir. 2008) ............................. 71, 93

Gray v. Maryland, 523 U.S. 185 (1998) .......................................... 49

Green v. Johnson, 515 F.3d 290 (4th Cir. 2008) ................................. 5

Gregg v. Georgia, 428 U.S. 153 (1976) ....................................... 82, 83

Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992) .............................. 52

Harris v. Nelson, 394 U.S. 286 (1990) ........................... 12, 58, passim

House v. Bell, 574 U.S. 518 (2006) ....................................... 15, 16, 17

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) ........................................ 9

J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994) ........................ 56, 57

Jenkins v. Anderson, 447 U.S. 231 (1980) ....................................... 50

Johnson v. California, 545 U.S. 162 (2005) ...................................... 57

Johnson v. Mississippi, 486 U.S. 578 (1988) ................................... 110

Johnston v. Love, 165 F.R.D. 444 (E.D. Pa. 1996) ............................ 113

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) ...................... 9

Kyles v. Whitley, 514 U.S. 419 (1995) ..................... 9, 24, passim

Lee v. Illinois, 476 U.S. 530 (1986) ..................... 49, 53

Lilly v. Virginia, 527 U.S. 116 (1999) ..................... 49, 50, passim

Mahaffey v. Page, 162 F.3d 481 (7th Cir. 1998) ..................... 58

Michelson v. United States, 335 U.S. 469 (1948) ..................... 46

Miller-El v. Cockrell, 537 U.S. 322 (2003) ..................... 58, 59, passim

Monge v. California, 524 U.S. 721 (1998) ..................... 54

Napue v. Illinois, 360 U.S. 264 (1959) ..................... 24

Ohio v. Roberts, 448 U.S. 56 (1980) ..................... 49

Old Chief v. United States, 519 U.S. 172 (1997) ..................... 46

Porter v. McCollum, 130 S. Ct. 447 (2009) ..................... 70, 71, passim

Quesinberry v. Taylor, 162 F.3d 273 (4th Cir. 1998) ..................... 112

Reed v. Farley, 512 U.S. 339 (1994) ..................... 26

Rompilla v. Beard, 545 U.S. 374 (2005) ..................... 8, 41, passim

Sanders v. United States, 373 U.S. 1 (1963) ..................... 56

Schiro v. Summerlin, 542 U.S. 348 (2004) ..................... 109

Schlup v. Delo, 513 U.S. 298 (1995) ..................... 15

Sears v. Upton, 130 S. Ct. 3259 (2010) ..................... 70, 71, passim

Shepard v. United States, 544 U.S. 13 (2005 ..................... 105

Shukwit v. United States, 973 F.2d 903 (11th Cir. 1992) ..................... 26

Silva v. Woodford, 279 F.3d 825 (9th Cir. 2002) .................................................. 13

Sims v. Livesay, 970 F.2d 1575 (6th Cir. 1992) ................................................. 41

Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) ................................................ 23

Smith v. Texas, 543 U.S. 37 (2004) ................................................................... 86

Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) ............................................. 20, 41

Spicer v. Roxbury Correctional Institute, 194 F.3d 547 (4th Cir. 1999) .............. 12

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) ........................................ 57

Strickland v. Washington, 466 U.S. 688 (1984) ........................................ 9, 20, 84

Stringer v. Black, 503 U.S. 222 (1992) ............................................................ 111

Sun Bear v. United States, 611 F.3d 925 (8th Cir. 2010) ................................. 110

Tankleff v. Senkowski, 135 F.3d 235 (2d Cir. 1998) ........................................ 58

Taylor v. United States, 495 U.S. 575 (1990) .................................................. 105

Teague v. Lane, 489 U.S. 288 (1989) ............................................. 100, 109, 110

Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) ........ 57

United States v. Allen, 10 F.3d 405 (7th Cir. 1993) .......................................... 51

United States v. Alston, 611 F.3d 219 (4th Cir. 2010) ..................................... 107

United States v. Bagley, 473 U.S. 667 (1985) ............................................. 23, 40

United States v. Balascsak, 873 F.2d 673 (3d Cir. 1989) ................................. 97

United States v. Becker, 502 F.3d 122 (2d Cir. 2007) ............................. 100, 101

United States v. Bonnette, 781 F.2d 357 (4th Cir. 1986) ................................. 100

United States v. Brown, 441 F.3d 1330 (11th Cir. 2006) ...................................... 54

United States v. Caro, 597 F.3d 608 (4th Cir. 2010) ...................................... 108

United States v. Causey, 185 F.3d 407 (5th Cir. 1999) ...................................... 84

United States v. Coppola, 526 F.2d 764 (10th Cir. 1975) ...................................... 49

United States v. Clay, 2010 WL 4970223 (4th Cir. Dec. 8, 2010) ...................................... 108

United States v. Corley, 348 F. Supp. 2d 970 (N.D. Ind. 2004) ...................................... 53

United States v. Galbraith, 200 F.3d 1006 (7th Cir. 2000) ...................................... 54

United States v. Garner, 32 F.3d 1305 (8th Cir. 1994) ...................................... 97

United States v. Green, 964 F.2d 365 (5th Cir. 1992) ...................................... 50

United States v. Hale, 422 U.S. 171 (1975) ...................................... 49

United States v. Hamilton, 30 F.3d 131(4th Cir. July 22, 1994) ...................................... 104

United States v. Hobbs, 136 F.3d 384 (4th Cir. 1998) ...................................... 96, 104

United States v. Holder, 248 Fed.Appx. 863, 872 (10th Cir. 2008) ...................................... 10

United States v. Jordan, 357 F. Supp. 2d 889, 901 (E.D. Va. 2005) ...................................... 55

United States v. King, 509 F.3d 1338 (11th Cir. 2007) ...................................... 97

United States v. Matthews, 239 Fed. Appx. 806, 807 (4th Cir. 2007) ...................................... 117

United States v. Mikos, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003) ...................................... 36

United States v. McMillon, 14 F.3d 948 (4th Cir. 1994) ...................................... 57

United States v. Monk, 774 F.2d 945 (9th Cir. 1985) ...................................... 52

United States v. Platero, 72 F.3d 806 (10th Cir. 1995) ...................................... 56

United States v. Pressley, 359 F.3d 347 (4th Cir. 2004) ...................................... 96, 98, passim

United States v. Richardson, 166 F.3d 1360 (11th Cir. 1999) .............................. 97

United States v. Rivers, 595 F.3d 558 (4th Cir. 2010) ........................................ 107

United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009) ................................. 108

United States v. Sanders, 247 F.3d 139 (4th Cir. 2001) ..................................... 110

United States v. Scheer, 168 F.3d 445 (11th Cir. 1999) ...................................... 23

United States v. Shipp, 589 F.3d 1084 (10th Cir. 2009) ..................................... 109

United States v. Talley, 16 F.3d 972 (8th Cir. 1994) ..................................... 97, 98

United States v. Tarricone, 996 F.2d 1414 (2d Cir. 1993) .................................... 41

United States v. Thornton, 554 F.3d 443 (4th Cir. 2009) ................................... 107

United States v. Vann, 620 F.3d 431 (4th Cir. 2010) ........................................ 107

United States v. Ward, 171 F.3d 188 (4th Cir. 1999) ........................................ 105

United States v. Washington, 404 F.3d 834 (4th Cir. 2005) ............... 102, 106, 107

United States v. Williams, 445 F.3d 724 (4th Cir. 2006) ..................................... 49

Welch v. United States, 604 F.3d 408 (7th Cir. 2010) ....................................... 110

Wiggins v. Smith, 539 U.S. 510 (2003) ................................................... 70, 71, 84

Williams v. Taylor, 529 U.S. 362 (2000) ................................... 70, 82, passim

Winston v. Kelly, 592 F.3d 535 (4th Cir. 2010) ................................ 9, 27, passim

Workman v. Tate, 957 F.2d 1339 (6th Cir. 1992) ............................................... 41

Zant v. Stephens, 462 U.S. 862 (1983) ............................................................. 108

**STATE CASES**

Clemons v. Maryland, 896 A.2d 1059 (Md. 2006) ........................................ 35, 36

Jones v. State, 425 N.E.2d 128 (Ind. 1981) ........................................ 43

New Jersey v. Behn, 868 A.2d 329 (N.J. 2005) ................................... 36

Ragland v. Commonwealth,191 S.W.3d 569, 582 (Ky. 2006) .............. 36

**FEDERAL STATUTES**

28 U.S.C. § § 1291 and 2253 ................................................................ 1

28 U.S.C. §§ 2241 and 2255 ................................................................. 1

28 U.S.C. § 2255 .......................................................... 2, 27, passim

28 U.S.C. § 2255(b) ............................................................................ 94

18 U.S.C. §924(e)(2)(B) ................................................................... 107

18 U.S.C. § 3592(a)(4) ....................................................................... 84

18 U.S.C. § 3592(c) ........................................................ 98, 103, 111

18 U.S.C. §3592(c)(1) ...................................................................... 111

18 U.S.C. §3592(c)(2) ............................................................. 5, 101, 109

18 U.S.C. §3592(c)(12) ...................................................................... 95

18 U.S.C. § 3592(c)(12) .................................................................. 5, 95

18 U.S.C. § 3592(c)(16) .................................................................... 111

18 U.S.C. § 3593(c) ........................................................................... 53

18 U.S.C. § 924(e) ........................................................................... 104

Fed. R. Crim. P. 33 ............................................................................ 44

Fed. R. Evid. 801(d)(2)(B) ................................................................. 48

Rules Governing Section 2255 ........................................................................... 112

USSG § 4A1.2 ........................................................................... 99

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2255. On September 16, 2010, Higgs filed a timely notice of appeal from the District Court's summary denial of relief. Upon the grant of a COA, this Court will have jurisdiction under 28 U.S.C. § § 1291 and 2253.

# STATEMENT OF ISSUES

1.   Higgs is actually innocent. But for counsel's ineffectiveness and the Government's suppression of exculpatory evidence, no reasonable jury would have found him guilty;

2.   Higgs's convictions violated due process and his right to effective counsel because they were based on discredited Comparative Bullet Lead Analysis evidence;

3.   Higgs's right to confrontation was violated in the guilt and penalty phases when his co-defendant's out-of-court statements were admitted;

4.   The Government discriminated against women in exercising peremptory strikes, in violation of due process and equal protection;

5.   Trial counsel were ineffective when they failed to investigate and present compelling mitigating evidence at sentencing;

6.   The submission to the jury of Higgs's prior convictions for (A) a drug offense and (B) assault and reckless endangerment, all of which post-dated the instant offenses, violated the Fifth, Sixth and Eighth Amendments;

7.  The District Court erred in summarily denying relief, without granting discovery and an evidentiary hearing.

## STATEMENT OF THE CASE

This is an appeal by Dustin Higgs, a death-sentenced federal prisoner who unsuccessfully moved for relief under 28 U.S.C. § 2255.

Higgs was charged with the January 27, 1996 shooting deaths of three women. On October 11, 2000, Higgs was convicted by a jury of firearms charges and three counts each of: first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death. Following a sentencing hearing, the jury recommended death sentences on the nine death-eligible counts. This Court upheld the judgment, and affirmed the District Court's denial of a new trial motion. United States v. Higgs, 353 F.3d 281 (4th Cir. 2003) ("Higgs 1") and United States v. Higgs, 95 Fed. Appx. 37 (4th Cir. 2004) ("Higgs 2"). Certiorari was denied. Higgs v. United States, 542 U.S. 999 (2004); Higgs v. United States, 543 U.S. 1004 (2004).

Higgs filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255*, etc., ("*2255 Motion*") on November 28, 2005. He also moved for discovery and a hearing on several of his claims. On April 7, 2010, the District Court denied the *2255 Motion*, without argument, discovery or an evidentiary hearing. Higgs's motion for

reconsideration and for COA, was denied on July 20, 2010.

## STATEMENT OF FACTS

The evidence supporting the Government's case is detailed in Higgs 1, 353 F.3d at 289-95. The Government contended that Higgs, Victor Gloria and Willis Haynes were at a social gathering with the decedents, after which they took them to United States land. According to Gloria, Higgs then gave Haynes a pistol and Haynes shot the decedents. The allegation that Higgs "caused or aided or abetted" Haynes to kill the decedents was only supported by Gloria.

At penalty phase, counsel presented limited and inaccurate information about Higgs. The jury unanimously found four statutory and two non-statutory aggravating factors. Individual jurors also found three mitigating factors, but the jury unanimously rejected proposed mitigating factors concerning Higgs's family history and background. See Higgs 1, 353 F.3d at 295.

In the *2255 Motion*, Higgs alleged facts challenging virtually all of the Government's evidence to establish first degree murder; supporting a claim that the prosecution discriminated on the basis of gender in jury selection; and supporting a claim that trial counsel ineffectively failed to investigate, develop and present powerful mitigating evidence at sentencing. The District Court nevertheless summarily denied the *Motion*, without argument, discovery or an evidentiary hearing.

The facts supporting Higgs's claims are set forth in each of the individual claims.

## SUMMARY OF ARGUMENT

Dustin Higgs is innocent of capital murder. The Government conceded that Higgs did not shoot the victims, and there is no direct evidence he directed or desired their deaths. But for <u>Brady</u> violations and ineffective assistance of counsel, there is a reasonable probability that he would not have been found guilty of capital murder.

Higgs's convictions and death sentences rested on what is now known to be completely invalid science, comparative bullet lead analysis ("CBLA"). Trial counsel ineffectively failed to challenge its admissibility or reliability and the Government failed to disclose internal studies revealing CBLA's flaws.

Trial counsel ineffectively failed to lodge a Sixth Amendment objection to the admission of co-defendant Haynes's confessions, which shifted blame to Higgs. These confessions violated Higgs's right to confront the witnesses against him at trial and during the penalty proceedings.

Higgs was tried by an all male jury after the Government disproportionately exercised peremptory strikes on the basis of gender. Higgs established a *prima facie* case of discrimination, which the Government failed to rebut.

Trial counsel ineffectively failed to investigate and present mitigating evidence during the penalty phase proceedings. There is a reasonable probability that, but for

counsel's failures, at least one juror would have voted for a life sentence.

Higgs's convictions for a drug offense and for assault both occurred after the instant offense, and therefore did not qualify as statutory aggravating factors. Further, the assault conviction did not qualify as an aggravator because use of a firearm is not an element of that offense. Because these aggravators should not have been submitted to the jury, Higgs is entitled to sentencing relief.

Although Higgs demonstrated good cause, the District Court erroneously denied discovery. The District Court also erred by finding facts, inventing tactical justifications for counsel's actions, and making credibility determinations, all without a hearing, to which Higgs was entitled.

## STANDARD OF REVIEW

This Court reviews legal decisions, including the decision to summarily deny relief without an evidentiary hearing, *de novo*. Green v. Johnson, 515 F.3d 290, 301 (4th Cir. 2008).

**ARGUMENT**

**I.     HIGGS IS INNOCENT OF CAPITAL MURDER.  BUT FOR COUNSEL'S INEFFECTIVENESS AND GOVERNMENT SUPPRESSION OF EXCULPATORY EVIDENCE, NO REASONABLE JURY WOULD HAVE CONVICTED.**

Willis Haynes shot and killed three women.  There is no allegation that Higgs fired the shots.  There is no direct evidence that Higgs intended their deaths.  The Government alleged that Higgs directed Haynes to shoot the victims.  TT 10/20/00, 92; A - 440, 92.  But the evidence of Higgs's intent to kill was weak at trial, and now is paltry.  He had neither motive nor intent to kill, and no control over Haynes, who had his own compelling motive to kill.

The Government's evidence supporting Higgs's murder convictions consisted primarily of the testimony of Victor Gloria.  See Higgs 1, 353 F.3d at 313-14 (convictions based primarily on Gloria's testimony).  The Government also relied on testimony from Enidsia Darby and jailhouse informant Domenick Williams, and on evidence purportedly linking Higgs to two unrelated shootings involving a .38 caliber weapon.  See *DCO*, A - 123-24.  However, both evidence that was disclosed – but not adequately investigated by trial counsel – and evidence that the Government failed to disclose, undermines the Government's case and shows that Haynes had his own unrelated and compelling motive to kill, having nothing to do with Higgs.  Had counsel properly investigated and had the Government fulfilled it disclosure

6

obligations, there is a reasonable likelihood that the jury would not have convicted Higgs of first degree murder.

The District Court denied relief on this claim because Higgs failed to "prove" his allegations. *DCO*, A - 131-32. This was erroneous, especially because the Court denied Higgs discovery or a hearing – the tools needed to prove his allegations.

Higgs shows that with respect to several critical aspects of the Government's case, trial counsel failed to properly investigate and/or the Government failed to disclose exculpatory information.

### A.     Victor Gloria.

**Failure to impeach.** Gloria was the centerpiece of the Government's supposed proof that Higgs aided and abetted Haynes. He testified that Higgs provided a gun to Haynes immediately before the shootings and that he witnessed Higgs and Haynes talking as they drove toward the scene of the shootings. However, Gloria previously told the FBI that he was asleep or passed out in the back of the car during the relevant time period and thus had no information about Higgs's role. See Gloria Interview, A - 185. Gloria was not effectively cross-examined on this initial statement. He also made other statements inconsistent with his trial testimony, which counsel neither investigated nor used at trial.

Keon Decosta, a witness to an incident in which Higgs allegedly threatened

Darby, has sworn that Gloria told Decosta that Gloria was asleep before and at the time of the homicides, and did not see any of the things that he testified occurred in the vehicle. Decosta Declaration, A - 458. Decosta has attested that neither trial counsel nor their investigator interviewed him. Id. Trial counsel had no reasonable basis for failing to do so: Decosta was named as a witness to the Darby incident, which counsel knew the Government intended to introduce against Higgs. Counsel have a duty to investigate the evidence that they know the Government will use. Rompilla v. Beard, 545 U.S. 374, 389 (2005).

Katrina Havenner, the mother of Gloria's child, told a trial defense investigator, and has since sworn, that Gloria told her he was drunk and unconscious when the women were killed, and was awakened only by the gunshots. Havenner Declaration, A - 461. Counsel's failure to call Havenner and/or the trial investigator at trial was deficient. Both would have corroborated the critical fact that, contrary to his testimony, Gloria was asleep at the time of the shootings.

The District Court suggested that counsel had no reason to question Decosta about his relationship with Gloria. *DCO*, A - 132-33. Any reasonable interview of Decosta, however, would have revealed that he knew many of Higgs's friends, including Haynes and Gloria. Decosta Declaration, A - 458. The District Court also ruled that Higgs did not show prejudice arising from these deficiences. *DCO*,

8

A - 133.  Under <u>Strickland</u>, prejudice is established when there is a reasonable likelihood that the outcome would have been different but for counsel's deficient performance, <u>i.e.</u>, when *confidence in the outcome is undermined*.  <u>Strickland</u>, 466 U.S. at 694.  Thus, the <u>Strickland</u> standard for prejudice "is not a stringent one.  It is less demanding than the preponderance standard."  <u>Hull v. Kyler</u>, 190 F.3d 88, 110 (3rd. Cir. 1999) (internal quotation marks and citations omitted) (citing <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986)).  Moreover, prejudice resulting from counsel's deficient performance should be assessed cumulatively.  <u>See</u>, <u>e.g.</u>, <u>Berryman v. Morton</u>, 100 F.3d 1089 (3d Cir. 1996) (cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); <u>Kubat v. Thieret</u>, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors").

Here, the Court erred in failing to assess prejudice arising from all of counsel's deficiencies cumulatively, <u>see</u> *DCO*, A - 133-34, and together with the materiality of evidence suppressed by the Government.  <u>Winston v. Kelly</u>, 592 F.3d 535, 557 (4th Cir. 2010) (<u>Strickland</u> prejudice requires a "collective evaluation of the evidence") (citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995).[1]  In particular, the Court

---

[1]Materiality under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) for suppression of exculpatory evidence, is also assessed cumulatively.  <u>Winston</u>, 592 F3d at 556. Because <u>Brady</u> materiality is coextensive with <u>Strickland</u> prejudice, <u>see</u> <u>Kyles</u>, 519

should have considered the cumulative effect of the other undisclosed or uninvestigated evidence that could have been used to impeach Gloria or undercut other aspects of the Government's case.

The Court also improperly ignored or minimized the effect of Decosta and Havenner's proffered testimony, even standing alone. The jury heard that Gloria told one story to the police and a different story in court. Evidence that Gloria had previously told independent witnesses the same version he told police would have powerfully corroborated that exculpatory version, making it reasonably likely that the jury would have acquitted. See, e.g., Bigelow v. Williams, 367 F.3d 562, 575 (6th Cir. 2004) (defendant likely prejudiced by failure to present witnesses to corroborate alibi; remanding for hearing), subsequent history, Bigelow v. Haviland, 576 F.3d 284 (6th Cir. 2009); United States v. Holder, 248 Fed.Appx. 863, 872 (10th Cir. 2008) (failure to present witness to corroborate self-defense was prejudicial).

**Failure to Disclose Exculpatory Information.** Gloria's criminal history was partly revealed to the jury. It learned he faced a maximum of 15 years imprisonment in this case, 30 years on other federal drugs charged, and 10 years on state drug charges. TT 9/28/00, 191-192, A - 1002-03. Additionally, the jury learned that the Government promised him it would seek a lighter sentence in this case based on his

U.S. at 434, materiality and prejudice must be assessed collectively.

cooperation. Ultimately, Gloria was sentenced to 7 years for his role in this case. United States v. Gloria, PJM-98-482 (D. Md.), ST 11/22/00, 3, A - 209.

However, the jury was not told, because the Government failed to disclose it, that the other charges against Gloria were resolved in a highly favorable manner. The federal drug charges were dismissed by Higgs's prosecutor on December 7, 2000. On the state drug charges, he was sentenced to one year concurrent to his federal sentences. Higgs alleged that these favorable dispositions strongly suggested that there existed a further, undisclosed, agreement with the Government. The District Court improper denied discovery (see *Discovery Motion*, at 12-13, A - 83-4), or a hearing on these allegations.

Additionally, through a combination of prosecutorial suppression and/or ineffective assistance of counsel, the jury did not learn that Gloria also had open charges and a bench warrant in Virginia. GC93-001182-01 (Smyth Co, Virginia) Gloria was, and remains, a fugitive from Virginia. Federal authorities never placed a detainer on Gloria and did not notify Virginia authorities that he was in custody. This constituted additional undisclosed consideration, which counsel also failed to investigate.

Finally, Gloria was a suspect, but never charged, in an unrelated homicide in Maryland. Higgs alleged that Gloria was not charged to preserve his status as a

witness. The decision not to charge him constituted further consideration. Higgs's post-conviction request for discovery on these allegations (*Discovery Motion*, at 11-12, A - 82-3), was improperly denied by the District Court.

When consideration provided to a witness is not disclosed at the time of trial, due process is violated. Giglio v United States, 405 U.S. 150, 153-56 (1972). Even when the prosecution has not expressly promised such leniency but knows that the witness hopes for it, that hope or expectation must be disclosed. Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 558-60 (4th Cir. 1999) (contact between witness's counsel and the prosecutor regarding deal must be disclosed). Had Gloria's secret deals or expectations been disclosed, the outcome of the trial would likely have been different.

The District Court denied relief on the grounds that the allegation of an undisclosed deal was speculative and that Gloria's credibility was impeached at trial. *DCO*, A - 130-31. It erred in both respects.

The allegation of an undisclosed deal was far from speculative. It was based on record facts creating a strong inference that deals existed. Where such allegations are made, they state a claim on which relief could be granted, and it is error to summarily deny relief, without discovery, see Harris v. Nelson, 394 U.S. 286, 290 (1990) (habeas discovery required upon *prima facie* showing of constitutional

12

violation), or a hearing.  Silva v. Woodford, 279 F.3d 825, 854-55 (9th Cir. 2002) (remanding for hearing on allegation of undisclosed deal).

That Gloria's credibility may have been impeached at trial is not a proper basis for denying discovery, a hearing and relief.  Gloria told two stories.  The jury had to decide which was false.  Testimony from Decosta and Havenner would have corroborated Gloria's exculpatory police statement.  Evidence of the undisclosed deals would have shown the strength of Gloria's motive to lie at trial.  If the jury believed that Gloria lied at trial, it would likely have acquitted Higgs.

**Gloria's Possession of Weapons.**  Gloria testified at Haynes's trial, five months prior to Higgs's, that he was familiar with guns and had fired .38 caliber revolvers.  United States v. Haynes, PJM-98-0520 (D. Md.) TT 5/10/00, 789-90, A - 210-11.  Trial counsel had access to the transcript of Gloria's testimony at Haynes's trial, but failed to elicit this information during Higgs's trial.

Despite being provided with Gloria's lengthy criminal record, counsel failed to review the court files of Gloria's charges.  Had counsel done so, they would have learned that at least two of those charges involved possession of a handgun, one of which was a .38 caliber.  As a result of counsel's failure to investigate, they did not know and failed to elicit this helpful evidence.

The court file on Gloria's Howard County drug charges reveals that police

13

searched his apartment in February, 1995. Drugs and paraphernalia were seized and Gloria was charged with possession with intent to distribute. The file also reveals that a black handgun was found, though Gloria was not charged. <u>Maryland v. Gloria</u>, CR V31034 (Howard Co. Md.). Gloria was charged in July, 1994 with possession of a loaded blue .38 caliber semi-automatic handgun in a vehicle. <u>See</u> Police Report, A - 188. These charges were dismissed in 1995, but the fact that Gloria possessed this gun would have damaged him in cross-examination. <u>See</u> <u>Maryland v. Gloria</u>, CR 62895 (Anne Arundel Co., Md.).

Trial counsel was obviously aware that Gloria would testify, so counsel had no reasonable basis for failing to secure the police and court records concerning Gloria's past charges. Trial counsel's failure in this regard prejudiced Higgs, as the resulting information would have impeached Gloria and weakened the evidence against Higgs. If Higgs's possession of a .38 revolver at the Chaconia and/or Cherry Lane incidents was probative for the Government, <u>see</u> *DCO*, A - 122, then Gloria's possession of a .38 weapon was equally probative for the defense. As a participant in the murders, who distanced himself from the murder weapon, evidence of Gloria's history with .38s would have suggested that Gloria had a bigger role in the murders than he admitted.

The District Court indicated that the evidence of Gloria's possession and use

of .38s was too attenuated for its absence to prejudice Higgs. *DCO*, A - 133. That conclusion was erroneous in the context of this case. Critical to the Government's case were evidence that Higgs owned and had previously used .38 caliber weapons, and Gloria's testimony that Higgs took a .38 with him on the night of the offense. Id. at A - 122. The proffered evidence was inculpatory of Gloria for similar reasons, and

would have suggested another reason for Gloria to lie – the murder weapon was actually his, not Higgs's. A jury that believed Gloria was deceptive about his role would likely not have convicted Higgs.

**Gloria's Recantation.** Higgs has presented a declaration indicating that Gloria has recanted his trial testimony. See Durand Declaration, A - 463. Gloria's recantation exonerates Higgs from capital murder because without Gloria, there is no evidence from which a jury could conclude that Higgs had the specific intent to kill.

The District Court denied relief on this claim, based on the high standard for a claim of actual innocence, and because recantations are generally disfavored. *DCO*, A - 123. Petitioner acknowledges that the standard for showing actual innocence is high. See Schlup v. Delo, 513 U.S. 298, 324, 327 (1995); House v. Bell, 574 U.S. 518, 553 (2006). But that high standard must be considered in light of the actual evidence against Higgs. The evidence in this case for capital murder was weak.

15

There was no allegation that Higgs pulled the trigger. The Government used circumstantial evidence in an attempt to argue that Higgs "directed" the murders, but the strongest evidence for this, if not the only evidence (Gloria's testimony), is now discredited.

Further, the reliability of Gloria's exoneration of Higgs is reinforced by the fact that he has consistently maintained that he was asleep to the police, the mother of his child, Keon Dacosta, and now to Higgs's investigator. The only time he told a different story — one that implicated Higgs for capital murder — was to the jury, for his own benefit. Thus, Higgs has made the requisite showing that he is innocent, and/or innocent of capital murder, and/or innocent of the death penalty. His execution would be "inconsistent with the Constitution." House, 574 U.S. at 553 (citing Herrera v. Collins, 506 U.S. 390, 417 (1993)).

**B.     Willis Haynes.**

The Government's theory was that the decedents were killed because of an argument one of them had with Higgs. According to the Government, Higgs became alarmed when he saw one of the victims writing down his license number, fearing she would retaliate against him. This supposed motive for killing three human beings is unconvincing. Other evidence, which counsel failed to investigate, suggests that Haynes had a much more credible motive for murder.

16

The fact that all three of the decedents were linked to money owed to drug dealers supported the existence of a motive for their murders that had nothing at all to do with the purported argument with Higgs. Indeed, these other motives were far more powerful and credible than the one proposed by the Government. Not only do these motives make more sense, each is linked to *Willis Haynes, the actual killer of the three victims*.

Mishann Chinn, one of the decedents, reportedly had stolen money from "Black," a notorious drug dealer, just weeks before her death. United States Park Police ("USPP") interview of Nikkia Skyria Jackson (1/27/96), A - 191. Black, whose real name is Benny Cephus, threatened to kill Ms. Chinn with a gun several days after this theft. Id.; USPP report of call from Sheena Chinn (1/28/96), A - 192. Mishann's parents confirmed that she had been dating Cephus for several months prior to her death. USPP report (1/29/96), A - 193.

Tanji Jackson, another of the victims, was dating Chico, an associate of Cephus's. The four of them frequented hotel rooms together and were reportedly involved in various illegal activities, including running and selling drugs, prostitution, and check scams. Ms. Jackson was blamed by Chico for his arrest. USPP interview of Derwana Mikiya Black (1/27/96).

The third decedent, Tamika Black, had transported narcotics to New York for

17

Cephus.  Tamika had confided in a friend that she owed a large amount of money to the drug trade and Cephus had threatened to kill her.  USPP report of 1/29/96, A - 203 (call from Jermaine Shaw).

A confidential informant, who had never provided false information in six years, stated that Chico and Cephus killed the women in retaliation for Mishann's having stolen money from Black.  USPP report (2/2/96), A - 195.  Numerous other reports corroborate that Ms. Chinn and Ms. Jackson were dating Chico and Cephus, and had recently had a dispute with them at a hotel in Silver Spring, Maryland.  USPP interview of Patricia Boswell (1/30/96), A - 196; USPP report of 1/31/96 call from Kim Garey, A - 197; USPP report of 1/31/96 investigative activity, A - 198; partially redacted USPP report of 2/7/96 interview of unnamed source, A - 199.

Another confidential source confirmed Ms. Chinn's theft, and stated that the "girls were killed because one of them ripped off a drug dealer of $60,000 in drugs." This source stated that Tanji Jackson stole the money and the "fat girl" was a drug carrier.  USPP report of activities, A - 1015.

A third confidential source corroborated that the women were drug couriers and were killed because one had stolen $60,000 worth of drugs from a dealer who then threatened to kill her.  USPP report (2/27/96), A - 200.

Higgs sought discovery of the identity of the confidential informants, see.

*Discovery Motion*, at 13, A - 84, which the District Court improperly denied. This was significant error. Higgs has made, at a minimum, a *prima facie* showing of ineffectiveness and of <u>Brady</u> violations. Faced with these showings, the District Court should have ordered discovery of these informants, so that Higgs could further develop and prove his claims.

Additional USPP reports state that *Haynes killed the victims over money*. <u>See</u> USPP interview with Sheree Marjorie Blake (5/29/96), A - 204, describing statements made by Robert Henderson, Haynes's brother. Both Sheree Blake and Patrice Birdine were present when Henderson made these statements. <u>Id.</u> Blake and Birdine were interviewed separately and each confirmed that Henderson told them that Haynes had killed the three women over a theft of some money. USPP report of 5/29/96, A - 206. Had trial counsel spoken to Birdine, she would have confirmed that Henderson told her that Haynes had shot the women over money they had stolen. Birdine Declaration, A - 416.

There is still more evidence providing Haynes with a drug theft motive. Haynes was reported to have been the "muscle" for a drug operation. USPP report, A - 200. This strongly suggests that *Haynes was the "muscle" for Black and Chico, to whom the victims owed a great debt*, and that Haynes carried out the murders because of the decedents' theft of money from himself, Black and Chico.

Reports outlining this theory, which would have gone a long way toward exonerating Higgs, were *handed* to counsel in discovery, but counsel failed to investigate or develop the information contained in those reports. This failure to investigate was unreasonable and prejudicial. Counsel went forward with no theory of the crime, other than to generally dispute that Higgs directed the killings – an argument that could only have been strengthened by evidence of Haynes's motive to kill.

Trial counsel has a duty to investigate all available defenses, including that the shooter had an independent motive to kill the decedents. In the absence of any meaningful investigation, counsel's failure to pursue this evidence was patently unreasonable. While courts defer to strategic choices made *after thorough investigation*, Strickland, 466 U.S. at 690-91, choices made in the absence of investigation are not only not entitled to such deference. They are not "strategic" choices at all. See, e.g., Soffar v. Dretke, 368 F.3d 441, 476-77 (5th Cir. 2004) (trial counsel ineffective where they failed to conduct adequate investigation); Fisher v. Gibson, 282 F.3d 1283, 1291 (10th Cir. 2002) ("counsel has a duty to investigate all reasonable lines of defense"). Higgs was prejudiced because a jury that heard this evidence of Haynes's motive would have been all the more likely to discount the Government's scanty evidence that Higgs directed the murders.

## C. Enidsia Darby

Darby was called as a Government guilt phase witness. She testified that she dated and lived with Higgs. TT 9/29/00, 117, A - 328. She described discovering that he was dating another woman, leading to an argument and fight. Id. at 133-34, A - 329-30. She testified that Higgs "stuck a gun up to [her] head," and threatened to kill her. Id. at 134-35, A - 330-31. She also testified that Higgs threatened to kill Andrea Waters if Waters called the police about an alleged check fraud scheme. Id. at 157, A - 332. Much of this was untrue.

On cross-examination, Darby agreed that in the first incident there was some mutual fighting involved, and that the police, who were called in response to this incident, were unable to find a gun. TT 9/29/00, 175, 178, A - 333-34. However, trial counsel failed to make known to the jury other critical facts about this incident.

The police report about this incident describes Darby and Higgs as "mutual combatants." According to the police report, made at the time of the alleged event on September 13, 1995, there were no threats to Darby and no allegation that Higgs held a gun to her head. Darby Declaration, A - 465.

Trial counsel did not make any attempts to interview Darby prior to her testimony against Higgs. Undersigned counsel's representative has since interviewed Darby and confronted her with the September 13, 1995 police report. In response,

21

Darby acknowledged that Higgs did not hold a gun to her head or threaten her. <u>See</u> Darby Declaration, A - 465-68.

Darby also attests that when she was interviewed by the USPP, she was threatened that she would be charged as an accomplice to Higgs and Haynes, and that the investigators offered to help her with the Parole Commissioner. Darby Declaration, <u>id.</u> Darby went along with the story about Higgs because she was afraid of being charged with additional crimes and because she hoped the USPP would help her to obtain parole on her own charges. <u>Id.</u>

The police report of the Darby incident lists Keon Dacosta as a witness to it. A - 207. Had trial counsel interviewed Dacosta about the incident, he would have confirmed that he was present, and that Higgs did not threaten Darby or hold a gun to her head. Dacosta Declaration, A - 458. In fact, Dacosta attests that Darby attacked Higgs and he "put his hands up to protect his face, but he didn't hit back or grab her." <u>Id.</u>

Finally, had trial counsel interviewed Darby's close friend Shanta Doby, she would have confirmed that Darby told her all about the incident with Higgs, but never stated that Higgs pulled a gun on her, threatened her or hurt her in any way. Doby Declaration, A - 478.

Doby also attests that she was interviewed by the USPP, and told them what

Darby said to her about the incident with Higgs. Id. The Government did not reveal to the defense that Darby told Doby about this incident, but did not tell her close friend that she had been threatened by Higgs – with or without a gun. Doby Declaration, A - 478. Darby's prior inconsistent statement to Doby was important impeachment evidence that the Government failed to disclose.

The Government also failed to disclose that it threatened to charge Enidsia Darby in connection with the homicides, and offered to assist her with the Parole Commissioner if she cooperated. Darby Declaration, A - 465-68.

The Government's failure to disclose the combination of coercion and offers of favorable treatment used to elicit Darby's testimony violates due process. See, e.g., United States v. Scheer, 168 F.3d 445 (11th Cir. 1999) (Government's failure to disclose its intimidation of witness was Brady violation); Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) (failure to disclose understanding that witness would receive benefits violated Brady).

Evidence capable of impeaching a prosecution witness is Brady material that must be disclosed. See United States v. Bagley, 473 U.S. 667, 676 (1985). In assessing a Brady violation, "[t]he question is not whether the [Petitioner] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict

worthy of confidence." <u>Kyles</u>, 514 U.S. at 437. In other words, if there is "any reasonable likelihood" that the non-disclosure could have "affected the judgment of the jury," relief must be granted. <u>Napue</u>, 360 U.S. at 271; <u>Giglio</u>, 405 U.S. at 154.

Together with the Government's other failures to disclose, its failure to reveal evidence impeaching Darby's testimony likely affected the verdict.

### D. Dominick Williams.

Dominick Williams is a jailhouse informant who testified that Higgs allegedly made incriminating statements to him while in jail. TT 10/4/00, 21-114, A - 335-428. Higgs alleged that Williams's testimony was false at least in part because Higgs was not even housed in the same area as Williams during a portion of the time he allegedly made them. Moreover, the name "Domenick Williams," is itself an alias, and "Williams" also had open charges pending against him in Philadelphia under another name, a fact not revealed by the Government at the time of trial. Higgs sought discovery to support his allegations about Williams. *Discovery Motion* at 10, A - 81. Although three of six items of evidence that the court relied on as conclusively establishing Higgs's guilt came from Williams, <u>see</u> *DCO,* A - 123-24, the court denied the requested discovery.

### E. Richard Diolamou and Wondwossen Kabtamu.

Diolamou and Kabatamu gave testimony linking Higgs to the Chaconia

Nightclub and Cherry Lane shootings. Higgs alleged that the government provided consideration to Diolamou and/or Kabtamu in exchange for their testimony. *2255 Motion*, at 43. Higgs sought discovery to support this allegation. *Discovery Motion*, at 13-14, A - 84-5. Although the court relied in part on this evidence as conclusively establishing Higgs's guilt, <u>see</u> *DCO*, A - 124, it denied the requested discovery.

Higgs alleged that the Government provided undisclosed assistance with respect to immigration matters to Diolamou and Kabtamu in exchange for their testimony. This allegation stated a claim on which relief could be granted. Due process requires the Government to reveal the details of any consideration offered to a witness in exchange for his testimony. <u>Brady</u>, 373 U.S. at 87. Higgs should have been allowed discovery and an evidentiary hearing in order to prove his allegation.

**F.    CBLA.**

As discussed at length in Issue II, the Government relied on the Comparative Bullet Lead Analysis (CBLA) evidence to provide a critical forensic "science" link between Higgs and the Chaconia Nightclub and Cherry Lane shootings. As shown in Issue II, we now know that the CBLA evidence lacks all probative value.

The Government achieved the admission of the Cherry Lane and Chaconia shootings based on this invalid "science." That evidence should not have been admitted. This pseudo-scientific evidence also placed the ammunition found at the

scene in Higgs's possession.

**G. Conclusion.**

Higgs's convictions and sentences of death, based as they are on Gloria's unreliable testimony and inadmissible CBLA evidence, constitute a miscarriage of justice, and are "inconsistent with the rudimentary demands of fair procedure," <u>Reed v. Farley</u>, 512 U.S. 339, 349 (1994). This Court should remedy this grave injustice by granting Higgs a new trial. <u>See</u> <u>Shukwit v. United States,</u> 973 F.2d 903, 904 (11th Cir. 1992).

But for counsel's deficient performance and Government suppression, counsel could have: (a) presented powerful impeachment of Gloria's testimony that Higgs provided the murder weapon and urged Haynes to commit the homicides; (b) shown that Gloria had a history of possessing and using weapons, including .38 caliber guns; (c) presented evidence that Haynes had a powerful independent motive to kill the decedents; (d) discredited Darby's testimony that Higgs threatened her with a gun; and (e) discredited Williams' testimony about purported admissions by Higgs. Here, the first degree murder convictions were predicated primarily on Gloria's testimony, and secondarily on the testimony of Darby and Williams, as well as evidence that Higgs owned and had used weapons including .38 caliber guns.

Reviewed cumulatively, and factoring in the flawed CBLA evidence, there is

no question but that the evidence that was not presented to the jury was prejudicial and material. Higgs's allegations state a claim on which relief could be granted, and the District Court should – at a minimum – have permitted a hearing to allow him to prove his entitlement to relief.  28 U.S.C. § 2255; <u>Winston v. Kelly</u>, 592 F.3d 535, 552-53 (4th Cir. 2010) (district court properly granted hearing where "it was not implausible that Winston would succeed if he proved the facts alleged in his petition.").

## II.   HIGGS'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH SCIENTIFICALLY UNSOUND EVIDENCE.

Higgs's convictions and sentences rest on now-discredited Comparative Bullet Lead Analysis ("CBLA").  Questions about the scientific underpinnings for CBLA have long been raised.  The tools to challenge CBLA were available to trial counsel, but went unused.  Based on internal studies, the Government was well aware of the factual flaws in this pseudo-science, but it failed to disclose that information to the defense. Despite the existence of information that could have conclusively debunked CBLA at trial, through a combination of ineffective assistance of counsel and Government suppression of information, this did not occur.

### A.   The Use of CBLA at Higgs's Trial.

Haynes shot and killed three women.  There is no allegation that Higgs fired the shots.  There is no direct evidence that Higgs directed, desired, or intended them

to be shot. It was therefore critical for the Government to prove a connection between Higgs and the .38 caliber gun (never recovered) and the ammunition used to kill the victims. See PTT 9/22/00, 119, A - 322 (Government: "it is absolutely critical for the government to put that .38 caliber handgun in Mr. Higgs's hands").

In order to make the connection between Higgs and the ammunition the Government presented evidence showing a CBLA "match" between bullets recovered from Higgs's Briarwood apartment; bullets recovered from the Cherry Lane and Chaconia shootings; and those recovered at the homicide scene. Kathleen Lundy, who worked for the FBI Laboratory Elemental Analysis Group, testified at trial that through CBLA she could "make a determination whether or not two bullets are from the same melt of lead of a manufacturer or different melts of lead." TT 10/06/00, 8, A - 430. Lundy further testified that bullets from the victims and a bullet recovered from the Cherry Lane shooting, to which Higgs pled guilty, were "analytically indistinguishable" and "originated from the same source or melt of lead at a manufacturing plant." Id. at 18, 32, A - 431, 436; see also id. at 35, A - 431, 436-37. She further testified that bullets used in the Chaconia nightclub shooting were indistinguishable from bullets found at the Briarwood apartment and that, as a result, the bullets "originated from the same melt of lead at an ammunition plant." Id. at 27-29, 40, A - 432-34, 439.

Lundy's testimony was essential to the Government's case. The Government argued the CBLA connection in its opening and closing statements. TT 9/26/00, 45-46, A - 326-27 (bullets provided links between Higgs and other shootings); TT 10/10/00, 124-26, A - 441-43 (relying on CBLA matches in closing). CBLA was the only evidence linking Higgs to the murders that was not subject to impeachment. Moreover, the Government relied on CBLA to gain admission of the Chaconia shooting – without this "scientific" link, that damaging piece of bad-act evidence would have been inadmissible. PTT 9/22/00, 121-23, A - 323-25. Lundy's testimony linking Higgs to bullets recovered from the decedents, and enabling admission of evidence of the Chaconia shooting, invalidated Higgs's capital murder convictions and death sentences.

### B. CBLA is Scientifically Invalid and Therefore Inadmissible.

It is clear that CBLA matching is a sham. It relies on two assumptions: that each batch of lead used to manufacture bullets is *homogenous* and *unique*. These assumptions, however, are unprovable and inaccurate. As a result, the scientific community has concluded it is impossible to determine that bullets originated from the same source based on CBLA, and the FBI no longer uses CBLA analysis.

Higgs's expert declaration (see Declaration of William Tobin, A - 469) and filings in the District Court laid out in detail the problems with CBLA. These

problems are longstanding, and the scientific consensus debunking CBLA has recently become overwhelming.

In 2002, the FBI commissioned the National Academy of Science, National Research Council ("NRC"), to review the Bureau's principles and procedures for CBLA. The NRC's report concluded that the FBI's bullet-matching techniques are flawed. As a result of the NRC Report, *the FBI announced on September 1, 2005 that it had discontinued using CBLA analysis for any purpose:*

> [N]either scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination.

A - 491.

Other CBLA studies laid the groundwork for the FBI's actions. Comprehensive studies show that sources of molten lead are not unique, i.e., do not have their own metallurgical fingerprint. For instance, Erik Randich, Wayne Duerfeldt, Wade McLendon, and William Tobin, *A Metallurgical Review of the Interpretation of Bullet Lead Compositional Analysis*, 127 FORENSIC SCI. INT'L 174 (2002) ("Randich Study"), disproves the key assumption of "uniqueness."

Another study, undertaken by a team of Iowa State University statisticians also undermines CBLA. See Alicia L. Carriquiry, *et al.*, *Statistical Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead,* Iowa State Univ. & Ames

Laboratory (May 4, 2000) ("Iowa Study"), A - 493. The FBI commissioned this study to examine bullet data with the goal of quantifying the significance of finding a "match" among bullets. Despite their mission to bolster CBLA, the authors concluded that no quantitative estimates of the significance of a "match" could be made.

A study conducted by Dr. Robert Koons, an FBI chemist, and Dr. Diana M. Grant, an FBI forensic examiner, observed an error rate, including false positives and negatives, of *twenty-five to thirty-five percent*. See Robert D. Koons & Diana M. Grant, *Compositional Variation in Bullet Lead Manufacture*, 47 J. FORENSIC SCI. 950 (2002).

A 1991 FBI study, which was not publicly available, found matching bullet compositions in boxes of bullets manufactured seven months apart by one ammunition manufacturer (Federal) and in boxes manufactured fifteen months apart by another manufacturer (Winchester). See E.R. Peele, *et al.*, *Comparison of Bullets Using the Elemental Composition of the Lead Component*, Int'l Symposium on the Forensic Aspects of Trace Evidence, FBI Academy, Quantico, VA (1991). The FBI purchased a total of only sixteen boxes of ammunition, and even in that small sample found compositional matches. This study showed, well before Higgs's trial, that the assumption of uniqueness was false. This alone debunked CBLA. The Government

31

had an obligation to advise the defense of these facts, but it failed to do so.

In order for expert testimony to be considered sufficiently trustworthy to be admissible, its acceptance in the scientific community is tested against five factors identified in <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 593-94 (1993): 1) testability; 2) peer review; 3) error rate; 4) standards controlling use of the technique; and 5) general acceptance in the scientific community. CBLA fails all five factors.

**1.    Testability.**   CBLA has not been comprehensively tested, but all significant studies – including those funded by the FBI in an attempt to show its validity – have resulted in abject failures.  <u>See</u> 1991 FBI Study; Iowa Study; Randich Study.  The 2004 NRC Report states:

> [T]he statistical method used by the FBI may be leading to a false positive rate much higher than that assumed by the examiners. Additional testing would be needed to fully satisfy the <u>Daubert</u>-testing requirement.

NRC Report, 100-01.

**2.    Peer Review.**   CBLA has never been subjected to peer review and publication.  The FBI has the only forensic laboratory in the United States that has ever offered CBLA as evidence in criminal trials, so the scientific community of CBLA practitioners is very small (at times only two examiners).  The National Laboratory Center of the Bureau of Alcohol, Tobacco, and Firearms ("ATF")

explored the possibility of using CBLA, but ATF researchers ultimately concluded it was unreliable and discontinued further research.  See William A. Tobin, *Comparative Bullet Lead Analysis:  A Case Study in Flawed Forensics*, THE CHAMPION (July 2004), at 18 ("Tobin, *A Case Study*").  Likewise, in Europe, the Bundeskriminalamt (German equivalent to the FBI) studied CBLA for over 30 years and rejected its use in criminal trials because of its unreliability.  Id.

3.      **Error Rate.**   The above reports point out several additional flaws in CBLA.  Lundy testified that she did not identify the potential or actual error rate for her opinions.  Nor could she, since that information was and remains unknown.  Identifying a "known" rate of error is impossible because CBLA has never been peer-reviewed.  See NRC Report at 100-01; Tobin, *A Case Study,* at 17 ("Actual error rate of the practice has never been studied or evaluated.").   The limited available information indicates that the error rate is very high.  Both the Randich and Iowa Studies demonstrated that Lundy could not reliably claim, as she did at Higgs's trial, that bullets which are "analytically indistinguishable" come from the same molten source of lead.

4.      **Standards Controlling use of the Technique.**   The FBI did not maintain adequate standards controlling CBLA, and Lundy did not follow the few standards that did exist.  Prior to 1998, the FBI lab conducting CBLA was not

accredited, and it lacked a written protocol for the use of standard deviations in determining whether elemental compositions "matched." Tobin Declaration, A - 476-77.[2]

Lundy conducted the analysis of bullets in this case in 1996, when there was no requirement for the use of a specific standard deviation to set a guideline for compositional "matches." Before 1998, in the absence of a written protocol, Lundy ostensibly used one standard deviation to determine if two measurements were sufficiently similar to one another to declare a "match." However, her data shows that she declared some matches even when her results fell outside one standard deviation. In such instances, where Lundy found the results "close enough," her declaration of a match was unreliable and false. Such manufactured matches (which occurred in Higgs's case) alone call into question the validity of her overall conclusions. In addition, she falsely testified at Higgs's trial that she used two standard deviations in the analysis of this case, when in fact her data shows that she did not. TT 10/6/00, 30, A - 435.

---

[2]These reports were provided to the District Court along with a declaration from Higgs's expert, William Tobin. A - 469. The Tobin declaration provides the history of scientific investigation leading up to the FBI 2005 cessation of the use of CBLA. In addition to showing that CBLA is not valid, the declaration demonstrates two other salient points: 1) some of this information was in the public domain at the time of trial; and 2) the Government knew of, but did not provide to the defense, its own internal studies demonstrating CBLA's invalidity.

The NRC Report also addressed this failure, finding: "The [factor requiring the] existence and maintenance of standards controlling the technique's operation ... in significant part is not satisfied." NRC Report at 100-01. The NRC Report noted that, even after 1998, the FBI had no "detailed standards governing the content of laboratory reports and testimony that may be given by examiners," and the procedures actually followed by the FBI laboratory deviated from the Bureau's written protocol. Id.

**5.** **General Acceptance.** Neither CBLA generally nor Lundy's testimony in particular is generally accepted. Indeed, the theories and techniques underpinning CBLA – and thus Lundy's testimony – have been soundly rejected by the relevant scientific community. NRC Report at 100-01; Randich Study; Tobin Decl.; Iowa Study. See Clemons, 896 A.2d at 1074 (concluding that "the trial court erred in admitting expert testimony based on CBLA because of the lack of general acceptance of the process in the scientific community").

A variety of courts confronting CBLA evidence have accordingly found it unreliable and inadmissible. United States v. McClure, Crim. No. DKC 01-0367, Mem. Op. at 7-8 (D. Md. Nov. 29, 2004) (excluding CBLA testimony because it lacks sufficient scientific foundations, "[T]he so-called expert testimony [CBLA] both lacks sufficient foundation, and even if it did not, should be excluded because of the

danger that a jury would misuse or misconstrue the opinion by giving it more weight than it deserves."); <u>United States v. Mikos</u>, 2003 WL 22922197 at \*3 (N.D. Ill. Dec. 9, 2003) (barring FBI CBLA expert from testifying because the "ultimate conclusion is based upon a series of determinations that lack scientific accuracy"); <u>Clemons v. Maryland</u>, 896 A.2d 1059, 1061-62 (Md. 2006) (holding that Lundy's opinions regarding "CBLA are not generally accepted within the scientific community and are thus not admissible"); <u>Ragland v. Commonwealth</u>,191 S.W.3d 569, 582 (Ky. 2006) (overturning murder conviction because Lundy's CBLA testimony was scientifically unreliable); <u>New Jersey v. Behn</u>, 868 A.2d 329 (N.J. 2005) (overturning conviction based on CBLA).[3]

## C.    The Government Suppressed Evidence Discrediting CBLA.

The Government had information in its possession at the time of Higgs's trial that demonstrated the lack of scientific reliability of the CBLA evidence.  Yet this information was not provided to defense counsel, in violation of due process.

The FBI's analysis, at the time of Higgs's trial, showed that "analytically indistinguishable" sources of lead occur even when the bullets originated from different lead melts, done at different times.  The Government withheld this

---

[3]Lundy has admitted to giving false testimony about CBLA in an unrelated Kentucky criminal case.  She pled guilty to criminal charges resulting from her false testimony. <u>See</u> <u>Ragland</u>, 191 S.W.3d at 578 (discussing Lundy's perjured testimony).

exculpatory evidence. Moreover, though it knew Lundy's conclusions were scientifically suspect, the Government relied on Lundy's testimony to obtain Higgs's capital convictions and death sentences.

In addition to the 1991 FBI Study, described above, the FBI funded the Iowa Study, hoping to quantify the significance of finding a "match" among bullets. The Iowa statisticians presented their results to the FBI in May 2000.[4] Far from validating CBLA, however, the Iowa Study concluded that no quantitative estimates of the significance of a "match" could be made. Specifically, the Iowa Study concluded that there is "difficulty in reliably measuring the quality of bullet lead evidence," and that there is "no reliable measure of the probability of a coincidental match." Id. at 2, A - 494.

In the course of their work, the Iowa researchers uncovered serious flaws in CBLA. First, they acknowledged that the vats of molten lead from which bullets are made are not homogenous. Id. at 15, A - 507 ("[W]ithin each vat the concentration of individual bullets varies because *mixing is not perfect*."). Second, they uncovered problems stemming from geographical bullet distribution. Id. at 17, A - 509.[5]

---

[4]Higgs's trial began in September 2000. Despite the FBI's receipt of the Iowa Study some four months before, it was not revealed to trial counsel.

[5]Because bullets are unevenly distributed, at any given time many of the bullets available in a particular area may come from the same source, decreasing the significance of a "match."

Finally, they pointed out that the above problems are most significant in regard to ammunition manufactured by Remington, because Remington bullets have the greatest amount of overlap in their trace elements. <u>Id</u>. at 19, 26, A - 511, 518. As Higgs's case involves Remington bullets, <u>see</u> TT 10/06/00, 36, A - 438, the importance of this final conclusion cannot be overstated.

Moreover, the Iowa Study *assumed* that bullets manufactured at the same time share similar trace element concentrations. Iowa Study at 12, 18, A - 504, 510. Thus, the Iowa Study accepted without question the unproven and inaccurate assumption that contemporaneously-manufactured bullets share similar trace elements – and *even so*, the FBI-financed researchers uncovered serious problems with CBLA and concluded that determining a likelihood ratio, or rate of finding compositional matches, was *not feasible* and *should not be used in court*. <u>Id</u>.

The 1991 FBI paper was published *internally and was not reasonably available to trial counsel*. The Iowa Study was *entirely secret and unpublished*. Had these materials been provided by the Government, trial counsel would have been able to mount a successful <u>Daubert</u> challenge to the admissibility of CBLA evidence, and/or would have been able to discredit Lundy and the conclusions she offered.

The District Court's conclusion that the 1991 internal study was publicly available, *DCO*, A - 121, was without foundation and should not have been made

without a hearing.  The District Court relied on the fact that the 1991 study was referenced in an article that the District Court itself found.  See id., citing R.O. Keto, *Analysis and Comparison of Bullet Leads by Inductively Coupled Plasma Mass Spectrometry*, 44 J. FORENSIC SCI. 1020 (1999).  The District Court failed to recognize that the author of this article, R.O. Keto, himself was employed by ATF at the time, and therefore had access to the unpublished 1991 study.  Trial counsel did not have such access.  Indeed, Higgs proffered to the District Court that the 1991 study was not made publicly available until a government official requested it through a congressional hearing after Higgs's trial.  At most, the District Court's unfounded supposition that the 1991 study was available shows that a hearing was needed to resolve disputed factual issues.

Even if the District Court's conclusion were correct, that would merely provide further evidence that trial counsel were ineffective for failing to acquaint themselves with the 1991 report.

Moreover, on its own, the 1999 Keto article did not convincingly discredit CBLA.  It contained a citation to one critical study, which was not publicly available.  The Government possessed both the actual 1991 study and the Iowa Study that it funded.  The Government's own studies would have provided for more powerful impeachment of Lundy's testimony than the Keto article.

A criminal proceeding "is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." Ake v. Oklahoma, 470 U.S. 68, 77 (1985). The FBI's own scientific research into CBLA revealed its unreliability. Because this research was not made available to the defense, the prosecution deprived Higgs of evidence that was "crucial to [his] ability to marshal his defense." Id. at 80. The resulting "risk of an inaccurate resolution," id. at 82, requires that relief be granted.

Evidence capable of impeaching a prosecution witness is Brady material that must be disclosed. See Bagley, 473 U.S. at 676; Kyles, 514 U.S. at 437 ("The question is not whether the [Appellant] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Higgs need not "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 435.

The Government's failure to provide trial counsel with critical information with which to impeach the Government's supposed "expert" testimony undermines confidence in the verdict. The District Court should not have summarily denied relief. This Court should either grant relief or remand for discovery and an

evidentiary hearing.

**D.      Trial Counsel Ineffectively Failed to Challenge CBLA.**

Even without the information withheld by the Government, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value.  Counsel's failures to do so were unreasonable.

To fulfill their Sixth Amendment duty to provide effective assistance, counsel must make a reasonable effort to obtain available evidence both to rebut the Government's case and to support the defense.  See Rompilla, 545 U.S. at 388 (counsel required to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on).  Where counsel fails to investigate, his inaction is deficient, not strategic.  Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992).

When a case involves forensic evidence that is central to the prosecution, effective assistance requires a defense attorney to hire and prepare expert witnesses. See, e.g., Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (failure to pursue expert ballistics testimony was ineffective); United States v. Tarricone, 996 F.2d 1414 (2d Cir. 1993) (attorney ineffective in failing to consult a handwriting expert); Sims v. Livesay, 970 F.2d 1575 (6th Cir. 1992) (counsel ineffective for not hiring expert to

analyze bullet holes and powder patterns).

Counsel's failure to aggressively challenge the expert testimony significantly impacted the defense. Lundy's testimony was the only unchallenged and unimpeached evidence linking Higgs to this crime and the other bad act evidence. Had trial counsel prepared, they could have challenged Lundy's testimony. Counsel failed in their duty to: (1) hire and prepare an appropriate expert witness to rebut Lundy's testimony; (2) research the Government's expert's theory; (3) investigate Lundy's prior testimony; and (4) review Lundy's work in this case. Had trial counsel properly prepared, Lundy's testimony would have been excluded or her credibility would have been drastically reduced. Trial counsel's failure to combat the CBLA evidence constitutes deficient performance.

### 1. Failure to hire and prepare an expert.

Trial counsel knew the Government planned to offer CBLA evidence, yet failed to retain an expert. No expert with any knowledge of CBLA was ever consulted, and trial counsel accepted Lundy as an expert in CBLA without asking a single question about her credentials. See TT 10/06/00, 8, A - 430.

Tobin's declaration represents the type of expert opinion trial counsel should have obtained prior to trial. Information consistent with Tobin's affidavit was available at the time of trial. As early as 1970, metallurgists began questioning the

techniques the FBI was using to compare the elemental composition of bullets. Analysis of these techniques began to appear in published case law well before Appellant's 2000 trial. Testimony from FBI agents was scrutinized, for instance, in Jones v. State, 425 N.E.2d 128 (Ind. 1981).[6]

Any competent metallurgist could have made many of the points made by Tobin in his declaration. A qualified expert would have pointed out the dangers of assuming that compositionally similar bullets came from the same source and would have explained why that assumption is not analytically sound. Trial counsel, however, did not seek an expert to confront the CBLA testimony, placing counsel's representation well below objective standards of reasonableness. See, e.g., Driscoll v. Delo, 71 F.3d 701, 706-07 (8th Cir. 1995) ( "defense counsel's failures to prepare for the introduction of the serology evidence, to subject the state's theories to the

---

[6]In Jones, an FBI agent compared the elemental composition of several bullets. Although the agent used a different kind of testing to determine the amount of trace elements in the bullets, he reached a similar conclusion to that advanced by the FBI here: that elemental similarities meant the bullets "could have come from the same" source. Id. at 131. Although the State Supreme Court held that such evidence was admissible, the dissent identified the problems with the agent's conclusion. According to the dissent, the FBI's conclusions were unsupportable in light of "testimony that as many as 100,000 bullets are produced from the same batch of lead, that 200 boxes of bullets of similar composition would in turn result, and that all retailers in a particular geographic area might consequently market bullets of similar composition." Id. at 136 (Hunter, J., dissenting). In other words, Justice Hunter made many of the same points that Tobin and other now make discrediting the "science" of CBLA, but in a published opinion almost two decades before Higgs's trial.

rigors of adversarial testing, and to prevent the jury from retiring with an inaccurate impression ... fall short of reasonableness under the prevailing professional norms"). Had counsel taken these basic steps, counsel could have developed an evidentiary basis to exclude Lundy's testimony altogether (<u>McClure</u>, *supra*.), or counsel could have demonstrated to the court and jury that Lundy's testimony was false, misleading and unworthy of belief, as was found in <u>Ragland</u>, *supra*.

### 2. Failure to timely raise new CBLA evidence.

Counsel failed to timely bring to the attention of the District Court the new evidence discussed herein, demonstrating that CBLA is unscientific and unreliable. As this evidence continued to mount, effective counsel would have brought that evidence to the District Court's attention through the filing of a Motion for a New Trial pursuant to Fed. R. Crim. P. 33. A Rule 33 Motion would have to have been filed within three years of the verdict. Rule 33(b)(1).

The guilty verdict was rendered by the jury on October 11, 2000. Higgs was sentenced to death on October 26, 2000. Thus, the three-year period for his Rule 33 Motion was exhausted by the time his Petition for Certiorari was denied on November 29, 2004. <u>Higgs v. United States</u>, 543 U.S. 999 (2004). The 2003 Randich study, the 2002 FBI commissioning of the National Research counsel, the FBI's suspension of the use of CBLA, and numerous other available challenges to CBLA were available

before the time for filing a Rule 33 Motion expired. Lundy was also charged with false swearing regarding CBLA prior to the expiration of the time for filing a Rule 33 Motion. Throughout this time, Higgs continued to be represented by trial counsel, who should have raised this new evidence.

### E. Prejudice and Materiality.

Had the CBLA evidence not been admitted, the evidence at trial would have been dramatically different for two reasons. First, there would have been no unimpeached evidence linking Higgs bullets taken from the crime scene to Higgs's apartment. Second, CBLA enabled the Government to introduce prejudicial Rule 404(b) evidence. Based on the CBLA evidence, the prosecution was permitted to draw links between Higgs and two other instances of violent bad acts (the Cherry Lane and Chaconia shootings).

The defense argued that such prior bad acts were presented only to show propensity for violence, and had no independent relationship to the offenses being tried. The Government claimed a "critical" need to put the .38 caliber handgun in Higgs's possession. Id. at 119, A - 322. The Government did this by showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings. Id. at 121, A - 323 (bullets "match[] the metals, the metal element analysis"). Thus, the Government

countered, the Chaconia and Cherry Lane shootings were not being offered to show violent propensity – prohibited by Rule 404 (b) – but instead to show that Higgs possessed the same ammunition as used in the killings.

However, that link does not exist. CBLA is invalid, and therefore the Cherry Lane and Chaconia shootings lose whatever relevance they possessed to prove identity or opportunity.

In a case where the central contested issue was whether the shootings were done at Higgs's behest, where all other evidence against Higgs was impeached, and where the Government professed a "critical" need to put the bullets and gun in Higgs's possession, the prejudice caused by the improper admission of these two shootings is clear. The uniquely prejudicial nature of evidence that a defendant has committed prior crimes has long been recognized. See, e.g., Michelson v. United States, 335 U.S. 469, 476 (1948); Old Chief v. United States, 519 U.S. 172, 180-92 (1997). Moreover, the CBLA testimony was material under Brady not just at the guilt phase, but at the penalty phase of trail, as well. The District Court failed to consider at all the effect on the penalty phase that resulted from the guilt phase admission of CBLA junk science, which in turn permitted the introduction of otherwise completely unrelated, irrelevant and prejudicial evidence of other purported "bad acts."

**III.    HAYNES'S CONFESSIONS WERE IMPROPERLY ADMITTED.**

Two statements made by Willis Haynes were used against Higgs at trial.  First,

during the guilt phase, the jury heard a tape-recorded telephone conversation in which

Melvin Grayson read a *Washington Post* article recounting Haynes's confessions,

which directly implicated Higgs as "triggering" the murders:

> [A]ccording to testimony and Haynes's confessions to U.S. Park Police
> and FBI agents, the slayings were triggered by an argument between
> Higgs and Jackson during a party at Higgs's Laurel apartment just
> before the attack.

TT 10/5/00, 49, A - 1006 (hereafter "first statement").

Second, at the penalty phase Captain Rule testified – in support of the

obstruction of justice aggravating factor – that Haynes told him:

> After they returned to Mr. Higgs's apartment at the end of the evening
> ... they went into the apartment, began cleaning up the apartment and
> throwing out various items....  [A]s to the murder weapon Higgs drove
> the van down to Anticostia [sic] Park and pulled over on a spot on
> Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool,
> and [Mr. Haynes] ran and threw the gun into the river.

TT 10/18/00, 150-51, A - 1004-05 (hereafter "second statement").

The introduction of each statement violated Higgs's right to confront and cross-

examine as secured by the Sixth Amendment.  Crawford v. Washington, 541 U.S. 36

(2004); Bruton v. United States, 391 U.S. 123 (1968).  Under Crawford, when a

witness is not available for cross-examination, admission is only permitted where

there was a prior opportunity for cross-examination. <u>Crawford</u>, 541 U.S. at 68-69.

Because Haynes was not available to testify and there was no prior opportunity for

cross-examination, Haynes's statements were improperly admitted.

### A.     The First Confrontation Violation.

The District Court found that trial counsel objected to admission of the first

statement on Fifth Amendment, but not on Sixth Amendment grounds.  *DCO*, A -

139.[7]  Counsel's failure to object on Sixth Amendment grounds was ineffective, as

there was ample existing authority upon which to base the objection.  Reasonable

counsel would have raised both bases for challenging the statement.

We show here:  (1) Higgs did not adopt Haynes's statements; and (2) trial and

appellate counsel were ineffective for failing to raise the Sixth Amendment objection.

### 1.     Higgs did not adopt Haynes's confession.

Under the Federal Rules of Evidence, "[a] statement is not hearsay if [it] is

offered against a party and is a statement of which the party has *manifested* an

adoption or belief in its truth."  Fed. R. Evid. 801(d)(2)(B).  To conclude that a

statement constitutes an adoptive admission,  "the statement [must be] such that,

under the circumstances, an innocent defendant would normally be induced to

---

[7] This Court in <u>Higgs 1</u> found that counsel did not object at all to the admission of
the tape recording at trial, but instead only objected unsuccessfully to the court's
instructions allowing the jury to consider Higgs's silence during the phone call as an
adoptive admission.  353 F.3d at 310.

respond," and "there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." United States v. Williams, 445 F.3d 724, 735 (4th Cir. 2006) (quotation omitted). Higgs did not adopt Haynes's confession.

Mere silence is not enough. United States v. Hale, 422 U.S. 171, 176 (1975) ("In most circumstances silence is so ambiguous that it is of little probative force."). Therefore, "[a] trial court should be most reluctant to credit mere silence – inherently ambiguous – as 'conduct' sufficient for adoption of an inculpatory statement." United States v. Coppola, 526 F.2d 764, 769 n.2 (10th Cir. 1975); see, e.g., Williams, 445 F.3d at 735 (district court erred in finding defendant's silence in response to "did he kill somebody or what?" an adoptive admission). By his mere silence, Higgs did not manifest an adoption or belief in the article's truth.

### 2. Trial and Appellate Counsel Were Ineffective.

At time of trial, there was ample pre-Crawford authority upon which to challenge the admission of the first statement under the Sixth Amendment. Sixth Amendment jurisprudence at that time barred the admission of a co-defendant's out-of-court statement, especially where the statement shifted blame to the defendant. E.g., Lilly v. Virginia, 527 U.S. 116, 133 (1999); Gray v. Maryland, 523 U.S. 185, 194-95 (1998); Lee v. Illinois, 476 U.S. 530, 541 (1986); Ohio v. Roberts, 448 U.S.

56, 66 (1980); <u>Jenkins v. Anderson</u>, 447 U.S. 231, 238 (1980); <u>Douglas v. Alabama</u>, 380 U.S. 415, 418-20 (1965); <u>Crawford v. United States</u>, 212 U.S. 183, 204 (1909). Indeed, one year before trial, <u>Lilly</u> reiterated that the admission of a co-defendant's confession violates the Sixth Amendment if the confession inculpates the accused. <u>Lilly</u>, 527 U.S. at 134. Trial counsel's failure to object on Sixth Amendment grounds was therefore deficient.

While there was a substantial basis for raising the Sixth Amendment objection at trial, following trial, <u>Crawford</u> conclusively demonstrated that the statement's admission violated the Sixth Amendment. Appellate counsel were thus deficient for failing to bring <u>Crawford</u> to this Court's attention while this case was on direct appeal.

<u>Crawford</u> was decided on March 8, 2004; Higgs's direct appeal concluded November 29, 2004. Counsel could not have had any sound reason for not bringing <u>Crawford</u> to this Court's attention.[8] It is unquestionably deficient for counsel to fail to provide controlling authority on a claim in a capital direct appeal.

---

[8] Counsel's failure to develop the Confrontation Clause challenge in Higgs's opening brief precluded appellate review. <u>United States v. Green</u>, 964 F.2d 365, 371 (5th Cir. 1992) (failure to provide adequate legal or factual analysis precludes appellate review).

Despite having ineffectively waived the Sixth Amendment claim, counsel had no excuse for failing to bring <u>Crawford</u> to this Court's attention, since it was decided months before this Court's decision in <u>Higgs 1</u>.

Crawford said: "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" Crawford, 541 U.S. at 60. Crawford elucidates what competent trial and appellate counsel should have recognized at the time of Higgs' trial: the Confrontation Clause is not satisfied even though a rule of evidence might be fulfilled. The Confrontation Clause demands actual confrontation.

In this case counsel's deficient performance – either when considered alone or together with counsel's other various errors – undermines confidence in the outcome of the trial, sentencing, and direct appeal. Had trial counsel raised the appropriate objection, there is a reasonable probability that the first statement would not have been admitted. Given the significance of the first statement, there is a reasonable probability that the result of the trial or sentencing would have been different without its admission. Moreover, had appellate counsel raised the claim, there is a reasonable probability that Higgs's convictions and/or death sentences would have been vacated.

The District Court ruled that counsel's failure to make a proper objection or litigate the issue, was not unreasonable, based on a single Court of Appeals decision. *DCO*, A - 140 (citing United States v. Allen, 10 F.3d 405, 413 (7th Cir. 1993).) The Court erred in relying on conjecture that counsel made a reasonable decision not to

51

raise the Sixth Amendment claim based on <u>Allen</u>. This is especially improper, since the Court took no evidence from counsel and is only guessing about their reasons. <u>Griffin v. Warden</u>, 970 F.2d 1355, 1358 (4th Cir. 1992) ("Courts should not conjure up tactical decision an attorney could have made").

The District Court's conclusion was even more egregious because at the time of Higgs's trial at least one circuit had expressly held the opposite. <u>See</u> <u>United States v. Monk</u>, 774 F.2d 945, 952 (9th Cir. 1985). Thus, Higgs's counsel had a clear basis for making the Sixth Amendment objection.

Higgs was prejudiced at trial and on direct appeal.[9] The Government relied on the first statement throughout trial, arguing in closing, "Again, I refer you back to Transcript Number 1b, the conversation with Melvin Grayson, where he is read the newspaper article, learning about his co-defendant's conviction and clear statements incriminating Mr. Higgs ...." TT 10/10/00, 136, A - 1008.

The article's substantive content was particularly damaging. Jurors place great weight on confessions. <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 296 (1991); <u>Bruton</u>, 391 U.S. at 126. Here, Haynes accused Higgs of "trigger[ing] ... the slayings." Given that Higgs's relative culpability was a central issue at trial and

---

[9]Because Higgs's confrontation claim was not before this Court, the determination that "[w]e find no error in the district court's decision to admit the recorded telephone conversation between Higgs and Grayson," <u>Higgs 1</u> at 310, does not resolve Higgs's instant challenge.

sentencing, the prejudicial effect of this evidence cannot be overstated. Haynes's statement lent critical weight to the Government's theory that Higgs initiated and was responsible for the killings.

### B. The Second Confrontation Violation.

Counsel also failed to raise appropriate objections to the admission at penalty phase of the second statement. The second statement was made by Haynes to a law enforcement officer during a custodial interrogation. TT 10/18/00, 149-50, A -1004-05. It therefore falls within the *core class* of statements deemed "testimonial." Crawford, 541 U.S. at 68. Higgs had no opportunity to cross-examine Haynes. Accordingly, the admission of Haynes's statements violated Higgs's right to confrontation. See id. at 68-69; Lilly, 527 U.S. at 134, 139.

The fact that this Confrontation Clause violation occurred in the capital sentencing context does not insulate it from review. Although the rules of evidence do not apply at sentencing, see 18 U.S.C. § 3593(c), it does not follow that the Confrontation Clause permits the introduction of a co-defendant's confession during the sentencing phase of a capital case, especially when it inculpates the defendant.[10] Such evidence is "presumptively unreliable." Lee v. Illinois, 476 U.S. 530, 545

---

[10]See United States v. Corley, 348 F. Supp. 2d 970, 978 n.1 (N.D. Ind. 2004) ("Congress's decision in 18 U.S.C. section 3593(c) to make the Federal Rules of Evidence inapplicable to the penalty phase cannot alter the bedrock Confrontation Clause principles identified by the Crawford Court.").

(1986); see Lilly, 527 U.S. at 137; California v. Green, 399 U.S. 149, 158 (1970); Monge v. California, 524 U.S. 721, 731-32 (1998). Evidence too unreliable to be considered during trial cannot be considered during the penalty phase, when the need for "reliable decisionmaking" is at its apex. See Deck v. Missouri, 544 U.S. 622, 632 (2005).

At the time of Higgs's trial, existing law barred the admission of "presumptively unreliable" evidence during the penalty phase of a capital case. See Monge, 524 U.S. at 731; California v. Ramos, 463 U.S. 992, 998-99 (1983). Accordingly, the admission of Haynes's "presumptively unreliable" confession at Higgs's penalty phase violated the Sixth Amendment, as well as Higgs's due process right to be sentenced on the basis of reliable information. See United States v. Galbraith, 200 F.3d 1006, 1012 (7th Cir. 2000).[11]

Because Haynes's confession clearly inculpated Higgs and established the obstruction of justice aggravator, trial counsel had no sound reason for failing to object to the admission of Captain Rule's testimony on Fifth and Sixth Amendment grounds.[12] In fact, the deficiency in counsel's performance is especially pronounced

---

[11]United States v. Brown, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006), recognizes that the Confrontation Clause should preclude unreliable hearsay in a capital penalty phase.

[12]On direct appeal this Court stated, "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding," Higgs 1, 353 F.3d at 324.

because counsel raised other objections to the admission of this evidence.  <u>See</u> TT

10/18/00, 149, A - 1004 (objecting that Haynes's statement is "more prejudicial than

probative").  Counsel recognized the prejudice from this evidence and sought to

prevent its admission, yet failed to articulate a constitutional basis for the objection.

Counsel's failure constitutes deficient performance.

Higgs acknowledges that this Court considered his Sixth Amendment claim

regarding the second statement on direct appeal and concluded that the alleged error

did not "affect[] Higgs's substantial rights." <u>Higgs 1</u>, 353 F.3d at 325.  That decision

should be revisited for two reasons.

First, appellate counsel ineffectively failed to provide this Court with

<u>Crawford</u>, which establishes that "[w]here testimonial statements are at issue, the only

indicium of reliability sufficient to satisfy constitutional demands is the one the

Constitution actually prescribes: confrontation." <u>Id.</u> at 68-69. Given the significance

of <u>Crawford</u>, and the fact that the admission of Captain Rule's testimony palpably

prejudiced Higgs, this Court should reconsider its ruling in <u>Higgs 1</u>.  <u>See</u> <u>Davis v.

United States</u>, 417 U.S. 333, 342 (1974) (holding that "the Court of Appeals erred in

holding that 'the law of the case' precluded §2255 relief on the basis of an

However, <u>Crawford</u>, 541 U.S. at 68-9,  undermines that statement. <u>See</u> <u>United States
v. Jordan</u>, 357 F. Supp. 2d 889, 901 (E.D. Va. 2005) (noting that this Court's <u>Higgs
1</u> *dicta* is "of limited value in a post-<u>Crawford</u> analysis").

intervening change in law"); <u>Sanders v. United States</u>, 373 U.S. 1, 17 (1963) (even though the §2255 issue was previously decided, the petitioner was "entitled to a new hearing upon showing an intervening change in the law"); <u>United States v. Platero</u>, 72 F.3d 806, 811 (10th Cir. 1995).

Second, because trial counsel never raised the Fifth and/or Sixth Amendment grounds, those arguments were waived in this Court. Thus, this Court's review was conducted under the more rigorous plain error doctrine. Since trial counsel also represented Higgs on direct appeal, he was precluded from raising his own ineffective failure to raise this claim. Now that Higgs can and is raising this claim as one of ineffectiveness, the claim should be considered *de novo*. Counsel's failure to raise the correct objection, alone or in combination with other errors, was ineffective, and the death sentences must be vacated.

## IV. THE PROSECUTORS DISCRIMINATED ON THE BASIS OF GENDER IN THEIR EXERCISE OF PEREMPTORY CHALLENGES.

The discriminatory use of gender-based peremptory strikes is forbidden by the equal protection component of the Fifth Amendment's due process clause. <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127 (1994). Higgs's trial prosecutors struck women venirepersons based on their gender. Higgs is entitled to a new trial, or alternatively, discovery and a hearing on his claim.

The three-step procedure for evaluating the propriety of a peremptory challenge established in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), applies to the evaluation of peremptory strikes based on gender. <u>J.E.B.</u>, 511 U.S. at 129; <u>United States v. McMillon</u>, 14 F.3d 948, 953 (4th Cir. 1994).

Under the <u>Batson</u> framework, a defendant must first establish a *prima facie* showing that the prosecution has engaged in the discriminatory use of a peremptory strike by demonstrating "an inference that the prosecutor used [the strike] to exclude veniremen from the petit jury on account of their [gender]." <u>Batson</u>, 476 U.S. at 93-94. If the court finds a *prima facie* case of discrimination, the burden shifts to the prosecution in the second step to articulate a facially neutral explanation for the strike. <u>Id</u>. at 94, 97. In the third step the court must decide whether that explanation is a pretext for discrimination, and if the defendant has established discrimination. <u>Id</u>. at 97-98.

### A.    Step One: *Prima Facie* Showing.

"The burden of establishing a *prima facie* case" is "minimal" and "not onerous." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993). A *prima facie* case is established if there is even a "suspicion" of discrimination. <u>Johnson v. California</u>, 545 U.S. 162, 172 (2005). That standard is easily satisfied here, because the

Government used its peremptory strikes to obtain an *all-male jury*. Indeed, the District Court assumed without deciding that Higgs had established a *prima facie* case. *DCO,* A - 126.

The prosecutor's strikes were grossly disparate by gender: 13 of 18 peremptory strikes (72.2%) were used against women.[13] Although women made up only 36.5% of the pool for potential strikes, the prosecutors struck women at a rate nearly double their representation. Moreover, though the jury pool was over a third female, the final jury in Higgs's case *was comprised of men only*. That fact strongly supports the *prima facie* case. See, e.g., Mahaffey v. Page, 162 F.3d 481, 484-85 (7th Cir. 1998); Tankleff v. Senkowski, 135 F.3d 235, 249 (2d Cir. 1998).

Higgs also alleged that his prosecutors have engaged in a pattern of striking women from other capital juries. He pled that in another capital case tried at about the same time, the same prosecutors picked another all-male jury. United States v. Lighty, PJM-03-457 (D. Md.). The existence of such a pattern supports a *prima facie* case of discrimination. Miller-El v. Cockrell, 537 U.S. 322, 334-35, 347 (2003).[14]

---

[13]The Government's conceded that 13 strikes were used against women. *Government's Response* at 65, A - 600. Of the 44 prospective jurors, 28 (63.5%) were men and 16 (36.5%) were women.

[14]In Lighty, the same prosecutors used 83.33 percent of their identifiable strikes against women and the final jury was comprised of eleven men and only one woman. Higgs moved for discovery regarding Lighty, which was erroneously denied. Harris v. Nelson, 394 U.S. 286, 290 (1969) (post-conviction discovery required when

**B.     Step Two:  Prosecutors' Gender Neutral Reasons.**

The Government proffered what purport to be gender-neutral reasons for the strikes of women.  See *DCO*, A - 127.  Because the Government's burden at Step Two is quite low, we assume they have met their burden as the District Court found, *DCO*, A - 126-27, and proceed to Step Three.

**C.     Step Three: Higgs has Proven Discrimination.**

Because there is a *prima facie* case, J.E.B. is violated unless the prosecutor gives gender-neutral reasons for the strikes that are clear, specific and related to the particular case.  Batson, 476 U.S. at 98 & n.20.  If the prosecutor fails to give non-pretextual reasons for even one strike, Higgs prevails.  Id. at 89; Miller-El, 537 U.S. at 338-39 ("critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.").

The District Court purported to decide Step Three on the basis of a cold record. *DCO*, A - 127.  At Step Three, however, the critical question is the credibility of the prosecutor's purported reasons, which requires an assessment of the prosecutor's "demeanor" and of "how reasonable, or how improbable," the prosecutor's explanations are.  Miller-El at 339.  The District Court could not properly make such

---

petitioner demonstrates a *prima facie* case for relief).

an assessment without a hearing, particularly since that record shows that the prosecutor's purported reasons are implausible, for the following reasons:

**Juror 19, Sylvia Pulliam Lacky.** The Government claimed that it challenged this juror because she worked as an emergency room nurse, believed in the "sanctity" of life, and had prior jury experience in which the jury found insufficient evidence on one count. *Government's Response* at 68; *Government's Exhibit* 8.[15]

This juror, however, expressed no hesitation about imposing death. She stated that if a person is "taking other people's lives," the death penalty "might be necessary." PTT 9/5/00, 162, A - 259. She further indicated that there were no cases in which she would exclude the possibility of returning a death sentence. Id. at 164-65, A - 260-61. Indeed, her belief in the "sanctity of life" and her work saving lives in an emergency room could just as easily have made her biased against Higgs. The Government's reliance on her prior jury service, and that jury's finding of insufficient evidence on one count, was pretextual, since the Government accepted other similarly situated jurors who were male. Juror 107 was not struck, although he had served on a prior jury which acquitted a defendant. See Juror Questionnaire, A - 866

---

[15]Government Exhibit 8, A - 746 – attached to its 2255 response in the District Court – is a declaration from trial prosecutor Johnston providing ostensible reasons for the strikes. The Government's stated reasons for its strikes, as recited herein, are derived from this declaration, which will not be further cited.

**Juror 43, Mercedes M. Pellet.** The sole concrete reason the Government gave for striking this juror is that she expressed concern about the impact of jury service on her employment. *Government's Response* at 68, A - 603. This explanation is pretextual; there were a number of male jurors who had similar concerns, whom the Government did not strike.

For example, Juror 113's concern about the impact on his career was so substantial that he would be biased in the event of any delays. See A - 880. As a result, the Government moved to excuse him for cause. PTT 9/8/00, 36, A - 296. The "for cause" strike was denied, but the Government accepted him nonetheless.

The Government also did not strike Juror 151, an hourly wage truck driver who indicated that he could not afford to take time off for jury service. PTT 9/8/00, 145, A - 298; A - 894. Nor did it strike Juror 24, despite her indication that jury service could jeopardize her job, id. at A - 767; Juror 86, even though he had a letter from his employer stating that he would only have unpaid leave for his jury service and that this would present a hardship for him, see note accompanying Juror Questionnaire, A - 838 ; or Juror 201, whose service would pose "a significant hardship/impact" to his company president and employees, see A - 923.

**Juror 49, Liliana Beatriz Defeo.** The Government said it struck this juror because she appeared "nervous and kind," believed that no one had the right to take

anyone's life, and appeared unlikely to vote for the death penalty. The juror's actual statements do not, however, support the Government's purported reasons. When asked about her views on the death penalty, Ms. Defeo responded:

Juror:     Well, if someone kills someone, I think they deserve it [the death penalty] if it's guilty beyond a reasonable doubt.

Court:     You say it is appropriate?

Juror:     Yes, sir.

Court:     And is this something you believe as a matter of religion or morals or do you have some other reason why you come to that view?

Juror:     Well, because I believe that no one has the right to take anybody else's life.

PTT 9/6/00, 186-87, A - 264-65.

This exchange makes clear that the juror's statement that "no one has the right to take anybody else's life" was a reference to those who murder. She actually supported the death penalty. See also PTT 9/6/00, 189, A - 266 (juror would not automatically vote for death in triple homicide, but "probably will"); id. at 191, A - 268 ("I think [in a premeditated, deliberate and unprovoked triple murder] it [the sentence] always has to be the death penalty."). The Government's stated reasons for her strike are not consistent with the record and are pretextual.

**Juror 64, Felicia Ann Peppins.** The Government claimed it struck this

62

prospective juror because she had a 28 year old nephew convicted of manslaughter, whom she did not think should have been convicted. Given this opinion and Higgs's age, the Government thought Ms. Peppins might be sympathetic to the defense. Id. But it did not strike similarly-situated men.

Juror 28 had a son with criminal charges, but was not struck by the Government. PTT 9/6/00, 6, A - 262. In addition, Juror 56 had a 25 year old son, Juror 72 had an 18 year old son, Juror 106 had 26 and 28 year old sons, Juror 107 had a 21 year old son, Juror 113 had a 20 year old son, and Juror 151 had three adult male children. See A - 795, 823, 852, 866, 880 and 894. None of these jurors were struck by the Government.

**Juror 69, Karen Marie Warhurst.** The Government claimed it struck this potential juror because her brother, a police officer, was charged with a crime and represented by one of Higgs's attorneys. This was pretext. The Government did not strike Juror 107, though it was aware that the partner of one of Higgs's trial attorneys represented his employer. PTT 9/7/00, 185-86, A - 281-82. In contrast, Juror 69 was completely unaware that trial counsel had represented her brother, or even that her brother had actually been charged with a crime, until the Government informed her. PTT 9/7/00, 51, A - 268.

**Juror 90, Sandra Michele Lee.** The Government said it struck this juror

because she stated that the death penalty is "too harsh" and because she was in the process of adopting two children.

A number of jurors expressed varying opinions about the death penalty, but were not struck by the Government. Juror 201 specifically indicated that he would lean against the death penalty. PTT 9/18/00, 123-33, A - 310-20. Juror 16 stated that he was "apprehensive" to invoke the death penalty. PTT 9/5/00, 138-148, A - 248-59. Juror 106 indicated that he would have to do "soul-searching" to determine if he could impose death, and he was not sure how he might react in actually voting on death. PTT 9/7/00, 176-184, A - 272-80. Juror 107 indicated that he did not know how he might react when it was his turn to vote for the death penalty and it made him nervous to think about it. PTT 9/7/00, 184-196, A - 280-92. When compared to men who were not struck for reservations about the death penalty, it becomes clear that gender was the true basis for striking Ms. Lee.

The Government does not indicate why the fact that Ms. Lee was adopting two children might make her a less favorable Government juror. She certainly did not indicate that adoption proceedings or her personal life would impact jury service. Her impending parenthood of young children is a pretextual reason, since the Government did not strike a number of male jurors with young children.[16] The difference between

---

[16]See Juror 63, A - 809; Juror 38, A - 781, Juror 10, A - 752, Juror 170, A - 909.

stricken Juror 90 and the other jurors with small children is that Juror 90 is a woman. The fact of this juror's impending parenthood of young children was a pretextual reason for this strike.

**Juror 100, Anita R. Monts.** The Government indicated that one of the reasons it struck this juror was because she had a 22 year old son, and therefore might be sympathetic to Higgs. In addition, because she stated that there were some specific cases in which she would never vote for death, the Government deemed her to be weak on capital punishment.

In reality, Ms. Monts was a strong juror for the death penalty. She stated that she favors the death penalty because she feels that "if a person is found guilty ... they should be charged to the maximum that the law permits." PTT 9/7/00, 154, A - 271. She indicated no ambiguity about her support for the death penalty.

The Government's alleged concern that her 22 year old son would make her sympathetic to the defense was pretext. It did not strike a number of male jurors with similarly aged children. See discussion of Juror 64, Ms. Peppins.

**Juror 112, Heidi M. Schrecengost.** The Government allegedly struck this juror because she returned a verdict of not guilty in an assault case during prior jury service and because she was unable to express certainty about imposing the death penalty.

Because the latter purported reason is not consistent with the record in the case, it is pretextual. Her answers during voir dire reveal that she "very strongly" supported the death penalty. She stated that she might always vote death in some cases and there were "no" kinds of cases in which she might never vote for death. PTT 9/7/00, 200-02, A - 293-95.

In addition, the Government's concern over her prior jury service is pretextual, since the Government failed to strike a similarly situated male juror. Juror 107 was not struck by the Government although he had served on a prior jury in which the jury acquitted a defendant. A - 866.

**Juror 124, Orletta J. Harley.** The Government states it struck this juror because her cousin was prosecuted for drug offenses in Charles County and her father served time in federal prison. Yet, this juror did not know anything about her cousin, including whether he had even been detained. PTT 9/8/00, 45, A - 297. This reason is pretextual, especially when compared to Juror 166, whom the Government did not strike, but whose brother was convicted of drug charges in Charles County and was incarcerated there at the time. PTT 9/8/00, 245, A - 303.

**Juror 37, Charlene Catherine Cherry.** The Government alleges that this juror was struck because her answers to death penalty questions "appeared to be rote." Her answers were merely those required by law, including, "I would consider

the circumstances" in voting for a life sentence versus a death sentence.  PTT 9/6/00, 81, A - 263.

Many male jurors answered questions similarly, but were not stricken by the Government.  For example, Juror 10 answered "yes, sir" or "no, sir" to nearly every death penalty question posed to him.  PTT 9/5/00,  109-116, A - 239-46.  He did not offer his personal reflections and his answers could be said to have been rote.  Id.  In addition, when answering such questions, Juror 86 simply indicated repeatedly that he would "consider the circumstances." PTT 9/7/00,  116-17, A - 269-70.  His answers were no less "rote" than Ms. Cherry's.  Juror 166 answered either "yes" or "no" to every death penalty question posed to him.  PTT 9/8/00,  244-251, A - 299-309.  He did not give any elaboration, so his answers could be said to be "rote" as well.  The Government's alleged basis for striking Juror 37, that her answers to death penalty questions were "rote," is  pretextual.

The Government says it struck three additional jurors because of their positions regarding the death penalty.  **Juror 173, Terri Lynn Tubergen,** was ambivalent about the death penalty and said that it would be difficult for her to consider.  The Government says that if she found it difficult to consider, they did not believe she was likely to impose death.  **Juror 14, Constance Eze** stated "I'm against [the death penalty]. I'm sorry."  And the Government indicates that they struck **Juror 104,**

**Jeannette R. Delawter** because she stated that "I do not believe in the death penalty." Each of these jurors unambiguously stated their ability to set aside their beliefs and impose the death penalty for an appropriate case. PTT 9/5/00, 137, A - 247; PTT 9/7/00, 173, A - 1009; PTT 9/18/00, 202, A - 321. However, they were each struck by the Government.

Yet male jurors who expressed similar reservations about imposing the death penalty were not stricken by the Government. See discussion of male jurors with similar views who were not struck with respect to Juror 90, Sandra Lee, above.

The failure to strike male jurors with similar views makes clear that gender was the true basis for striking Ms. Tubergen, Ms. Eze, and Ms. Delawter, and that the reasons offered are pretextual.

### D. Higgs Has Demonstrated Cause and Prejudice Sufficient to Overcome Any Waiver.

The District Court ruled that this claim was defaulted because it was not raised at trial or on appeal. *DCO*, A - 125. While the District Court assumed Higgs could establish "cause" for the default based on his allegation that prior counsel were ineffective, it ruled that Higgs could not establish "prejudice" based on its analysis of the merits of the J.E.B. claim. Id.

Higgs has shown cause and prejudice. Higgs's claim has much more than arguable merit. Trial counsel obviously knew or should have known that the

prosecution was striking a disproportionate number of women from the jury, with the result that Higgs faced an all male jury. These factors should have triggered counsel's objection, development and presentation of the claim. "The omitted claim would have had a reasonable probability of success," making counsel's performance prejudicial because it likely affected the outcome of the appeal. Eagle v. Linahan, 279 F.3d 926, 943 (11th Cir. 2001). Counsel unreasonably failed to raise this valid J.E.B. claim.

## V. COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE AND PRESENT EXTANT MITIGATING EVIDENCE DURING THE PENALTY PHASE.

> [Defense counsel] stood before you just a couple of weeks ago ... he said [] we have been working to gain insight into Mr. Higgs. We are going to present that insight to you. Where, ladies and gentlemen is the insight? *Where in the world is there any evidence that they have presented to you that says this man deserves a lesser sentence? What is it they have told you about this man that says he should be treated less harshly than where these aggravators put him? Where is it?* That his mother died when he was ten, his caring loving mother, that his Aunt Connie is a caring, loving woman so that justifies what he did here? ... He should be punished more harshly because this young man had people who loved him. He was raised by individuals who loved and cared and took care of him. *He wasn't deprived as a child. He wasn't subject to child abuse....* If anything, that fact of his background justifies more the reason for the ultimate penalty in this case.

Government's penalty phase closing argument; TT 10/25/00, 76-77, A - 456-57.

The prosecutor was correct that virtually no mitigation was presented. While there was abundant and compelling mitigating evidence that would have provided the

69

"insight" that counsel promised, it was not presented because trial counsel failed to conduct an adequate investigation into Higgs's background.

In five recent decisions, the Supreme Court has emphasized that capital counsel have a constitutionally-mandated duty to conduct a thorough investigation of potential mitigation evidence in preparation for capital sentencing. See Williams v. Taylor, 529 U.S. 362 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 545 U.S. 374 (2005); Porter v. McCollum, 130 S.Ct. 447 (2009); Sears v. Upton, 130 S.Ct. 3259 (2010). These decisions make clear that in the absence of such an investigation, counsel cannot make reasonable decisions about what evidence to present. Here, Higgs's counsel conducted an inadequate mitigation investigation, which pales when measured against that done in each of those five cases.[17]

---

[17]In Williams, the defendant was evaluated by three mental health experts and counsel interviewed numerous family members. Nonetheless, counsel's performance was deficient because counsel failed to "thoroughly" seek out and present evidence of Williams' difficult childhood and potential mental impairments. Williams, 529 U.S. at 370. The Court noted that capital counsel has an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence, id. at 396, and anything less than a "thorough investigation" constitutes deficient performance. Id.

In Wiggins, counsel uncovered a Presentence Investigation report, which included an account of Wiggins' personal history, Wiggins, 539 U.S. at 523, and social services records about Wiggins and his family. Id. Defense investigators interviewed family members. Id. at 544 (Scalia, J., dissenting). Counsel retained a psychologist who provided opinions based on psychological tests, interviews with Wiggins and his family, and the social service records. Id. at 523, 532; id. at 544 (Scalia, J., dissenting). Counsel retained a criminologist who opined that Wiggins would adjust to prison life. Id. at 526; id. at 544 (Scalia, J., dissenting). The Court

In <u>Gray v. Branker</u>, 529 F.3d 220 (4th Cir. 2008), a capital section 2254 appeal, this Court granted relief based on <u>Williams</u> and its progeny. In <u>Gray</u>, as here, counsel's decision to truncate their investigation was not the result of "reasonable professional judgment." <u>Id.</u> at 231.

The District Court should have permitted Higgs the opportunity to establish his claim at a hearing. "Unless it is clear from the pleadings, files, and records that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing *mandatory*."

---

nonetheless found counsel did not satisfy the Sixth Amendment because they acquired only "*rudimentary knowledge* of [Wiggins'] history from a *narrow set of sources*." <u>Id.</u> at 524.

Defense counsel in <u>Rompilla</u> extensively interviewed members of defendant's family and had him evaluated by three mental health experts, but ineffectively failed to review court records that the prosecution planned to use in support of an aggravating circumstance, and that contained extensive mitigating evidence and leads.

In <u>Porter</u>, as in Higgs's case, defense counsel did not pursue "pertinent avenues for investigation of which he should have been aware" including prior mental health assessments that were available, and thus "failed to uncover and present any evidence of Porter's mental health [] impairment, his family background or his military service." <u>Porter</u>, 130 S. Ct. at 453.

<u>Sears</u> is also particularly apt. Like Higgs's jury, Sears's jury was told that he was a "person, privileged in every way, who has rejected every opportunity that was afforded him." 130 S. Ct. at 3262. However, because his trial counsel conducted an inadequate investigation, <u>id.</u> at 3261, the jury did not learn of the domestic dysfunction that marked his early life and its resultant psychological impact. Like Higgs – whose father introduced him to a life of drug dealing – Sears's brother did the same. <u>Id.</u> at 3263.

United States v. Matthews, 239 Fed.Appx. 806, 807 (4th Cir. 2007) (citing Raines v. United States, 423 F.2d 526, 529 (4th Cir.1970); United States v. Witherspoon, 231 F.3d 923, 925-27 (4th Cir.2000)). This Court should reverse and remand for an evidentiary hearing.

### A. Counsel's Deficient Investigation.

Counsel's investigation was deficient in several respects. They failed to secure available school records, made no meaningful attempt to locate and interview Higgs's father and other relatives, and failed to work effectively with mental health experts.

**School records.** Counsel retained Joel Sickler as Higgs's mitigation specialist. He testified at trial that he was unable to locate any of Higgs's school records except for a two page high school transcript. TT 10/19/00, 176, A - 452. Based upon this transcript, he testified that Higgs "did fairly well" in school and was an "*average to fairly good student* and seemed to have the *aptitude for school*." Id. at 170, 176, A - 448, 452.

This testimony was inaccurate. Current counsel easily obtained over 300 pages of Higgs's school records. See A - 953-961 (excerpts). They show that Higgs was not an "average to fairly good student." Rather, he was diagnosed as learning disabled from an early age, was provided with an IEP (Individual Education Plan, required by federal law for disabled or handicapped students), and struggled to pass even special

education classes. These records also contain psychological reports showing that Higgs was emotionally disturbed and depressed as a young boy, particularly after his mother's passing.

Counsel did nothing to obtain these records. Neither Sickler nor trial counsel tried to find out the correct procedure for obtaining Higgs's special education records, a basic building block of any capital mitigation investigation. Joseph Gordon, Director of Guidance, Hyde Park School District explained in his declaration (A - 962-64), the procedures followed by the New York State Education Department, the Hyde Park School District and the Franklin Delano Roosevelt High School, which Higgs attended. Gordon's declaration also explains that Sickler and trial counsel failed to correctly request the records. As a result, they received only two pages instead of Higgs's full record.[18] The significance of these records is discussed below.

**Higgs's Father.** Sickler testified that he unsuccessfully attempted to locate Higg's father, Alphonso Higgs. However, neither Sickler nor counsel actually tried to locate or speak with Alphonso Higgs. They delegated this critical task to Higgs's

---

[18]Gordon's declaration explains that Sickler and counsel neglected to identify Higgs as a special education student, even though they knew him to be such. Gordon Declaration; Fiester Declaration, ¶ 6, A - 966-67 (counsel's expert knew Higgs was in Special Education). Gordon explains that the process for securing special education records is different than for non-special education pupils and that because undersigned counsel identified Higgs as a special education student, their request was handled differently, with the result that the three hundred page record was produced. Gordon Declaration, A - 962.

cousin and half brothers.  TT, 10/19/00, 166-67, A - 445-46.  This was deficient.

Alphonso Higgs was living in Poughkeepsie, was accessible and willing to speak with investigators and testify:

> I did not know that Dustin was in trouble with the law at the time of his trial in Maryland in 2000.  Nobody ever contacted me about it.  I understand that somebody claims to have contacted my other sons to see if I'd get involved in his defense.  But that is not true.  I was not contacted by anybody, including my family, to let me know that my help was needed....  I would have done all that I could to help my son to whom I did so much harm.

Declaration, Alphonso Higgs, ¶ 9, A - 978

Not having spoken to Alphonso, Sickler inaccurately testified that Alphonso and Higgs "never had a relationship," and contact between them was limited to "a couple of visits with Dustin when he was a small boy ... [but] otherwise was completely absent from his life."  TT 10/19/00, 165-66, A - 444-45.

Again, Sickler was incorrect.  Alphonso explains the dramatic impact he had on his young son – one that would leave durable psychological scars.  Alphonso met Dustin's mother (Marilyn Bennett) two years before Dustin's birth.  At that time and for years after, he was a neighborhood drug dealer and addict.  He ran a drug business *across the street* from where Dustin lived.  He sold and used many drugs, including heroin, cocaine, marijuana, and PCP.  He sold drugs on the street, "hanging on the corner and usually getting high."  He explained that because the drug business was

hard, "you had to be tough to survive." He usually carried a weapon of some sort and developed a reputation "as a tough guy." Declaration, Alphonso Higgs, ¶ 3, A - 976.

Alphonso has an arrest record, including two New York felony convictions. The first occurred in 1981, and he served a year in local jail for a drug sale to an undercover state trooper. The second resulted from a 1983 sale of cocaine to a Poughkeepsie police officer. He was sentenced to state prison for 2-4 years. He also was arrested for a number of assaults, fights and larcenies. Id. at ¶ 4, A - 976.

Alphonso also engaged in serial infidelity. He drank, used drugs and, in his words "would act crazy." He was physically abusive both to Dustin's mother, and the other women he was seeing: "I would yell and scream insults at them, and usually my yelling turned to hitting." He described how he would go over to Marilyn Bennett's home "for sex and food. If things weren't just the way I wanted them, and sometimes even if they were, I would go off and start yelling, throwing stuff and hitting her. I did this while Dustin was a child, and he often got into the middle of it. I am ashamed to say that I even laid my hands on that young child." Id. at ¶ 5, A - 977.

There was no positive aspect to his relationship with Dustin: "I didn't do any father-son type of activities with him, and I ... showed him no love or affection. I would see him on the street, while I was earning my living. Sometimes I'd say hi and other times I wouldn't. I would beat his mother, and sometimes him. He'd get it the

worst when he got older and tried to protect his mother from my beatings. I'd be in such a rage, that I'd just swat or smack him." Id. at ¶ 6, A - 977.[19]

Alphonso was in jail when Dustin's mother was dying and he "provided no emotional or financial support to her or Dustin during that time." Id. at ¶ 7, A - 977.

**Other Witnesses.** Nancy Riley is Dustin's aunt. She lived one floor above him and his mother and saw them daily. Neither Sickler nor counsel spoke to her. She witnessed Alphonso's abusive conduct toward Dustin and his mother. She knew of Alphonso's drug dealing and use, and violence: "He was not a working man, but made his living selling drugs. When he was not selling drugs, he was using them. He spent his days on the corner engaged in his business, or else he was in a bar drinking." She was also aware that Alphonso "used heroin, free-based cocaine, smoked marijuana and drank. . . The more drugs he used, the more abusive he was toward his wife and child." Declaration of Nancy Riley, ¶¶ 1-8, 10, & 12, A - 988

Richard Bennett (Higgs's maternal uncle), also knew about Alphonso's life of

---

[19]Neither Sickler nor trial counsel obtained a transcript of the tape recording of the undercover sale made by Alphonso to a confidential informant in 1983. This transcript was secured by undersigned counsel from the court file related to his 1983 conviction, Transcript, A - 984. It reveals Alphonso plying his trade across from his son's home: "you know I got good coke"; "I got dimes. . . It's good. No doubt about it, it's good. . . Got the best out here they say. . . I been working for a number of mother fuckers and I don't like it, I like . . . . . . . . . I don't care if I gotta pay one hundred dollars. I don't make eighty or seventy-five. I want the people to like it that I give." The transcript would have provided powerful evidence of the negative impact Higgs's father had on his life.

crime and abusive conduct.  He was never interviewed by the trial team.  Declaration of Richard Bennett, A - 1000.

**Higgs's emotional problems.**  After providing some historical information about Higgs's mother, TT 10/19/00, 167-68, A - 446-47, Sickler testified about her illness and death.  Id. at 172.  He described that Higgs went to live with relatives following his mother's passing.  Id. at 173-74, A - 450-51.

However, neither Sickler nor anyone else testified about the adverse psychological and emotional impact on Higgs of his mother's death.  The only person to testify on this subject was his maternal aunt, Constance McKinnon.  She said that Higgs came to live with her following the death and that he "adjusted well."  TT 10/20/00, 56, A - 453.

The school records contain stark evidence to the contrary.[20]  The records show that Higgs had *not* "adjusted well."  The records show the death's profound impact on his psychological development and inability to achieve in school.  See Child Study Team Report (December 2, 1982 , 9 months after the death) (evaluator finds Higgs has "low functioning in classroom, poor reading skills, poor small muscle coordination (handwriting) ... poor language skills, limited vocabulary, difficulty expressing himself in writing cannot construct more than simple sentences. Poor

---

[20]All of these documents were provided to the District Court.  A - 953.

speller." He was reading at the second grade level, which was two grades below his placement. Regarding "social functioning," it was noted he "tends to be a loner, quiet-withdrawn."), A - 953; Psychological Evaluation (March 29, 1983, age 11 years – about 1 year after the death) (documenting Higgs's difficulties with learning and that "Dustin has had significant *losses over the last few years of his life .... He reports that his dad doesn't visit him at the present time,"* and that *"his mother's death ... have important implications on Dustin's social/emotional development and quite possibly on his overall cognitive development*."), A - 955.

A Child Study Team Report (September 20, 1983) noted that Higgs "presently seems to be depressed but that seems to be separate from his basic learning problems." The evaluator noted deficiencies in "in expressive language, both verbal and written," "poor reading skills," "emotional problems following family disintegration (related counseling services)" and "language deprivation is extremely evident. He has trouble expressing thoughts orally and written [sic]. Appears as if their [sic] may be a visual perception problem." Id., A - 959.

Higgs's need for counseling (mentioned in the March and September 1983 reports) was again addressed on March 28, 1984:

> In a meeting with Arlene and Ruth, Arlene raised a question about counseling for Dustin – feeling that we should have some counseling contacts. Have you kept in touch with Dustin in any way? Should we consider him for counseling? Maybe in a group? Let me know what

you think.

A - 960. The response (April 4, 1984), rejected counseling: "He doesn't seem to need counseling more than twenty other students I could name.... [H]e might at sometime benefit from some counseling to work thru the feelings that must have come with his mother's death – but that's not really a school job and it certainly is not a crisis situation." Id., A - 961.

Because Higgs was not in "crisis," he did not receive the counseling recommended by the authorities, either through school or his new family. His mental health needs were left unattended, with resultant deterioration.

The severe impact on Higgs of his mother's passing was noted by his aunt, Nancy Riley, and uncle, Richard Bennett, with whom Sickler never spoke:

> [Dustin was] overwhelmed by his mother's condition. He ... cr[ied] all of the time about her illness. He was present when she passed, and he saw them place her body in a "body bag." He literally was present to hear her body fall to the bottom of the bag. I was also present and could see that this caused a physical reaction in Dustin. He was out of control and upset on that day, and he took her death very hard. He became withdrawn from the world .... [H]e never recovered emotionally from watching his mother die.... After her death, he was never the same.

Riley Declaration, ¶ 13, A - 989.

> When my sister became ill with cancer, I was working nights for the post-office. As a result, I was responsible for taking her to many of her doctor appointments. As she became more sick over time, I was able to see the impact of her illness and eventual death on [] Dustin .... At the same time that he tried to shoulder the burden of being the "man of the

house," I could see that it was having a significant impact on him emotionally. Dustin simply shut down verbally. He became non-responsive when I would try to speak with him. Marilyn's death hit Dustin very hard. He literally picked out the dress that she was buried in, and insisted that her eyeglasses be placed on her coffin.

Bennett Declaration, ¶¶ 3, 8, A - 1000-01.

**Mental Health Experts.**

Trial counsel retained two mental health experts, Lawrence Donner, Ph.D., and Susan Fiester, M.D. Neither expert testified at trial. Each explained in post-conviction declarations that they were provided with virtually no collateral information regarding Higgs. Declaration of Lawrence Donner, Ph.D., ¶¶ 3-4, A - 990-91 ("I requested all records that counsel had or could obtain relevant to the subject's childhood and upbringing ... I received very limited, and in my view, inadequate records"); Fiester Declaration, ¶ 2, A - 965 ("I was not asked to review or obtain any records, nor was I asked to ... conduct any collateral interviews.").

Each expert opined that they nonetheless detected red flags for potential mitigating evidence, but in the absence of any of the background information obtained by undersigned counsel, they were unable to provide helpful opinions. Dr. Donner explained:

Based upon my evaluation and the sparse documents that were provided to me [] I had several suspicions about Mr. Higgs and about the mitigating evidence that could have been presented at his trial. I suspected that he was learning disabled and likely suffering from

organic brain damage. I also suspected that he was suffering from the lasting psychological effects of losing his mother at a tender age after having been her caregiver for the last months of her life. As a result, I also believed that he suffered from impulse control problems and judgment. I could not offer opinions to a reasonable degree of certainty at that time because I had no corroboration of my suspicions.

Donner Declaration, ¶ 13, A - 994.

Dr. Fiester also believed that mitigating evidence likely existed based on her interview of Higgs, <u>see</u> Fiester Declaration, ¶¶ 4, 6, 10-12, 15-17, A - 966-70, including evidence of social and emotional problems, trauma and learning disability. However, like Dr. Donner, Dr. Fiester was unable to reach reliable trial conclusions because she was not provided with corroborative data. <u>Id.</u> at ¶ 35, A - 975 (discussing limited scope of services requested and absence of any collateral information).

**Conclusion.** Reasonable counsel would have obtained and provided the above-described information to the experts and used it to develop an accurate case for life. Reasonable counsel would have known that in the absence of the real mitigating evidence, the prosecutor would make the devastating closing argument that she ultimately made. Since counsel did not obtain the information, they were not able to make reasonable tactical decisions about it. <u>Sears v. Upton</u>, 130 S.Ct. 3259, 3265 (2010) ("We reject[] any suggestion that a decision to focus on one potentially reasonable trial strategy ... [is] justified by a tactical decision when counsel did not

fulfill their obligation to conduct a thorough investigation of the defendant's background.") (internal quotations and citations omitted). Higgs has alleged deficient performance; he should be allowed a hearing.

### B. Prejudice.

The importance of mitigating evidence in capital sentencing proceedings is indisputable. <u>Williams v. Taylor</u>, 529 U.S. 362, 393 (2000) (capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence" available to be presented in his case). It is critical to the reliability of capital sentencing that the jury render an individualized decision, based upon the "particularized circumstances" of the defendant. <u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976). A sentencing jury cannot make its decision in a reliable and individualized way without knowing the actual mitigating evidence about the defendant.

Given counsel's multiple deficiencies, Higgs's jury was not able to consider the mitigating impact of Higgs's childhood abuse; his witnessing the abuse of his mother; his father's negative influence on him; the devastating emotional impact of his mother's death; and the educational difficulties caused by his learning disability and emotional disturbances. Even worse, the jury was provided with incorrect information:

- It was told that Higgs was an "average to fairly good student" and had an "aptitude" for school, TT 10/19/00, 170, 176, A - 448, 452, when in reality he was learning disabled and barely passed his courses;

- It was told that Higgs's father had no relationship with him as a child and no impact upon his upbringing, TT, 10/19/00, 165-66, A - 444-45 when in reality, his father brutalized him and his mother, and sold drugs on the street in front of their apartment;

- It was told that Higgs "had adjusted well" to his mother's death, TT 10/20/00, 56, A - 453, when in reality the school records and available witnesses demonstrate that he was depressed, and her death significantly impacted his school performance and mental health.

If counsel had obtained the available information, Drs. Fiester and Donner would have been able to accurately evaluate Higgs, and provide mitigating opinions. For instance, Dr. Fiester could have testified that Higgs was learning disabled, and that the disability impacted his social and emotional development. Fiester Declaration., ¶ 9, A - 967-68. She also could have testified regarding the trauma caused by his mother's illness and death, the impact of Higgs's abusive upbringing at the hands of his father, his long-standing alcohol and substance abuse, and its mitigating impact. Id. at ¶¶ 10-11, 15, 17-19, 22-31, A - 968-74. Dr. Donner could have provided similar insight into Higgs's learning disability and emotional disturbance. Donner Declaration, ¶¶ 16-20, A - 995-97.

Prejudice is established in a federal death penalty case when there is a

reasonable probability that, but for counsel's unprofessional errors, at least one juror would have found additional mitigating evidence and at least one juror would have found that mitigation sufficient to vote for a life sentence. Wiggins, 539 U.S. at 537. A reasonable probability need not be proven by a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.

In addition, Higgs was prejudiced at capital sentencing by counsel's deficient performance at guilt/innocence, discussed in Issues I and II. In particular, but for counsel's failures to show that Willis Haynes had an independent motive to kill the decedents, that Gloria's account of the crime was utterly untrustworthy, and to challenge the CBLA evidence that purportedly linked Higgs to the murder weapon, it is reasonably likely that the jury would have found the statutory mitigating factor that an equally (or more) culpable person – Haynes – had received a lesser sentence. 18 U.S.C. § 3592(a)(4). That powerful mitigating factor – which the jury rejected at trial, *DCO*, A - 115 – goes to the fairness of imposing the death sentence on the defendant. Had the jury found that factor, it is reasonably likely that the jury would have imposed a life sentence. See, e.g., United States v. Causey, 185 F.3d 407, 445-46 (5th Cir. 1999) (vacating defendants' death sentences, after vacating co-

defendant's conviction and sentence, given likelihood that jury could have found this factor with respect to defendants had they known co-defendant not subject to death sentence).

There is a reasonable probability of a different result here in light of Higgs's factual allegations; he should be permitted an evidentiary hearing.

## C. District Court's Opinion.

The District Court gave several reasons for denying this claim without a hearing, but erred in multiple respects. This Court should reverse and remand for a full evidentiary hearing.

**School records.** The District Court ruled that counsel's failure to secure the school records was not deficient because they had no reason to believe that further attempts to secure them were necessary once Sickler received the initial two pages of records. *DCO*, A - 143. Because counsel's failure was based on ignorance of the law governing retention of records in New York State, this was error.

Counsel knew, or should have known, that Higgs was a special education student. See Fiester Declaration, ¶ 6, A - 966-67 (recounting that she learned Higgs was in special education).[21] Given the value of special education placement as

_____

[21]Even the two pages of records received by Sickler had notations indicating Special Education placement, such as Higgs's receipt of an "IEP," and placement in a "resource room" and "learning center."

potential mitigating evidence, see Smith v. Texas, 543 U.S. 37, 44 (2004) (identifying "Special Education classes as a reason to impose a sentence more lenient than death"), counsel should not have simply accepted the school authorities' two-line, hand written note that the "cumulative records for this student are no longer available." A - 1010.

The District Court said that given the hand-written note, along with the "school system's stated policy that retention of special education records ... is only required for six years," it was not "unreasonable for counsel to fail to search further." *DCO*, A - 143. This was incorrect as a matter of law: counsel have an obligation to know, understand and act on the law relevant to the gathering of mitigating evidence. Williams v. Taylor, 529 U.S. at 395 (counsel deficient when they "failed to conduct an investigation that would have uncovered extensive records ... not because of any strategic calculation but because they *incorrectly thought that state law barred access to such records*").

The District Court also misconstrued the significance of New York's record retention policy. New York's regulations set six years as the *minimum* period for retention of Special Education records, and specifically encourage local school

districts to preserve such records beyond this minimum.[22]  In any event, there is no evidence counsel were even aware of those regulations, which were first discussed by the Government in its *Response* to the *2255 Motion*.

Given the absence of evidentiary development, this Court must presume that trial counsel were unaware of this retention policy.  Applying that presumption, the "decision" not to look further than the two pages was not reasonable – it was based on counsel's lack of awareness of New York's treatment of special education records. The court therefore erred in assessing the reasonableness of counsel's ostensible decision not to investigate further without conducting an evidentiary hearing.  United States v. Matthews, 239 Fed.Appx. at 807 ("Unless it is clear from the pleadings, files, and records that the prisoner is not entitled to relief, § 2255 makes an evidentiary hearing in open court *mandatory*.").

The District Court alternatively ruled that the failure to secure the school records did not cause prejudice because they also showed Higgs "rejected efforts to assist him to grow into responsible adulthood." *DCO*, A - 143.  This ruling is contrary to the record and the law.  The school records present a significantly mitigating

---

[22]The regulations state:

> **NOTE:** These records may be needed more than 6 years beyond the student's 21st . . . School districts and BOCES should weigh these concerns carefully and consult their attorneys or counsel before establishing policy concerning retention of these records beyond their legal minimum retention periods.

picture of Higgs's early life. Whereas he was inaccurately presented to the jury as a boy who had success in school and made a "good adjustment" to his mother's death, the records show a child who struggled mightily in school and was deeply traumatized by his mother's illness and death. Additionally, contrary to the District Court's reasoning, the school records do not show that Higgs rejected "efforts to assist him to grow into responsible adulthood." Id. To the contrary, the records show that necessary services were not offered to him. See, e.g., the above described exchange between "Don" and "Sandy."

The court below also committed legal error. The fact that mitigating records contain some unflattering information does not absolve counsel from reviewing and considering them for presentation. Sears, 130 S.Ct. at 3264 (because of counsel's inadequate investigation they were not able to see the mitigating value of apparently negative information); Williams, 529 U.S. at 396 (counsel ineffective for not presenting mitigating evidence even though "not all of the evidence was favorable").

**Higgs's father**. The court also excused counsel's failure to locate Higgs's father or the records related to his criminal history, believing it acceptable that Sickler did not actually try to find Alphonso, but instead relied on "information from two of Alphonso Higgs's children that he did not want to participate in his son's defense." *DCO*, A - 143. This ruling conflicts with the duty of counsel to insure that a member

88

of the defense team contacts and evaluates witnesses, rather than rely on representations made by lay persons. Sears, 130 S.Ct. at 3264 (counsel deficient for relying on witnesses selected by defendant's mother).

Nothing in the District Court's analysis excuses counsel's failure to secure the court files of Higgs's father's convictions, including the transcript of the drug sale, which would have provided compelling evidence to the jury of the negative influence that Alphonso had on his son. Counsel had a duty to secure the court files, given that they knew Alphonso had a felony arrest record. Having done so, they would have seen the transcript. Cf. Rompilla, 545 U.S. at 391 n.8 (2005) (once counsel have reason to investigate, "they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected").

The District Court believed that Alphonso's absence from trial did not cause prejudice. *DCO*, A - 58-59. This finding is contrary to the record. Alphonso would have provided evidence that he abused Dustin and Dustin's mother. See Declaration of Alphonso Higgs at ¶ 5, A - 976 (admitting physical abuse of Dustin and his mother). There was no evidence presented at trial about such abuse. The court's ruling that Alphonso would have been impeached by his prior drug convictions is circular. *DCO*, A - 143-44. Under this reasoning, drug addicted parents should never testify about the impact of their addiction on their capital offspring, because they

would be impeached with their addiction.  However, <u>Sears</u> says that counsel who have properly investigated can turn such a negative into compelling mitigation. <u>Sears</u>, 130 S.Ct. at 3264.  Here, impeachment with the drug conviction would have bolstered  witness testimony about what a bad father Alphonso was and the impact of his poor parenting on his son.  <u>See</u> <u>also</u> <u>Williams</u>, 529 U.S. at 395 (considering mitigating fact that prisoner's parents were imprisoned).

The Court also excused counsel's failure because *Sickler* testified that Alphonso had a drug and arrest history. *DCO*, A - 144.  However, Sickler's testimony did not provide the graphic detail offered by Alphonso or the transcript about Alphonso's criminal lifestyle and Dustin's exposure to it.  That information would have been crucial both for the jury and for the defense mental health experts.  See <u>Sears</u>, 130 S.Ct. at 3263 ("the fact that Sears' brother is a convicted drug dealer and user, and introduced Sears to a life of crime [] would have been consistent with a mitigation theory portraying Sears as an individual with diminished judgment and reasoning skills [like Higgs, <u>see</u> Donner Declaration; A - 990; Fiester Declaration, A - 965], who may have desired to follow in the footsteps of an older brother").

**Uncle Bennett and Aunt Riley**.  The Court's excuse of counsel's failure to locate, speak with and present Uncle Bennett and Aunt Riley was also erroneous. Each had important information about the abuse suffered by Higgs and his mother at

the hands of his father and about Higgs's emotional problems resulting from the death of his mother. Each would have offered details that breathed life into Sickler's bland assertions.

The court reasoned: "Beyond stating in general terms that Alphonso Higgs on occasion abused Marilyn Bennett [Higgs's mother] in Defendant Higgs's presence, the witnesses' declarations *offered no new concrete facts or specific incidents relevant to Defendant Higgs's background*." Id. A - 144  But, since there was *no* evidence presented at trial that Higgs was abused and witnessed his mother's abuse, even if the testimony of Uncle Bennett and Aunt Riley was "general," such testimony would have been important.  See, e.g., Porter, 130 S.Ct. at 454 ("Had Porter's counsel been effective, the judge and jury would have learned of the 'kind of troubled history we have declared relevant to assessing a defendant's moral culpability.'") (quoting Wiggins v. Smith, 539 U.S. 510, 535 (2003)).

Moreover, there were *specific incidents* recounted in the declarations:

> I *recall one instance* when I heard a commotion going on in Marilyn's apartment.  I could hear Alphonso screaming.  I ran down to her apartment (I lived one floor above) to find that she was bleeding from the head and she told me that Alphonzo had hit her with a pot. Alphonso was still present, and I found Dustin in the same room crying his eyes out.  He was obviously very scared and upset.  I stayed with Dustin while Marilyn went to the hospital.  It took quite a while to calm him down and I sent him to bed.

Riley Declaration, ¶ 6, A - 988.

Uncle Bennett also had specific information to present regarding Alphonso's drug use, dealing, weapons possession, abusive conduct, and reputation for violence. And he had information to present regarding negative influences on Higgs when he went to live with his Aunt Constance McKinnon, such as Higgs's cousins drinking and getting high. See Bennett Declaration, ¶¶ 1, 2, 6, A - 988. He knew that the Webb household, where young Dustin was also sent following his mother's death, was "highly dysfunctional," where drugs were used and sold. Id. at 7, A - 988.

The District Court's conclusion that the unpresented testimony of these two witnesses would have "essentially tracked that of Investigator Sickler," *DCO*, A - 144, is wrong – as discussed above, the available testimony of these witnesses was far more powerful than Sickler's testimony. Indeed, they would have corrected many of Sickler's inaccurate representations. The court's belief that the absence of these witnesses did not cause prejudice because each could have been impeached with the fact that they only came forward years later (*DCO*, A - 144), ignores that in their declarations they each state that *they were never contacted by the defense* at trial. See Bennett Declaration, ¶ 9, A - 1001; Riley Declaration, ¶14, A - 989.

**Expert Witnesses.** The Court believed that counsel did not perform deficiently when they failed to provide any of the undiscovered mitigating evidence to their experts, reasoning that since counsel were not deficient for failing to secure

the information, they were not deficient because they did not give it to their experts. *DCO*, A - 144. As the discussion above illustrates, however, counsel were deficient in failing to secure the information.[23] Moreover, after developing such life history information, effective capital counsel provides it to his experts for further development of mitigating evidence. <u>See</u>, <u>e.g.</u>, AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, 11.8.6 (counsel should seek expert testimony regarding "[f]amily and social history ... and the resulting impact on the client");[24] <u>Rompilla</u>, 545 U.S. at 390-91 (effective counsel, having obtained life history information, "would unquestionably have gone further to build a mitigation case" by, *inter alia*, providing that information to defense experts; defense "experts who examined Rompilla before trial" without background information "found 'nothing helpful to [Rompilla's] case,'" but post-conviction experts with background information "found plenty of 'red flags' pointing up a need to test further" and identified significant mitigating evidence).

---

[23]The court suggests that Higgs's argument about counsel's deficient failure to call these witnesses was not "carried forward" in Higgs's briefing. *DCO*, A - 144. This is incorrect. Higgs's argument has always been that counsel deficiently failed to provide his experts with important information about his background – information that would have informed their opinions about mitigating evidence.

[24]This Court has endorsed the ABA Guidelines as reflecting "prevailing norms." <u>Gray v. Branker</u>, 529 F.3d 220, 229 (4th Cir. 2008).

**D.      Conclusion.**

The court below made multiple errors of law, and its opinion is peppered with erroneous conclusions about the evidence that Higgs has proffered.  It also erred in denying this factually intensive claim without a hearing.  Because the section 2255 "motion and the files and records of the case" do not "conclusively show" that Higgs is not entitled to relief, 28 U.S.C. § 2255(b), this Court should reverse the District Court and remand for an evidentiary hearing on this claim.

**VI.   HIGGS'S PRIOR CONVICTIONS FOR (A) A DRUG OFFENSE AND (B) ASSAULT AND RECKLESS ENDANGERMENT DID NOT QUALIFY AS STATUTORY AGGRAVATING FACTORS.**

Higgs's death sentences rest upon the jury's finding of four statutory and two non-statutory aggravating circumstances.  Two of the statutory aggravating factors were for prior convictions – a federal drug offense and a felony (assault and reckless endangerment) involving use of a firearm.  These convictions, however, did not qualify as statutory aggravating factors because they were not "previous" to the instant offense as required by the plain language of the statute.  Additionally, the conviction for assault and reckless endangerment did not qualify because use of a firearm is not an element of those offenses, as required under the "categorical approach" followed in this Circuit.

The jury's weighing of these invalid aggravating factors violated the Fifth,

94

Sixth and Eighth Amendments. Since the jury could not have weighed these convictions under any other aggravating factor, their submission to the jury was not harmless and the death sentences are invalid.

**A.** **Higgs's 1997 Conviction for Violation of the Federal Drug Statute Did Not Qualify as an Aggravating Factor under 18 U.S.C. § 3592(c)(12) Because it Was Not Previous to the Instant Offenses.**

Higgs's federal drug conviction was an invalid aggravator because the conviction was not previous to the instant offenses. Well after the homicides, on May 12, 1997, Higgs pled guilty to federal drug offenses. The Government submitted this conviction as a statutory aggravating factor under 18 U.S.C. § 3592(c)(12). A - 212-238; A - 454-55. But this factor applies only if the defendant "had *previously* been convicted of" a federal drug offense for which the sentence could be five or more years in prison. 18 U.S.C. § 3592(c)(12).[25] Under the plain language of the statute and the case law, this conviction should not have been permitted as a statutory

_____

[25]18 U.S.C. § 3592(c)(12) states, in relevant part:

> **(c) Aggravating factors for homicide. –** In determining whether a sentence of death is justified *for an offense* described in section 3591(a)(2), the jury ... shall consider each of the following aggravating factors ...
>
> > **(12) Conviction for serious Federal drug offenses. –** The defendant *had previously* been convicted of violating title II or III of the Controlled Substances Act for which a sentence of 5 or more years may be imposed....

aggravating factor because it did not occur previous to the instant offense.

Trial counsel argued in the District Court and in this Court that under a plain reading of the statute, the phrase "had previously" must be interpreted as requiring that the federal drug conviction have been entered prior to the commission of the instant offense. Any other interpretation renders these words mere surplusage. This Court rejected the argument, reasoning that this provision applies to all federal drug offenses occurring prior to sentencing. Higgs 1, 353 F.3d at 318.

While Higgs's case was still on appeal, however, this Circuit took a contrary position with regard to the similar recidivist enhancement language in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). In United States v. Pressley, 359 F.3d 347 (4th Cir. 2004), the court ruled that the phrase "three previous convictions," which triggers a 15-year mandatory minimum sentence for a § 922(g) violation, requires that the three convictions be *previous to* the § 922(g) violation, since the violation is the only event mentioned in the statute to which the word "previous" could refer. Any other interpretation would render the word "previous" superfluous. Id. at 350.

In so ruling, this Court followed United States v. Hobbs, 136 F.3d 384, 387 n.3 (4th Cir. 1998) ("Hobbs's armed robbery conviction occurred after the instant offense, so it is not a 'previous conviction' for purposes of § 924(e)") (citing with

approval United States v.Talley, 16 F.3d 972, 974-75 (8th Cir. 1994) ("'previous conviction' must occur prior to *violation* of § 922(g)").  This Court thus joined all other circuits to have addressed the issue.  See  United States v. Richardson, 166 F.3d 1360, 1361 (11th Cir. 1999); United States v. Garner, 32 F.3d 1305, 1312 (8th Cir. 1994); United States v. Talley, 16 F.3d 972, 975-76 (8th Cir. 1994); United States v. Balascsak, 873 F.2d 673, 679 (3d Cir. 1989) (interpreting predecessor statute, 18 U.S.C. § 1202(a)(1982)); see also United States v. King, 509 F.3d 1338, 1342-43 (11th Cir. 2007) ("prior conviction" as used in 18 U.S.C. § 2252A(b)(2) means prior to instant offense conduct).

The reasoning of Pressley and the cases on which it relies applies equally to the phrase "had previously been convicted of," as used in § 3592(c)(12).  It is a cardinal rule of statutory construction "that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context." Talley, 16 F.3d at 976. Moreover, "a court should 'give effect, if possible, to every clause and word of a statute.'" Id. at 975 (quoting Moskal v. United States, 498 U.S. 103, 109-10 (1990)). Following, these principles, Talley and Pressley concluded that the term "previous conviction" in § 924(e)(1) must be interpreted in reference to the only other event mentioned in that subsection – the violation of § 922(g).  The three convictions must therefore be "previous" to the § 922(g) violation for which the defendant is being

sentenced. <u>Pressley</u>, 359 F.3d at 349-50; <u>Talley</u>, 16 F.3d at 976. Similarly, in the FDPA, the only other event mentioned in § 3592(c) that the word "previously" could be interpreted in reference to is the "offense" for which the death penalty is being sought. 18 U.S.C. § 3592(c) ("In determining whether a sentence of death is justified for an *offense* described in section 3591(a)(2), the jury ... shall consider ...").

As both <u>Pressley</u> and <u>Talley</u> make clear, the Government's interpretation of "previous" as requiring only that the conviction occur before the sentencing would render the word superfluous. <u>Talley</u>, in language equally applicable here, states the point succinctly: "If *previous convictions* meant those convictions a defendant had accumulated prior to sentencing, Congress could have omitted the word *previous* because, at sentencing, a district court could never consider *convictions* not yet in existence." <u>Talley</u>, 16 F.3d at 975-76 (emphasis in original). <u>Pressley</u> similarly reasoned that "if we were to adopt the Government's interpretation – that any convictions obtained prior to sentencing qualify as 'previous convictions' – we would be violating a cardinal rule of statutory construction by reading the term 'previous' out of the statute." <u>Pressley</u>, 359 F.3d at 350.

<u>Pressley</u> gives an additional compelling reason why the word "previously" must be read this way. Treating the date of the offense as the controlling date "represents the most logical and compelling rule," because it "is not subject to the

whims of the court's docket nor vulnerable to manipulation by either party." Id. at 351. In contrast, Pressley noted that it would be "absurd" to adopt an interpretation "not supported by the plain text of the statute, which would subject a defendant to a mandatory fifteen-year minimum sentence based on the mere fortuity of his sentencing date." Id. It would be even more absurd to subject a defendant to the death penalty "based on the mere fortuity of his sentencing date."

Pressley also pointedly rejects the Government's argument on direct appeal that the definition of "previous conviction" should mirror the definition of "prior sentences" used in the Sentencing Guidelines. Higgs 1, 353 F.3d at 317. The Guidelines define "prior sentences" as all those sentences imposed prior to sentencing on the instant offense. USSG § 4A1.2. Pressley explains, "[t]his argument fails" not only because "prior *sentence*" is a different term, but also because "the far more analogous guideline governing career offenders expressly defines 'previous ... convictions' as those occurring prior to the instant *offense*." Pressley, 359 F.3d at 350 (citing USSG § 4B1.2(c) (providing that "two prior felony convictions means [that] the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions")).

Although this Court ruled against Higgs on this issue in Higgs 1, 353 F.3d at 317, the Court's subsequent decision in Pressley constitutes an intervening change

in the law, which is an exception to the law of the case doctrine and is cognizable under § 2255. See Davis v. United States, 417 U.S. 333, 342 (1974) (allowing defendant to assert a § 2255 claim rejected on direct appeal, based on intervening substantive change in the interpretation of federal statute); United States v. Bonnette, 781 F.2d 357, 363-64 (4th Cir. 1986) ("Davis suggests that a change in law can serve as the basis for a § 2255 motion, whether the change is constitutional or nonconstitutional."); United States v. Becker, 502 F.3d 122, 128 (2d Cir. 2007) (following Davis, ruling that change in law following rejection of claim on direct appeal constituted exception to law of the case doctrine and was cognizable under § 2255).

Given Pressley's clear application to the statutory language involved here, the failure to apply this ruling would constitute a "miscarriage of justice," Davis, 417 U.S. at 346, since Higgs's death penalty rested in part on the prior drug conviction aggravator. See Section "C" below.

The District Court correctly observed that since Pressley was decided while Higgs's appeal was still pending,[26] Higgs is entitled to raise the issue at this time and is not barred by Teague v. Lane, 489 U.S. 288, 301 (1989). *DCO*, A - 155; see also

---

[26]Pressley was decided on February 27, 2004. Higgs's conviction did not become final until the Supreme Court denied his writ of certiorari on November 29, 2004. See *DCO*, A - 155 n.28.

Becker, 502 F.3d at 129 ("Teague's rule of non-retroactivity ... applies only 'to those cases which have become final before the new rules are announced.'" (quoting Teague, 489 U.S. at 310)).

This Court should apply the superior and compelling reasoning of Pressley to the interpretation of § 3592(c)(12), and overturn its inconsistent ruling on this issue in Higgs 1, 353 F.3d at 317-318. Given Pressley's clear application to the statutory language here, the failure to apply this ruling would render the death sentences in this case arbitrary and capricious in violation of the Eighth Amendment.

**B. Higgs's 1997 Conviction for Assault and Reckless Endangerment Did Not Qualify as an Aggravating Factor under 18 U.S.C. § 3592(c)(2).**

Petitioner's death sentences also rest upon the jury's finding of an aggravating circumstance pursuant to 18 U.S.C. § 3592(c)(2): that Petitioner "has previously been convicted of [a felony offense] involving the use or attempted use of a firearm ... against another person." The jury's finding and weighing of this aggravating circumstance violated the Constitution in two respects.

First, like the drug conviction discussed in Section A above, the 1997 conviction for assault and reckless endangerment did not qualify as an aggravating factor because the conviction was not previous to the instant offense, which took place in 1996. Although defense counsel raised and preserved this issue with regard

to the drug conviction, counsel failed to raise the argument with regard to the assault and reckless endangerment conviction either in the District Court or on appeal. This failure constituted ineffective assistance in violation of the Sixth Amendment.

Second, neither the assault nor the reckless endangerment qualified under the "categorical approach" as felony offenses "involving the use of a firearm," since use of a firearm is not an element of either offense. Defense counsel did raise this issue in the district court and on appeal, but this Court rejected it. <u>Higgs 1</u>, 353 F.3d at 316. Yet, in a later decision, <u>United States v. Washington</u>, 404 F.3d 834 (4th Cir. 2005), this Circuit held that the categorical approach should be applied in circumstances that are materially indistinguishable from Higgs's. <u>Washington</u> and subsequent Supreme Court decisions mark a substantive change in the law that should be applicable here.

### 1. The assault and reckless endangerment conviction occurred after the instant offense, and therefore does not qualify as a "previous" conviction.

The instant offenses took place on January 27, 1996. Higgs' Maryland state court conviction for assault and reckless endangerment arising out of the "Cherry Lane" incident occurred on April 1, 1997. A - 171. Under the FDPA's plain language, this conviction cannot constitute an aggravator because it was not previous

to the instant offense.[27]

As discussed thoroughly in Part A above, the word "previously" – as used in the statute – can only be understood as meaning "previous to" the "offense" for which death is sought, since this "offense" is the only other event referred to in § 3592(c). Indeed, the only antecedent in § 3592(c)(2) itself is "offense," and thus the phrase "has previously been convicted," contained in the very same sentence, must mean previous to the instant "offense." Moreover, the term "previous" is consistently interpreted this way in similar federal criminal statutes by the Fourth Circuit. <u>See</u> <u>Pressley</u>, 359 F.3d at 349-50 (4th Cir. 2004) (the phrase "three previous convictions," which triggers a 15 year mandatory minimum sentence for a § 922(g) violation, must be read as requiring that the three convictions be *previous to* the § 922(g) violation). There is no principled reason why <u>Pressley</u>'s reasoning and interpretation of the word

---

[27]18 U.S.C. § 3592(c), states in relevant part:

> **(c) Aggravating factors for homicide.** – In determining whether a sentence of death is justified *for an offense* described in section 3591(a)(2), the jury ... shall consider each of the following aggravating factors...
>> (2**) Previous conviction of violent felony involving firearm**. – *For any offense*, other than an offense for which a sentence of death is sought on the basis of section 924(c), *the defendant has previously been convicted of a Federal or State offense* punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

"previous" should not be equally applicable to § 3592(c)(2).

Defense counsel was plainly deficient in failing to make this argument. Even prior to Pressley, this Court had already made clear that the term "previous conviction" as used in 18 U.S.C. § 924(e) requires that the conviction "must occur prior to *violation* of § 922(g), and not simply prior to conviction or sentence for that violation." United States v. Hobbs, 136 F.3d 384, 387 n.3 (4th Cir. 1998) (citing United States v. Talley, 16 F.3d 972, 974-75 (8th Cir. 1994). In light of Hobbs and its adoption of the reasoning in Talley, counsel cannot be excused for failing to raise this argument in the context of § 3592(c)(2).[28] Counsel's deficient performance was also prejudicial since it resulted in the jury's consideration of an aggravating factor that otherwise would not have been presented. Counsel's failure to raise this argument in the trial court and on appeal therefore constituted Strickland ineffective assistance.

---

[28]The District Court ruled that counsel's failure to raise this argument was excusable because this Court had issued a "conflicting" ruling in an earlier unpublished opinion, United States v. Hamilton, 30 F.3d 131, 1994 WL 381735 (4th Cir. July 22, 1994). (DCO, A154). But since an unpublished lower court opinion has no precedential value, there was no "conflict."

**2. The "categorical approach" applies to § 3592(c)(2), under which the assault and reckless endangerment conviction should not have counted as an aggravator.**

Under the "categorical approach," courts look only to "the fact of conviction and the statutory definition of the prior offense" to determine whether it qualifies under a sentence enhancement statute. Taylor v. United States, 495 U.S. 575, 600-02 (1990). Taylor applied the categorical approach in the context of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(c), in a case in which the prior conviction resulted from a jury trial. In Shepard v. United States, 544 U.S. 13, 19 (2005, the Court emphasized that the categorical approach has constitutional underpinnings: strict application of this approach is required in order to "avoid serious risks of unconstitutionality" under the Sixth Amendment. Id. at 25-6.

Trial counsel argued in the District Court and before this Court that the categorical approach should have been applied to Higgs. Under Maryland law, assault is a common law offense without any specific statutory elements. It permits conviction without proof that any firearm was involved. "For example, one could be convicted of assault and battery in Maryland for offensively touching the person of another." United States v. Ward, 171 F.3d 188, 192 n.2 (4th Cir. 1999).[29] Reckless endangerment similarly does not require proof that a firearm was involved since it

---

[29]Higgs was charged with and pled guilty to assault, not assault and battery. (A452).

applies broadly to "conduct that creates a substantial risk of death or serious bodily injury to another person." Ann. Code of Maryland, Art. 27, § 120 (repealed 10/96; now Art. 27, § 12A-2 Ann. Code of Maryland). Thus, neither of these offenses required proof that a firearm was involved, and under the categorical approach this conviction therefore did not qualify as a statutory aggravating factor under § 3592(c)(2). Indeed, Higgs denied he possessed a .38 caliber gun during the guilty plea colloquy, and then stated, "It was the other way around." A - 1014. The state court judge never addressed or clarified Higgs's denial of the possession of the gun, and thus this factual dispute was not resolved.

This Court rejected application of the categorical approach, reasoning that it is not required under § 3592(c)(2) since that section applies to prior convictions "*involving* the use or attempted use or threatened use of a firearm." The Court concluded that the use of the word "involve[s]" requires the court to look beyond the elements of the offense to the offense conduct itself. Higgs 1, 353 F.3d at 316.

But in subsequent opinions, this Court and the Supreme Court have taken the contrary position, ruling that the term "involves" does implicate the categorical approach. In United States v. Washington, 404 F.3d 834 (4th Cir. 2005), this Court recognized that the categorical approach is of "Sixth Amendment significance," and held that it applies when the word "involves" is used. Id. at 840-41. This Court ruled

that, for purposes of enhancement under the federal sentencing guidelines, the categorical approach applies to the determination whether the defendant has a conviction for an offense that "otherwise *involves* conduct that presents a serious potential risk of physical injury to another." Id. at 842.

Likewise, in Begay v. United States, 553 U.S. 137 (2008), the Supreme Court, in interpreting the statutory language "otherwise involves conduct," in 18 U.S.C. § 924(e)(2)(B) of the Armed Career Criminal Act (ACCA), applied the categorical approach to determine whether the defendant's prior conviction was a violent felony. Id. at 139-41 ("In determining whether this crime is a violent felony ... we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it ..."). And in Chambers v. United States, 129 S. Ct. 687 (2009), the Court adopted the categorical approach in determining that the violation of an Illinois failure-to-report statute did not "involve conduct" that qualified as a violent felony under the ACCA. Id. at 689-90.

Following Begay and Chambers, this Court has applied the categorical approach exemplified in Washington in its reading of the statutory phrase "otherwise involves conduct." See, e.g, United States v. Alston, 611 F.3d 219, 222-26 (4th Cir. 2010); United States v. Rivers, 595 F.3d 558, 559 (4th Cir. 2010); United States v. Thornton, 554 F.3d 443, 444 (4th Cir. 2009); United States v. Vann, 620 F.3d 431,

432 (4th Cir. 2010); <u>United States v. Clay</u>, 2010 WL 4970223 (4th Cir. Dec. 8, 2010). The reasoning in <u>Washington</u>, <u>Begay</u>, and <u>Chambers</u> applies equally to the use of the word "involving" in the federal death penalty statute and requires application of the categorical approach here.

<u>Higgs 1</u> also rejected the categorical approach in part because the categorical approach in the context of the ACCA and other noncapital sentencing provisions was intended to avoid "the practical difficulties ... of a factual approach." 353 F.3d at 317. This Court reasoned that since an "individualized determination *is* required in the death penalty context," the categorical approach should not apply here. <u>Id.</u>, <u>citing</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 877-79 (1983); <u>see also</u> <u>United States v. Rodriguez</u>, 581 F.3d 775, 807 (8th Cir. 2009). But capital sentencing proceeds in two stages – eligibility and then selection – and <u>Zant</u> made clear that the "individualized determination" is not required until "the selection stage." 462 U.S. at 879. The purpose of determining statutory aggravating factors at the eligibility stage, in contrast, is to narrow the *class* of those eligible for the death penalty. As <u>Zant</u> explains, "[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the *class* of persons eligible for the death penalty." <u>Id.</u> at 878; <u>see also</u> <u>United States v. Caro</u>, 597 F.3d 608, 623 (4th Cir. 2010) (purpose of aggravating circumstance is to narrow "class of

108

persons eligible for the death penalty"). Thus, § 3592(c)(2), as a statutory aggravating factor in the FDPA, plays the same role as § 924(e)(2)(B) in the ACCA – it narrows the "class" of people to whom the enhanced penalty applies, and it is thus equally subject to the categorical approach.

Washington, Begay and Chambers constitute an intervening change in the law cognizable in a § 2255 proceeding. See Davis, 417 U.S. at 342. These rulings compel the conclusion that the offenses of assault and reckless endangerment do not necessarily involve the use of a firearm, and that Higgs's conviction for these offenses should not have been presented to the jury as an aggravating factor under 18 U.S.C. § 3592(c)(2). Because these rulings work a substantive change in the law by altering the definition of what can qualify as a predicate conviction for sentence enhancement purposes, they do not constitute a procedural change barred from retroactive application by Teague, 489 U.S. 288. See Schiro v. Summerlin, 542 U.S. 348, 352 (2004) (substantive changes warrant retroactive application due to "significant risk that a defendant ... faces a punishment that the law cannot impose."). Both Begay and Chambers have been applied retroactively in § 2255 cases. See, e.g., United States v. Shipp, 589 F.3d 1084, 1090 (10th Cir. 2009) ("Chambers falls within a category of substantive decisions that 'prohibit[ ] a certain category of punishment for a class of defendants because of their status or offense," and thus applies

retroactively on collateral review); <u>Sun Bear v. United States</u>, 611 F.3d 925, 929 (8th

Cir. 2010) (same); <u>Welch v. United States</u>, 604 F.3d 408, 415 (7th Cir. 2010) (same)[29]

The District Court therefore erred in ruling that the categorical approach set out in

<u>Washington</u> was a procedural rule barred from retroactive application by <u>Teague</u>.

*DCO*, A - 152.

Moreover, basing a death sentence on an aggravating factor that is subject to

such varying interpretation and application violates the Fifth and Eighth

Amendments. <u>Washington</u>, <u>Begay</u> and <u>Chambers</u> stand in bold contrast to this

Court's prior decision in this case. Permitting Higgs's death sentence to stand in

view of this contrary authority would be arbitrary and capricious, and would violate

due process and the Eighth Amendment. <u>Godfrey v. Georgia</u>, 446 U.S. 420, 427-28

(1980); <u>Johnson v. Mississippi</u>, 486 U.S. 578, 584-85 (1988).

**C.    The Jury's Improper Consideration of the Above Convictions Requires Vacation of Higgs's Death Sentences.**

An invalid aggravating circumstance invalidates a death sentence when it

permits the jury to weigh facts that otherwise would not be before it in the selection

---

[29]The Supreme Court has never applied the <u>Teague</u> bar in the § 2255 context. Since the comity concerns underlying <u>Teague</u> are absent in a § 2255 motion that seeks to vacate a federal and not a state conviction, <u>Teague</u> ought not apply here even if the categorical approach is viewed as a procedural rule. <u>Teague</u>, 489 U.S. at 308. <u>But see</u> <u>United States v. Sanders</u>, 247 F.3d 139, 146 (4th Cir. 2001) (applying <u>Teague</u> bar to § 2255 motion).

phase.  <u>Brown v. Sanders</u>, 546 U.S. 212, 220 (2006).  "When the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."  <u>Stringer v. Black</u>, 503 U.S. 222, 232 (1992).

The convictions discussed in Parts A and B meet this test because there were no other aggravating factors found by the jury that would have permitted it to give these convictions aggravating weight.  The other statutory aggravating factors found were:

- death during commission of another crime (18 U.S.C. § 3592(c)(1)); and

- multiple killings in single episode (18 U.S.C. § 3592(c)(16) (invalidated on direct appeal, <u>Higgs 1</u>, 353 F.3d at 319)

Additionally, the jury found two non-statutory aggravating factors:

- harm and loss caused to victims and family; and

- obstruction of investigation.

The federal drug conviction and the assault and reckless endangerment convictions, admitted improperly under 18 U.S.C. § 3592(c), could not possibly have been considered under any of these other factors since the convictions involved prior unrelated events, and none of the other factors related to those convictions.  Thus, the improper submission of these convictions, which were not entitled to aggravating

111

weight, rendered the death penalty unconstitutional under <u>Sanders</u> and <u>Stringer</u>.

## VII. THE DISTRICT COURT ERRED IN SUMMARILY DISMISSING HIGGS'S CLAIMS.

### A. The Court Below Improperly Denied Discovery.

Higgs has a right to discovery on a showing of good cause, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings. Higgs made a detailed request for discovery. *Petitioner's Motion for Discovery*, ("*Discovery Motion*"), A - 72. The District Court denied Higgs's discovery requests in the course of denying relief on his substantive claims. *DCO*, A - 124, 128 (denying discovery with respect to CBLA and <u>J.E.B.</u> claims).

Higgs's discovery requests are governed by Rule 6, which provides for discovery on a showing of "good cause." A post-conviction petitioner establishes good cause whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09 (1997) (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 299 (1969)); <u>accord</u> <u>Quesinberry v. Taylor</u>, 162 F.3d 273, 279 (4th Cir. 1998).

When a petitioner establishes good cause, discovery must be allowed. The Supreme Court has explained that habeas proceedings must be "administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach

112

are surfaced and corrected." Harris, 394 U.S. at 291. Post-conviction discovery should be allowed whenever it "may be necessary to adequately explore a petitioner's claim for relief." Johnston v. Love, 165 F.R.D. 444, 445 (E.D. Pa. 1996). Discovery should not be denied if the requested discovery "might allow him to demonstrate" his entitlement to relief. Id. This is particularly true in capital cases, which require heightened procedural safeguards. See, e.g., Kyles, 514 U.S. at 422 (Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").

The *Discovery Motion* requested discovery regarding (1) internal FBI reports and studies concerning CBLA analysis; (2) the Government's use of 11 of its 15 peremptory strikes against women; (3) the prosecutors' use of peremptory strikes in other capital trials; (4) jailhouse informant Domenick Williams's location when Higgs supposedly made incriminating remarks to Williams; (5) favorable disposition of state and federal drug charges against Victor Gloria, and Gloria's uncharged participation in a Baltimore homicide; (6) confidential informants who said that Willis Haynes had a motive to kill at least some of the victims; and (7) consideration provided to Government witnesses Richard Diolamou and Wondwossen Kabtamu. See *Discovery Motion* at 5-14, A - 73-78.

This discovery was appropriate in support of Higgs's claims: that his

convictions were obtained on the basis of unreliable CBLA evidence, *2255 Motion*, Claim I; that the trial prosecutors discriminated on the basis of gender in exercising peremptory challenges, *2255 Motion*, Claim II; and that he was wrongly convicted of capital murder, *2255 Motion*, Claim III.

Regarding the discovery relating to CBLA (and implicitly the wrongful conviction claim), the District Court concluded that there was "no reason to believe that such additional facts as Higgs might hope to mine during discovery would demonstrate his entitlement to relief," apparently because it thought the "multiplicity and the strength of the evidence" against Higgs precluded him from obtaining relief. *DCO*, A - 124  With respect to the J.E.B. claim, the court deemed the claim too speculative.  Id. at A - 128.  The court erred.

Petitioner's J.E.B. claim is not speculative.  The District Court itself acknowledged that the record may support a *prima facie* claim under J.E.B.  *DCO*, A - 126.  See Harris, 394 U.S. at 290 (good cause for discovery is shown when court finds a *prima facie* constitutional violation).  Because there were facially neutral reasons for the strikes, the J.E.B. inquiry moved to step three.  There, "the critical question ... is the persuasiveness of the prosecutor's justification for his peremptory strike."  Miller-El v. Cockrell, 537 U.S. 322, 338-39 (2003).  One among many factors to be considered in making this determination is the presence of a "culture of

114

discrimination" in the prosecutor's office.  <u>Id.</u> at 347.  Petitioner alleged that the trial prosecutors struck women disproportionately in at least one other capital case, *2255 Motion*, ¶ 101, and sought discovery to determine if there were other such cases. Under <u>Miller-El</u>, this was a proper inquiry.

The court also erred in denying discovery on the CBLA and wrongful conviction claims.  There was circumstantial evidence that Higgs was present at the scene of the crime, but the convictions for first degree murder rested almost entirely on Gloria's testimony.  <u>See</u> <u>Higgs 1</u>, 353 F.3d at 313-14.[30]  Gloria's testimony, which is undermined by the wrongful conviction claim, does not defeat Higgs's claims.

The District Court cited the following evidence as establishing Higgs's guilt, precluding any successful challenge in these proceedings:  (1) a statement about a motive for the murders, reportedly made by Higgs to Enidsia Darby; (2) Higgs's attempt to manufacture an alibi; (3) a statement by Higgs to Williams suggesting a link between the gun used at Chaconia and the gun used at the homicide; (4) a statement by Higgs to Williams about a motive for the killings; (5) a suggestion by Higgs to Williams that Higgs's friends would stop Gloria from testifying; and (6) evidence that Higgs owned and had fired a .38 caliber gun.  *DCO*, A - 123.  That

---

[30]Mere presence at the scene of the crime does not amount to guilt of first degree murder; Gloria admitted being present, and was convicted only of being an accessory after the fact.  Nothing more credible than Gloria's own testimony  precludes the possibility that Higgs was innocent of capital murder.

evidence does not preclude relief.

In particular, powerful challenges to Darby's credibility were available, but for trial counsel's ineffectiveness and the Government's failures to disclose. See Issue I. Trial counsel also failed to use information supporting an independent motive for Haynes to kill the decedents, and Higgs seeks discovery of additional such information. Issue I; *Discovery Motion*, ¶¶ 33-35, A - 84. Thus, Higgs's claims and discovery request both challenge Darby's testimony and suggest that Haynes had the motive for the homicides.

Items (2) and (5) in the Court's list at most support a consciousness of guilt in general, not necessarily guilt of first degree murder.

Items (3) and (4) are both based on statements allegedly made by Higgs to Williams. Higgs, however, claims that he and Williams were not even housed together during part of the time when those remarks were supposedly made. Higgs should have had the opportunity to undermine Williams's testimony through discovery and a hearing before the court relied on it as establishing guilt.

Finally, owning and previously firing a gun of the same caliber as that used in the murders does not come close to being conclusive evidence that Higgs is guilty of first degree murder.

The District Court essentially required Higgs to prove he is innocent in order

to obtain discovery that could help him prove his innocence.  If that standard were correct it would be virtually impossible to obtain discovery in § 2255 proceedings. The court's requirement that Higgs demonstrate his entitlement to relief in order to establish "good cause" was contrary to <u>Bracy</u>.

This Court should remand, with instructions to grant the requested discovery and allow Higgs to file an amended petition within a reasonable period of time thereafter.

**B.      The Court Below Erred in Summarily Dismissing Higgs's Claims.**

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon ...."  28 U.S.C. § 2255.  If a district court summarily dismisses a § 2255 motion in the absence of such a showing, reversal and remand for a hearing is required.  <u>Fontaine v. United States</u>, 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for hearing); <u>Winston v. Kelly</u>, 592 F.3d 535, 552-53 (4th Cir. 2010) (district court properly granted hearing where "it was not implausible that Winston would succeed if he proved the facts alleged in his petition."); <u>United States v. Matthews</u>, 239 Fed. Appx. 806, 807 (4th Cir. 2007) (similar); <u>Ciak v. United States</u>, 59 F.3d 296, 306-07 (2d Cir. 1995) (hearing required where movant "alleged facts, which, if found to be true, would have entitled him to

habeas relief").

The record does not conclusively show that Higgs is not entitled to relief. Rather, he has "alleged facts, which, if found to be true, would have entitled him to habeas relief" as to his first degree murder convictions. Moreover, his guilt phase claims also cast doubt on the reliability of his death sentences, and his claim of ineffective assistance of counsel at penalty phase, <u>see</u> Issue V, is meritorious. This case should be remanded for an evidentiary hearing.

**CONCLUSION**

Counsel's ineffectiveness, prosecutorial violations of due process and Court error combined to render Mr. Higgs's trial unfair in multiple respects and highly unreliable. Virtually every aspect of the Government's proof has been shown to be suspect with a resultant reasonable probability of a different outcome, but for these errors.

This Court should reverse Higgs's convictions and sentences and remand for a new trial. Alternatively, the Court should remand to the District Court for provision of discovery and an evidentiary hearing on all material and disputed facts.

Respectfully Submitted

/s/    Michael Wiseman
_____

| | |
|---|---|
| Michael Wiseman | Stephen H. Sachs |
| Angela Elleman | Wilmer Cutler Pickering Hale & Dorr, |
| Matthew Lawry | 5 Roland Mews |
| Assistant Federal Defenders | Baltimore, MD 21210 |
| Federal Community Defender Office | 410-532-8405 |
| Eastern District of Pennsylvania | |
| Suite 545 West – The Curtis Center | |
| Philadelphia, PA 19106 | |
| 215-928-0520 | |
| Counsel for Appellant, Dustin John Higgs | |

Dated:      December 21, 2010

**Certificate of Compliance with Typeface and
Length Limits, Pursuant to FRAP 32(a)(7)(C)**

I, Michael Wiseman, hereby certify pursuant to FRAP 32(a)(7)(C) that this brief complies with the typeface and length requirements of FRAP 32(a)(7)(C) in that it is composed in 14 point proportional (Times New Roman) typeface, and is 27,627, which complies with this Court's December 7, 2010 that the brief not exceed 28,000 words.

/s/ Michael Wiseman

_____

Michael Wiseman

Dated: December 21, 2010

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 21st day of December, 2010 I served a copy of the foregoing upon the following persons through ECF filing and by placing two copies in the United States Mail, First Class, postage prepaid:

Deborah A. Johnston
Sandra Wilkerson
Assistant United States Attorneys
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

/s/ Michael Wiseman

_____

Michael Wiseman