No. 10-7

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

DUSTIN JOHN HIGGS,

Appellant.

*Appeal from the United States District Court for the*
*District of Maryland, Southern Division*
*Honorable Peter J. Messitte, District Judge*

**BRIEF OF APPELLEE**
**UNITED STATES OF AMERICA**

**Rod J. Rosenstein**
**United States Attorney**

**Sandra Wilkinson**
**Deborah Johnston**
**Assistant United States Attorneys**
**36 South Charles Street, Fourth Floor**
**Baltimore, Maryland 21201**
**410-209-4800**
**Attorneys for the Appellee**

May 20, 2011

**TABLE OF CONTENTS**

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Murders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Evidence Regarding Comparative Bullet Lead Analysis. . . . . . . . . 12

    D.    Post-Trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.    The District Court's Denial of Higgs' Section 2255 Motion
        Based on CBLA Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

THE DISTRICT COURT PROPERLY DENIED HIGGS' CLAIMS
REGARDING THE INTRODUCTION OF COMPARATIVE BULLET
LEAD ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    Facts Relevant to Higgs' CBLA Claims. . . . . . . . . . . . . . . . 22

    C.    Discussion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.    The Alleged Inadmissibility of the CBLA Evidence at
            the Time of Trial is Not a Basis for Habeas Relief. . . . 26

2. The Government Did Not Suppress *Brady* Information or Violate Higgs' Due Process Rights.. . . . . . . . . . . . . 28

3. Higgs Has Not Shown That He Received Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . 35

    a. Failure to Hire and Prepare an Expert.. . . . . . . . 38

    b. Failure to Timely Raise New CBLA Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

STATEMENT WITH RESPECT TO ORAL ARGUMENT. . . . . . . . . . . . . . . . 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Barefoot v. Estelle,* 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). . . . . . . . . . . . . *passim*

*Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 37

*Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 22

*Harrington v. Richter*, 131 S. Ct. 770 (2011). . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Haynes v. United States*, 451 F. Supp. 2d 713 (D. Md. 2006). . . . . . . . . . 27, 39, 41

*Higgs v. United States*, 543 U.S. 999 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Higgs v. United States*, 543 U.S. 1004 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Higgs v United States*, 711 F. Supp. 2d 479 (D. Md. 2010). . . . . . . . . . . . . *passim*

*Hill v. Lockhart*, 474 U.S. 52 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 41

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*McDaniel v. Brown*, _____ U.S. ___, 130 S. Ct. 665 (2010). . . . . . . . . . . . . . . . . 42

*Roach v. Martin*, 757 F.2d 1463 (4th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . 36, 37

*Rodriguez v. United States*, 286 F.3d 972 (7th Cir. 2002). . . . . . . . . . . . . . . . . 42

*State v. Noel*, 157 N.J. 141, 723 A.2d 602 (N.J. 1999).. . . . . . . . . . . . . . . . . . . 38

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . 35, 36, 37, 39, 40

*United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010). . . . . . . . . . 34, 35, 38, 45, 46

*United States v. Davis*, 103 F.3d 660 (8th Cir. 1996).. . . . . . . . . . . . . . . . . . . . 38

*United States v. Drones*, 218 F.3d 496 (5th Cir. 2000). . . . . . . . . . . . . . . . . 27, 28

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003).. . . . . . . . . . . . . . . . . *passim*

*United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004). . . . . . . . . . . . . . . . . . 3

*United States v. McClure*, Crim. No. DKC 01-0367 (Mem. Op.)
    (D.Md. Nov. 29, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Pettiford*, 612 F.3d 270 (4th Cir. 2010). . . . . . . . . . . . . . . . 27, 42

*Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 22

**STATUTES**

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1111(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1201(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §§ 3591 to 3598. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## OTHER AUTHORITIES

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## STATEMENT OF JURISDICTION

The district court (Peter J. Messitte, J.) issued a final order of judgment on April 7, 2010 as to Higgs' Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative to 28 U.S.C. § 2241. JA 179.[1] The district court denied a Certificate of Appealability on all issues. JA 180. Higgs timely filed this notice of appeal on September 16, 2010. JA 183. This Court granted a Certificate of Appealability as to one issue. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. Jurisdiction existed in the district court by virtue of 28 U.S.C. §§ 2241 and 2255.

## STATEMENT OF THE ISSUES

Whether the district court properly denied habeas relief based on petitioner Higgs' post-trial arguments challenging the Government's use of Comparative Bullet Lead Analysis (CBLA) at his trial because three years later the FBI discontinued use of the science for forensic purposes.

---

[1] "JA" refers to the Joint Appendix filed on December 21, 2010, in connection with this appeal. "OJA" refers to the original Joint Appendix filed in connection with Higgs' direct appeal of his conviction and sentence.

**STATEMENT OF THE CASE**

A federal grand jury in the District of Maryland indicted Dustin John Higgs and co-defendant Willis Mark Haynes in connection with the murders of Tanji Jackson, Tamika Black, and Mishann Chinn. JA 37-54. Prior to trial, the United States Attorney for the District of Maryland filed a Notice of Intent to Seek the Death Penalty.

Jury selection in Higgs' trial began on September 5, 2000. JA 18. On October 11, 2000, the jury convicted Higgs of three counts of first-degree premeditated murder (18 U.S.C. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)(2)), and three counts of using a firearm "during and in relation to [a] crime of violence" (18 U.S.C. § 924(c)). JA 21. Accordingly, the case then proceeded to a bifurcated penalty phase. On October 26, 2000, the same jury recommended, and the district court on January 3, 2001 imposed, nine death sentences under the Federal Death Penalty Act, 18 U.S.C. §§ 3591 to 3598, plus a consecutive 45-year prison sentence. JA 25, 26.[2] The district court entered judgment on January 9, 2001. JA 26-27.

---

[2] In a separate trial, a jury convicted Haynes but failed to reach a unanimous penalty verdict, and the trial court imposed a life sentence.

Higgs appealed his convictions and death sentences to the United States Court of Appeals for the Fourth Circuit. In a published opinion, this Court affirmed the conviction and sentence in full. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (hereinafter *Higgs-I*). On November 29, 2004, the Supreme Court of the United States denied Higgs' petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 999 (2004).

During the pendency of his direct appeal, Higgs discovered new evidence that he claimed, by way of a new trial motion in the district court, demonstrated the equal culpability of codefendant Haynes, who had not received a death sentence. The district court denied the new trial motion, and this Court affirmed that decision by way of an unpublished opinion. *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (*Higgs-II*). The Supreme Court also refused to grant review to Higgs with respect to this claim. *Higgs v. United States,* 543 U.S. 1004 (2004).

On November 28, 2005, Higgs timely filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 ("Section 2255 motion"), which asserted 25 claims of error. The Brief in Support was filed on May 3, 2006. In an Opinion dated April 6, 2010, the district court denied the Section 2255 Motion in all respects. *Higgs v. United States*, 711 F. Supp. 2d 479

(D. Md. 2010) (hereinafter *Higgs-III*).  The district court entered a separate Final Order of Judgment on April 7, 2010, denying the Section 2255 Motion as well as requests for discovery and an evidentiary hearing.  JA 179.  On July 20, 2010, the district court denied Higgs' Request for a Certificate of Appealability ("COA").  JA 180.  Higgs filed a notice of appeal on September 16, 2010.  JA 183.  On March 3, 2011, this Court granted a COA as to Issue II ("Higgs' Conviction and Sentence Were Obtained Through Scientifically Unsound Evidence") and established a briefing schedule on this single issue.   The Government now files this response.

## STATEMENT OF FACTS[3]

### A.     The Murders

On the evening of Friday, January 26, 1996, Dustin John Higgs, Willis Mark Haynes, and Victor Gloria drove from Higgs' apartment, at 13801 Briarwood Drive in Laurel, Maryland, to Washington, D.C.  Arriving in the city in Higgs' blue Mazda MPV van, the men picked up Tanji Jackson, Tamika Black, and Mishann Chinn.  Jackson knew Higgs, and they had arranged for Haynes to date Black and Gloria to date Chinn.  After stopping at a liquor store, the couples

---

[3]     The facts underlying the conviction are not disputed.  Sections (A) and (B) of the Statement of Facts herein are drawn directly from this Court's first opinion in this case.  *Higgs-I*, 353 F.3d at 289-94.

returned to Higgs' apartment to drink alcohol and listen to music.  The men also smoked marijuana.[4]

Early on January 27, Higgs and Jackson began to argue, prompting Jackson to obtain a knife from the kitchen.  Hearing the commotion, Haynes, who had been in a bedroom with Black, broke up the fight, convincing Jackson to surrender the knife.  Jackson, however, remained angry, and the three women left the apartment.  As Jackson exited, "[s]he stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat."  The remark led Higgs to comment that Jackson "do know a lot of n-----s."  Higgs saw Jackson stop and copy the license plate number of his van.  Angered, Higgs commented aloud about Jackson's actions, which Gloria interpreted as concern that Jackson intended some retaliation.

Higgs said, "f---- that," retrieved his coat, and urged the men to come with him.  Before leaving the apartment, Higgs took a silver .38 caliber firearm from the end table drawer and put it in his pocket.  With Higgs driving the MPV van,

---

[4] Following a 1998 arrest on federal drug charges, Gloria agreed to cooperate in the Government's murder case against Higgs and Haynes.  His testimony was partially corroborated by Chinn's mother and by a friend of the Jackson family, both of whom saw the victims enter a blue Mazda MPV van.  Gloria pled guilty to being an accessory after the fact to the murders and received 84 months' incarceration and three years of supervised release.  *United States v. Gloria*, PJM 98-0482 (Docket Entry 9).

Haynes in the front passenger seat and Gloria behind Higgs, the men pursued the three women. Seeing the three women walking on the side of the road, Higgs told Haynes to get them in the vehicle. Haynes complied, and the three women got into the back seat of the vehicle, which Higgs drove toward Washington, D.C.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and quietly conversed. Higgs drove past the Baltimore-Washington Parkway which would have taken them to the city and turned instead into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. When Higgs pulled the van over at a secluded location, one of the girls asked if they were trying to "make [them] walk from [t]here?" Higgs responded, "something like that." When the women exited the van, Higgs handed his gun to Haynes, who put it behind his back and left the van. Moments later, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings in the rearview mirror. Gloria put his head down and listened to more shots and the sound of a woman screaming.

When the shooting ended, Haynes reentered the van and closed the door. He or Higgs then commented that they had to "get rid of the gun." Higgs drove to

the Anacostia River where he or Haynes threw the gun into the water.  Higgs then

drove back to his apartment, which the three men proceeded to sanitize of

evidence.  They wiped the patio doors and "everything else, the bathroom, the

doorknobs, the stereo," and threw away any items the women might have touched,

such as CDs, videotapes, and liquor bottles.  The men left the apartment and

dropped the trash by a dumpster.  Higgs and Haynes left Gloria at a fast food

restaurant with an admonition to "keep [his] mouth shut."

Around 4:30 a.m., a motorist found the murdered women's bodies strewn

about a roadway and contacted the Park Police.  Jackson's day planner was found

at the scene.  It contained Higgs' nickname and telephone number, as well as a

note that read "13801 'MAZDA' 769GRY" – the street number of Higgs'

apartment and the tag number for his van.  The police also recovered a .38 caliber

wadcutter bullet at the scene.  According to the medical examiner, Jackson and

Black had each been shot once in the chest and once in the back.  Chinn had been

shot once in the back of the head.

### B.    The Investigation

Although Higgs was almost immediately suspected, the police investigated

the murders for nearly three years before arresting him.  On March 21, 1996, Park

Police officers interviewed Higgs at his apartment.  Higgs acknowledged his

acquaintance with Jackson and said he could have talked to her the night before her death. However, he denied that she had ever visited his apartment. He said that he first heard of the murders while watching the ten o'clock news on Saturday, January 27, at a party hosted by his girlfriend, Phyllis Smith. Higgs recalled immediately commenting to another party guest that he thought he knew "that Tanji girl." But the names and photos of the three victims were not released to the media until January 28.

After concluding the interview, the officers executed an arrest and search warrant arising from Higgs' suspected involvement in unrelated bank frauds. In addition to cash and documents, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45, and .38 caliber weapons. On May 12, 1997, Higgs pled guilty to possession with intent to distribute cocaine base, for which he received 17 years' imprisonment.

The Park Police turned their attention to Higgs' girlfriend, Phyllis Smith, who initially provided a false alibi for Higgs. She claimed Higgs had been with her and her family on the night of the killings, helping clean her home for a party the following night. She instructed her relatives to confirm the alibi. Later, Smith testified to the grand jury that Higgs was with her at 5:00 a.m., January 27. At trial, she recanted both accounts and testified that Higgs called her after his arrest

and asked her to provide an alibi for the night of January 26. She complied, believing that the police were investigating drug charges; when she learned the officers' questions pertained to a triple murder, she admitted her lies. At trial, Smith testified that Higgs was not with her when she cleaned her house on the evening of the 26th, when she went to bed at 1:30 a.m. on the 27th, or when she awoke three-and-one-half hours later to care for her son. Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs in her home.

Enidsia Darby, Higgs' former girlfriend and the mother of his son, Daquon, also testified Higgs telephoned Darby after his March 1996 arrest and told her that he was in custody on drug charges. Darby, however, had seen news reports about the arrest that included photographs of the murder victims. When she asked Higgs about the women, he responded by asking if Darby remembered that he had been with her at the hospital on the night of the murders. When Darby later visited Higgs in jail, he admitted having been present at the shooting. He said that Jackson had been invited to his house to smoke and drink because she had been "snitching on one of them." He also said he did not know the other two victims: "They were just for his friends."

Darby also testified that Higgs had leveled death threats against his criminal accomplices. She and Higgs had perpetrated a bank fraud in the fall of 1995 with the assistance of a woman named Andrea Waters. Waters received a percentage of the criminal proceeds, until Higgs defrauded her. When Waters announced her intention to contact the police, Higgs responded with a threat to kill her. In a separate scheme, Darby had charged the merchandise of her employer to a credit card number she received from Higgs. When the fraud prompted an investigation, Higgs threatened to kill Darby if she identified him.

The investigation into Higgs' involvement in the murders disclosed his participation in two shootings involving .38 caliber weapons, the same caliber of firearm used in the homicides. On November 20, 1995, about two months before the murders, Higgs got into an argument outside the Chaconia Nightclub in Washington, D.C., and shot out the windows of a vehicle from his van. During a search of the damaged vehicle, the police recovered a .38 caliber bullet. An accomplice to the shooting, Wondwossen Kabtamu, threw Higgs' gun out the window of van after the crime. The men returned to get the weapon at Higgs' insistence. Higgs was later charged with the shooting and explained to Domenick Williams, a jailhouse lawyer, that he did not want to plead guilty to it "because they would try to use the gun in another case." When Williams learned of the

indictment for the murders of the three women, Higgs commented to him, "You see why I can't plead guilty to that charge?" A second shooting occurred on Cherry Lane in Laurel, Maryland, on December 10, 1995, when Higgs and Haynes fired at a man named Rodney Simms following a verbal dispute over a woman. At the scene, the police later recovered nine millimeter and .38 caliber bullets and bullet casings.

The .38 caliber bullets at the Cherry Lane and Chaconia sites had five lands and grooves, with a right twist, just like the slugs recovered in connection with the three murders. Despite identifying the common caliber and rifling characteristics, firearms examiners could not definitively conclude that all the projectiles were fired from the same weapon. Still, the bullets recovered in connection with the murders were also .38 caliber with five lands and grooves and a right twist.[5]

While awaiting trial in the D.C. jail, Higgs made comments to Domenick Williams evincing his consciousness of guilt. He told Williams that he had rebuffed an offer to cooperate against Haynes. When Williams said that the authorities would likely extend a similar offer to Haynes, Higgs responded "that

_____

[5] In April 1997, Higgs pled guilty to the Cherry Lane shooting. During the plea hearing, the prosecutor stated that Haynes had fired the nine millimeter handgun and that Higgs had fired the .38 caliber handgun. Higgs did not contest the facts of the shooting, but gratuitously asserted that he "didn't have a .38. It was the other way around."

his youngan would hold up," and "that the Government wouldn't offer a deal to the trigger man."  Higgs asked Williams, in reference to Gloria, what his chances would be "if the witness after the fact wasn't there."  Williams told him that "his chances would be good," but Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because" former D.C. Jail inmates Melvin Grayson and "T" "would be out there to handle anything that he needed."  Williams told the police about the conversations and produced letters in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner."  Through visitation records, authorities learned that Grayson had visited Higgs in jail in February and March 1999.  The Chaconia charges were dismissed in May 1999.

## C.      Evidence Regarding Comparative Bullet Lead Analysis

The Government offered Comparative Bullet Lead Analysis (CBLA)[6] at trial as additional evidence that bullets found at the crime scene and at Higgs' home could be linked to Higgs through the .38 caliber bullets fired during the Cherry Lane and Chaconia Nightclub shootings.  The bullets were already forensically linked as described by this Court in affirming Higgs' conviction on

---

[6] CBLA is oft-referred to interchangeably as  "CABL" (Compositional Analysis of Bullet Lead).

direct appeal:

> Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist. Fn2. Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

> Fn 2  According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." ....  Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," ... the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Higgs-I*, 353 F.2d at 293.

As the district court articulated in ruling on Higgs' Section 2255 Motion, CBLA is a process that measures the elemental composition of the lead found in one bullet and compares it to that of the lead found in another bullet.  *Higgs-III*, 711 F. Supp. 2d at 493 (*citing* Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit*?, 28 OKLA. CITY U. L. REV. 43, 44-45 (2003)).  As the district court explained:

> Pursuant to CBLA, two bullets with statistically significant similarities in their elemental composition may be declared

"analytically indistinguishable," the implication being that the bullets were manufactured during a single process by a single manufacturer and thereafter found their way into the same box of bullets purchased by a person who, inferentially, fired both.

*Higgs-III*, 711 F. Supp. 2d at 494.[7]

The CBLA evidence was introduced through the testimony of Kathleen Lundy, an examiner in the Elemental Analysis Group in the Materials Analysis Unit of the FBI Laboratory. JA 116. Trial counsel accepted Lundy as an expert in comparative bullet lead analysis without challenge regarding her qualifications. JA 585. As Lundy explained, the technique used to conduct comparative lead analysis is called "Inductively Coupled Plasma Atomic Emission Spectroscopy" or "ICP." JA 585. In this case, after conducting the ICP, Lundy identified three composition groups relevant to the jury's deliberations. Composition Group 1 included Government Exhibits "B1", "TB1," and "TJ1," bullets recovered from the scene of the crime and victims Black and Jackson, respectively. JA 431, 586. Composition Group 2 were bullets recovered from the body of Mishann Chinn and the scene of the Cherry Lane shooting. JA 431-32. Composition Group 3 included a bullet from the Chaconia shooting (Exhibit B3) and 18 bullets seized

---

[7]   As the district court stated, "[t]he typical inference is that two 'analytically indistinguishable' bullets originated from the same sources or melt of lead at a manufacturing plant." *Id.* at 494 n.4.

-14-

from Higgs' home.  JA 432-33, 586.  Lundy opined that the composition groups were bullets that originated from the same sources of lead.  JA 434.  She specifically opined that the Chaconia shooting bullet was "analytically indistinguishable" from the 18 .38-caliber bullets seized at Higgs' residence.  JA 436-39, 585.  She also opined that a .38 caliber bullet from the Cherry Lane shooting was "analytically indistinguishable" from the bullet found in Mishann Chinn's head.  JA 436-39, 585.

Defense counsel aggressively cross-examined Lundy, making the same points through her testimony that would have been made through an expert retained by the defense.  JA 585-86.  The jury first learned that the "compositional association of lead" and fingerprint analysis are very different sciences:

> A fingerprint is an impression that would be identified to one individual.  When you are talking about associations of two different bullets, I am not saying that those are the only two bullets that have that composition.  I know there were more, many more when they were originally made.... [and I am not] able to put a number on how many were originally or initially made...

JA 586.  Lundy conceded on cross-examination that the FBI could not identify what items were used for the melt of lead, or how many suppliers of lead were used, by "only a very small percentage of available bullet lead."  JA 586.  Lundy also agreed that there is a variation in the measurement between the different

specimens from one bullet and none "match[] identically" nor will ever be an "exact replication between bullets."  JA 586.  Lundy further concurred that the compositional association between bullets is an "interpretati[ve]" analysis and that "there is always going to be uncertainty in any measurement you make."  JA 586.  Counsel further undermined Lundy's analysis by obtaining concessions that the FBI did not seek outside peer review for the work and that Lundy did not know the instrumental error rate for ICP.  JA 586.  Lundy stated that the bullets recovered from Chaconia were not tested against the bullets from the homicide because of the "physical differences" between them.  JA 586.  In his direct appeal, Higgs challenged the relevance of the Chaconia testimony at all on this basis but this Court disagreed and held otherwise without even mentioning the CBLA testimony:

> Higgs asserts that no such relevance exists because the bullet recovered from the Chaconia shooting was not the same type of bullets used to murder the three women, i.e., it was not a wadcutter bullet.  While true, this distinction does not render the evidence irrelevant.  The bullet used in the .38 caliber revolver during the Chaconia shooting was only of a different type than those used in the murders.  Indeed, while forensic evidence could not establish an exact match, the bullets examined from the murders, the Chaconia shooting, and the Cherry Lane shooting all had the same land and groove impressions, consistent with being fired from the same .38 caliber

weapon.  Accordingly, we hold that the district court did not abuse its discretion in admitting the evidence.

*Higgs-I*, 353 F.3d at 326.

Finally, Lundy agreed that bullets even contained in the same manufacturer's box can be analytically distinguishable given the compositional elements that are in the bullets.  JA 586-87.

The CBLA evidence was mentioned only briefly during closing arguments.  JA 443.  In fact, the argument on that point comprised only fourteen lines of lengthy closing argument.  JA 442-43.

### D.    Post-Trial

More than three years after the trial, the National Research Council of the National Academy of Sciences released the results of a study criticizing the reliability of CBLA.  *Higgs-III*, 711 F. Supp. 2d at 494.  The NRC study led to the FBI's September 1, 2005, announcement that it was discontinuing its use of CBLA.[8]  *Id.*  In its September 1, 2005, announcement, the FBI admitted that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination."  *Id.*

---

[8]  *See* http://www.fbi.gov/pressrel/pressrel05/bullet_lead_analysis.htm (FBI Press Release (Sept. 1, 2005).  JA 116.

**E.** **The District Court's Denial of Higgs' Section 2255 Motion Based on CBLA Evidence**

In Higgs' Section 2255 Motion, he claims that he is entitled to a new trial or sentencing because CBLA is a "discredited" scientific analysis, and a "sham." App.Br. 25, 29. In support of his motion, Higgs relies heavily on the fact that, in 2005, the FBI discontinued use of CBLA. App.Br. 29. In denying Higgs' Section 2255 Motion, the district court rejected each of Higgs' three claims based on the CBLA evidence. *Higgs-III,* 711 F. Supp. 2d at 494-502.

First, the district court rejected the argument that there was a *Brady* violation because the Government did not disclose two studies that could have been used to impeach Lundy's CBLA testimony: one study conducted by the FBI in 1991 ("FBI Study"), and a second conducted by Iowa State University researchers at the request of the FBI in 2000 ("Iowa State Study"). *Id.* at 498-500. As to this issue, the district court found:

> Higgs' *Brady* claim derives from the prosecution's failure to divulge the FBI study and the Iowa State study, which he claims contained information that would have helped him impeach the Government's expert testimony with respect to CBLA. While the Court accepts that these studies raise questions as to the validity of CBLA, it concludes that they were not required to be disclosed. The Court reasons thus: (1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly

identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Id.* at 498.

Second, the district court rejected Higgs' argument that the discovery of "new evidence" about the reliability of CBLA, including the NRC study that led to the FBI's abandonment of the practice, entitles him to a new trial. *Id.* at 500-01. As the district court correctly noted, such argument is premised on a claim of "actual innocence" - a "high threshold" from which Higgs "falls far short." *Id.* at 500. The district court found that evidence adduced against Higgs at trial was "extensive and strong" and included the testimony of Victor Gloria, an eyewitness and co-conspirator, Higgs' post-offense conduct, statements Higgs made to third parties, and "testimony from various witnesses that Higgs owned and had previously fired a .38 caliber gun, the same caliber used in the murders." *Id.*

Finally, the district court rejected Higgs' third CBLA argument that defense counsel was ineffective for failing to offer available studies or experts critical of CBLA. Here, the district court found:

Passing the question of deficiency *vel non* of counsel's performance,

the Court concludes that there was no reasonable probability that, absent counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence previously catalogued establish that proposition beyond peradventure.

*Id.* at 502.

## SUMMARY OF ARGUMENT

The district court correctly denied Higgs' Section 2255 Motion.

Higgs' convictions were not "obtained through scientifically unsound evidence," App. Br. 27, but rather through strong and compelling evidence of his guilt that did not hinge on the CBLA testimony. Moreover, CBLA evidence was widely accepted at the time of trial. It is not clear that defense counsel ever would have elected to pursue a *Daubert* hearing or that such evidence would have been excluded based following a *Daubert* hearing if counsel had sought such a hearing. Higgs' Due Process rights were not violated through admission of the CBLA testimony, and there is no habeas relief available to him.

The FBI and Iowa State studies do not amount to *Brady* material because similar information was publicly available well before the trial. Moreover, there was other significant probative evidence supporting the admissibility of Higgs' prior possession of a .38 caliber gun. The CBLA evidence was cumulative,

-20-

minimal, and vigorously challenged during cross-examination. In short, the CBLA studies were not material and, as such, do not undermine confidence in the jury's verdict.

Higgs' trial counsel was not ineffective regarding the CBLA evidence. Higgs' new claim that counsel was ineffective for failing to raise a CBLA issue in a motion for new trial is forfeited because it was not raised in the district court. Further, there is no reasonable probability that the results of the trial would have been different had trial counsel found the studies and used them to further impeach the government's expert. The weaknesses inherent in CBLA have been known for years and indeed were well exploited by trial counsel in this case. In any event, Higgs' trial strategy was to admit Haynes' involvement in the killing, and the admission of the CBLA evidence did not taint or affect that strategy in any way. Moreover, there was overwhelming evidence beyond the CBLA testimony which clearly linked Higgs to the .38 caliber gun and to the .38 caliber bullets.

**ARGUMENT**

**THE DISTRICT COURT PROPERLY DENIED HIGGS' CLAIMS REGARDING THE INTRODUCTION OF COMPARATIVE BULLET LEAD ANALYSIS.**

### A.     Standard of Review

The district court's legal conclusions are reviewed *de novo* and its factual findings for clear error.  *Walker v. Kelly*, 593 F.3d 319, 322-23 (4th Cir. 2010), citing *Green v. Johnson*, 515 F.3d 290, 301 (4th Cir. 2008).   For factual findings reviewed under the clear error standard, this Court does not substitute its version of the facts for that found by the district court; instead, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, this Court will not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  *Walker v. Kelly*, 593 F.3d at 323.

### B.     Facts Relevant to Higgs' CBLA Claims

The evidence at trial was that, on January 26, 1996, Haynes shot three young women with a .38 handgun that belonged to Higgs.  Victor Gloria testified that he saw Higgs take a .38 from a drawer in Higgs' apartment and was in the back seat of the minivan when he saw Higgs hand Haynes the gun.  *Higgs-I*, 353

F.3d at 290. The murder weapon was undisputedly a .38 caliber gun. The gun was never found.

In addition to Gloria's testimony, the Government proved Higgs' link to a .38 caliber gun a number of ways. First, an eyewitness testified at trial that he saw Higgs fire a .38 caliber weapon on November 20, 1995, at persons located in a parking lot outside the Chaconia Nightclub and a .38 caliber casing was recovered. *Id.* at 292, 311. Second, a .38 caliber weapon was used during the December 10, 1995 Cherry Lane shooting involving both Higgs and Haynes. Higgs pled guilty in connection with the Cherry Lane shooting. *Id.* at 293. Third, .38 caliber bullets were found in Higgs' apartment during the execution of a search warrant. *Id.* at 291.

The knowing possession of a .38 caliber weapon by Higgs in the two months prior to the triple murders was unquestionably relevant. *Id.* at 293. The .38 caliber firearm used in the Chaconia and Cherry Lane shootings was tied to the murders by the fact that the bullets fired from the gun in the two prior shootings also shared the same rifling characteristics. *See id.* at 311-12 ("[T]he evidence of Higgs' participation in the Chaconia Nightclub shooting was properly introduced by the Government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the

murders, and one which shared the same rifling characteristics as did the murder weapon."). Significantly, this Court's opinion in *Higgs-I* did not even mention the CBLA testimony in assessing the relevance of the Chaconia shooting, as there was significant other evidence linking the murder weapon to Higgs.[9]

The Cherry Lane shooting was also unquestionably relevant at trial without reference to the CBLA evidence. Higgs pled guilty to the Cherry Lane shooting but disclaimed use of the .38 caliber weapon during the plea colloquy. *Id.* at 293-94. However, as this Court properly noted, Higgs made statements to Domenick Williams linking himself to the .38 caliber weapon used in the Cherry Lane shooting. *See id.* at 293 (Higgs told Williams "[t]hat he didn't want to plead guilty because they would try to use the gun in another case"). After Williams learned through a press report that Higgs was being indicted for the murders of the three

---

[9]     Higgs asserts that the CBLA evidence was the only evidence linking him to the weapon that was not subject to impeachment. *See, e.g.,* App.Br. 29. It is simply wrong to call Lundy's testimony "unchallenged and unimpeached." App.Br. 42. The CBLA evidence was heavily impeached through vigorous cross-examination of Lundy by trial counsel. Regardless, the "impeachable" and "challenged" evidence of Higgs' possession of a .38 caliber gun was clearly sufficient to support the jury's guilty verdict and this Court's affirmance. It included, of course, Gloria's testimony, the fact that .38 caliber bullets were found in Higgs' apartment, the witness testimony regarding his involvement in the Chaconia shooting, his guilty plea to the Cherry Lane and various admissions he made including to Williams, the jailhouse informant.

women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" *Id.*

The Government introduced CBLA evidence only to provide a further link between the Chaconia shooting and the bullets found in Higgs' apartment and between a bullet recovered at the Cherry Lane shooting to the projectile that killed Mishann Chinn. Before the CBLA evidence was even admitted, the evidentiary link among the forensically similar .38 caliber bullets was already well established.

### C. Discussion

Higgs challenges his conviction and death sentence based on the introduction of CBLA testimony at his trial. Higgs argues that: (1) CBLA is "a sham" and therefore should have been inadmissible at trial, App.Br. 29; (2) the Government suppressed the two studies discrediting CBLA in violation of *Brady v. Maryland,* 373 U.S. 83 (1963)*,* and his Due Process rights, App.Br. 36; and (3) trial counsel's failure to timely challenge the CBLA evidence post-trial and to effectively rebut the CBLA evidence during trial constitutes ineffective assistance of counsel, App.Br. 41-45.

The carefully reasoned judgment and accompanying findings of fact of the district court should be affirmed here. The district court correctly found that none

of the arguments before it had merit.[10]  In addition, Higgs' claim that trial counsel was in effective in failing to timely raise the CBLA issue in a motion for a new trial has been forfeited.

### 1.    The Alleged Inadmissibility of the CBLA Evidence at the Time of Trial is Not a Basis for Habeas Relief.

At pages 32 through 36 of his Brief, Higgs contends that the CBLA evidence was not admissible at trial under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 589 (1993).  App.Br. 32.  Higgs does not clearly discuss how this allegation warrants habeas relief though he suggests at page 38 that, had the two studies been provided to him, "trial counsel would have been able to mount a successful *Daubert* challenge" and at page 41 that "even without the information withheld by the Government, reasonable counsel would still have had much at their disposal to exclude CBLA."

In ruling on Higgs' Section 2255 Motion, the district court did not address *Daubert* or the notion that even without the two studies, trial counsel should have filed a *Daubert* motion, *Higgs-III*, 711 F. Supp. 2d at 493-501, presumably

---

[10]    In his Section 2255 Motion, Higgs also claimed that recent revelations about CBLA's unreliability amount to newly discovered evidence warranting a new trial.  He has abandoned that argument on appeal.

because it was not raised specifically as an independent basis for habeas relief.[11]
In any event, CBLA "was a widely accepted technique in federal and state courts"
at the time of trial. *Haynes v. United States*, 451 F. Supp. 2d 713, 719 (D. Md.
2006). Thus, it can hardly be ineffective for trial counsel to challenge
admissibility of scientific evidence that was widely admitted at the time of trial.
*Id; see also United States v. Drones*, 218 F.3d 496, 504 (5th Cir. 2000) (counsel
not constitutionally deficient in choosing to attack the government's case rather
than challenge expert voice identification despite uncertainty of the current state
of the law regarding the reliability and admissibility of expert voice identification
evidence).

Even if a *Daubert* hearing would have been fruitful, it is not a foregone
conclusion that trial counsel would have elected to move for such a hearing.
Faced with overwhelming other evidence of Higgs' guilt, trial counsel may well
have preferred to permit the Government to introduce what counsel believed was
flawed scientific evidence, which would have given counsel the opportunity to do
exactly what they did in the trial: score points on cross-examination, and thereby
try to raise a question in the jury's mind about the validity of the Government's

---

[11] *See United States v. Pettiford,* 612 F.3d 270, 281 (4th Cir. 2010) ("an argument
not presented to the federal district court in a habeas petition is forfeited and
cannot be advanced at the merits stage, on appeal").

case.  In any event, Higgs has not made a convincing showing that the evidence would have been excluded under *Daubert*.  It is just as likely that the district court would have allowed Lundy's testimony, recognizing that trial counsel would be able to expose the flaws in CBLA on cross-examination.  *Drones*, 218 F.3d at 504 (noting value of rigorous cross-examination of questionable scientific technique).

Finally, as discussed in more detail below, even if the CBLA evidence had been excluded from the trial, there remained overwhelming evidence of Higgs' guilt, and there is no reason to believe that the outcome of the trial would have been any different.

In sum, Higgs' Due Process rights were not violated through admission of the CBLA testimony, and there is no habeas relief available to him on that ground.

2. The Government Did Not Suppress *Brady* Information or Violate Higgs' Due Process Rights.

Higgs contends that the Government violated *Brady* due to the fact that he was not informed about the FBI and Iowa State studies.  Higgs claims that the studies would have allowed him to better impeach the Government's expert testimony with respect to CBLA.  App.Br. 36-40.  Higgs maintains that the failure to turn over these studies undermines confidence in the jury's verdict of guilt on

nine counts of capital murder and the subsequent death verdict.  This argument

lacks merit.

The district court accurately described the two types of critiques of CBLA

that could be gleaned from the FBI and Iowa State studies:

> (1) challenges based upon bullet manufacturing and
> distribution processes, suggesting the possibility that
> bullets from the same lead source could make their way
> into separate boxes and ultimately into the possession of
> different individuals; and (2) challenges to the validity of
> the chemical and statistical analyses used to determine if
> two bullets – e.g. a bullet found at a crime scene and a
> bullet found in a suspect's possession – are "analytically
> indistinguishable."

*Higgs-III,* 711 F. Supp. 2d at 498.  The district court found that, as to the first

category, the information was publicly available at the time of the trial.  *Id.*  As to

the second point, the district court stated the studies were too "speculative" and

the conclusions "less than ringing" to be material as *Brady* requires.  *Id.* at 499.

The district court is correct.

The materiality standard for *Brady* claims is met only when "the favorable

evidence could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435

(1995).  Higgs has not demonstrated in the slightest how his lack of access to the

FBI and Iowa State studies undermines confidence in the verdict.  This is readily

apparent when the CBLA evidence is compared with the other compelling proof of the facts for which the CBLA evidence was admitted - that is, simply to corroborate other evidence of Higgs' prior possession of the .38 caliber gun used in the triple murder. The evidence of Higgs' guilt in the offense was overwhelming (even without any testimony regarding the .38 caliber weapon) as it included admissions Higgs himself made while incarcerated and directly after the murder and the cooperating testimony of Victor Gloria - an eyewitness to the murders. The small point for which Lundy was called was hardly the linchpin of the guilty verdict.

In his brief, Higgs takes specific issue with the district court's factual finding that the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial. App.Br. 38; *Higgs-III*, 711 F. Supp. 2d at 498. Higgs claims that the September 1999 article the district court found in which the FBI study was referenced was written by an ATF employee (Keto) and "therefore [a person who] had access to the unpublished 1991 [FBI] study." App.Br. 39. Higgs wants this Court to infer that this fact means only government employees would have such access to the information, but that is an inference without foundation or support. The point is that the FBI study was mentioned and the information could be obtained through

the exercise of reasonable diligence. *See Higgs-III,* 711 F. Supp. 2d at 498. Even if the FBI Study was not publicly available, the Keto article certainly was publicly available. Thus, the district court was correct to conclude that, with the exercise of reasonable diligence, Higgs could have "obtained identical or nearly identical information" to that contained in the FBI and Iowa State studies. *Id.*[12]

With respect to the remaining critiques of CBLA, as the district court noted, the studies did not provide "strong, definitive conclusions, but at most suggest areas for possible additional study." *Id.* at 498. Thus, the information was not, in the district court's view, material. *See id.* at 497 ("not every shred of general scientific information available to the prosecution constitutes *Brady* evidence"). This conclusion is, of course, bolstered by the fact that the very critiques made in the study, and that were in the 1999 study found by the district court, were simply that CBLA "does not generate individualizing information" because "[t]he extent of each particular source (i.e., the number of identical boxes by each manufacturer) and the bullets available in a particular geographic area at a particular time are all unknown factors." *Id.* at 499 (quoting Keto article) (district

---

[12] Elsewhere in his brief, Higgs concedes that, even without the information "withheld by the government," counsel "had much at their disposal to exclude CBLA," App.Br. 41, and also acknowledges that concerns about CBLA have "long been raised." App.Br. 27.

court's emphasis removed). Higgs' trial counsel hammered this issue home to the jury in every conceivable way, and the government's own expert did not challenge this point. OJA 586-89.

Higgs also suggests that, absent the CBLA evidence, evidence of the Chaconia and Cherry Lane shootings would not have been admitted. App. Br. 25. This assertion is clearly incorrect. First and foremost, the claim is belied by this Court's published decision in *Higgs-I* noting the relevance of the two prior shootings linking Higgs to a .38 caliber gun and *never mentioning* the CBLA evidence. *Higgs-I*, 353 F.3d at 311-12 ("The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same rifling characteristics--five lands and grooves with a right twist. Thus, the evidence of Higgs' participation in the Chaconia Nightclub shooting was properly introduced by the Government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon."). Moreover, as this Court also noted, Higgs admitted the relevance of the gun used in the Cherry Lane shooting during his conversation with Domenick Williams – it linked him to the triple murders. *See id.* at 292-93 (describing Williams' testimony that Higgs

-32-

explained to him that he did not want to plead guilty in the Cherry Lane shooting because "they would try to use the gun in another case").

Higgs fails to address in his brief remaining facts which provide strong support for the district court's opinion regarding the alleged *Brady* violation. First, by his own admission, Higgs could have called either at trial (or at a *Daubert* hearing) "witnesses capable of stating conclusions nearly identical to those he characterizes as present" in the FBI and Iowa State studies. *Higgs-III*, 711 F. Supp. 2d at 499. The Section 2255 Motion itself, filed in 2006, notes that the problems with CBLA "are longstanding. . . . [and] has been mounting in recent years." Section 2255 Motion at 6.

Further, the very premise of the information contained in the Iowa State study regarding "some difficulty in reliably measuring the quality of bullet lead evidence" from a quantitative view had been the subject matter of countless cross-examinations in bullet lead analysis for years and was mirrored in this case. Learned trial counsel simply chose not to call his own expert and vigorously cross-examined the Government's witness instead. And the government's expert agreed on cross-examination about the relative significance of an "analytically indistinguishable" match when the universe of possible bullets is so large. JA 586- 592. The district court properly found that these admissions negate Higgs'

claim that the studies "contained information not reasonably available elsewhere."

*Higgs-III*, 711 F. Supp. 2d at 500. Higgs offers no response to this simple fact.

The Ninth Circuit properly rejected a similar due process argument in

*United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010). There, the defendant was

convicted of armed bank robberies and bombings. The government not only

called Lundy, the same expert at issue in this case, but also a second expert to

further buttress her testimony. Like Higgs, the defendant in *Berry* asserted that the

bullet lead evidence was so scientifically unsound that it rendered his trial

"fundamentally unfair," in violation of his due process rights. *Id.* at 1039.

Second, he argued that Lundy's perjury and the FBI's discontinued use of the

bullet lead evidence undermined confidence in his guilty verdict. *Id.* The Court

found "neither argument convincing." *Id.* at 1039. As the Court explained:

> In order for Berry to succeed on his due process claim, it is not
> enough that the evidence introduced against him was of low probative
> value or was of questionable reliability. Rather, Berry must establish
> that the evidence was so arbitrary that "the factfinder and the
> adversary system [were] not ... competent to uncover, recognize, and
> take due account of its shortcomings." [*citing Barefoot v. Estelle*, 463
> U.S. 880, 899 (1983)].

*Id.* at 1040. The Court noted that even though the bullet lead evidence "may have

been flawed," it was not so arbitrary as to render Berry's trial "fundamentally

unfair." *Id.* Indeed, the Court noted, the criticisms of CBLA evidence "indicate

that it is precisely the kind of evidence that the adversary system is designed to test. Vigorous cross-examination would have exposed its flaws to the jury." *Id.*

Both the district court here and the Court in *Berry* appropriately analyzed analogous due process claims and both courts properly rejected them. This Court should do the same.

### 3. Higgs Has Not Shown That He Received Ineffective Assistance of Counsel.

Next, Higgs contends that his trial counsel was ineffective with respect to the CBLA evidence admitted at trial. App.Br. 41. This argument also lacks merit.

The touchstone for evaluating Higgs' claim of ineffective assistance of counsel is whether the conduct of his attorneys fell "within the range of competence normally demanded of attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court instructed that claims of ineffective assistance of counsel are decided by the following two prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction

or death sentence resulted from a breakdown in the adversary process
that renders the result unreliable.

*Id.*; *see also Roach v. Martin*, 757 F.2d 1463 (4th Cir. 1985)*; Hill v. Lockhart*, 474

U.S. 52 (1985).

In evaluating the first part of the *Strickland* test, courts should make every

effort to evaluate attorney conduct from counsel's perspective at the time.

*Strickland,* 466 U.S. at 690.  Moreover, courts apply a strong presumption of

competence with respect to the actions of defense counsel.  In this regard, this

Court has recognized that "[j]udicial scrutiny of counsel's performance must be

highly deferential.  It is all too easy for a defendant to second guess counsel's

assistance after conviction . . . . [A] court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action, might be considered sound trial strategy."

*Roach*, 757 F.2d at 1476; *see also Harrington v. Richter*, __ U.S. __, 131 S. Ct.

770, 788 (2011) ("The question is whether an attorney's representation amounted

to incompetence under 'prevailing professional norms,' not whether it deviated

from best practices or most common custom."), *quoting Strickland,* 466 U.S. at

690.

Therefore, it is the defendant who carries the burden of overcoming the presumption that an attorney's actions were based on "sound trial strategy." *Strickland*, 466 U.S. at 689; *see also Roach*, 757 F.2d at 1476. Moreover, an attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation." *See Fisher v. Angelone,* 163 F.3d 835, 852-53 (4th Cir. 1998).

The second prong requires the defendant to show that the attorney's conduct actually prejudiced the defense. *Strickland*, 466 U.S. at 689. Even if the conduct was professionally unreasonable, in order to satisfy this prong, the defendant must show that his attorney's error caused the trial to be unreliable and, thus, denied the defendant his right to a fair trial. *Id.* Unless the defendant is able to make both of these showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process" that led to an unreliable verdict. *Id.*

Applying *Strickland* here, the district court correctly held "that there was no reasonable probability that, absent counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence previously catalogued establish that proposition beyond peradventure." *Higgs-III*, 711 F. Supp. 2d at 502. In addition, Higgs has not shown that trial

counsel's performance fell below an objective standard of reasonableness.

a. <u>Failure to Hire and Prepare an Expert</u>

Higgs asserts that trial counsel was constitutionally ineffective for failing to hire and prepare an expert at trial. App.Br. 42-44. This argument claim is wrong for two reasons.

First, the record is clear that counsel did consult a "metals analysis" (CBLA) expert. JA 594. Thus, counsel chose to deal with the CBLA evidence through cross-examination. This strategy of confrontation is a well established defense technique and not at all indicia of facial ineffectiveness. *See, e.g., Berry*, 624 F.3d at 1040 (noting that "vigorous cross-examination" of scientific techniques can expose"flaws to the jury"); *see also Harrington v. Richter*, 131 S. Ct. 770, 789 (2011)("Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it.").

At the time of Higgs' trial in 2000, CBLA was a widely accepted scientific technique in federal and state courts. *See, e.g.*, *United States v. Davis*, 103 F.3d 660, 673 (8th Cir.1996); *State v. Noel*, 723 A.2d 602, 606 (N.J. 1999). Moreover, despite the statistical flaws with CBLA noted in the Iowa State study, the science itself is still probative. *See Higgs-III*, 711 F. Supp. 2d at 499 (noting that the FBI

-38-

Study "actually did more to confirm the validity of the CBLA processes than to discredit them" and that the Iowa State study never actually concluded the science was invalid but instead criticized the "limited data availability"). There is no question, nor does Higgs challenge, the fact that the bullets here did share the same elements as testified to by Lundy.

Indeed, the same CBLA evidence at issue here was offered at the trial of Higgs' codefendant, Haynes. Haynes also filed a habeas motion contending that his trial counsel was ineffective for failing to challenge the Government's comparative lead bullet analysis at trial. Haynes also faulted counsel for not cross-examining the government's expert (Lundy) or offering testimony in rebuttal. *Haynes*, 451 F. Supp. 2d at 719. Haynes contended that the evidence presented by Lundy was "actually bogus science which has come under attack by numerous defense counsels and criminal courts across the country." *Id.* As in this case, the district court denied Haynes' motion finding that "[c]ounsel cannot fairly be deemed ineffective if they chose not to dispute the conventional scientific wisdom of the time." *Id.; see also Harrington v. Richter,* 131 S. Ct. at 789 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach."), quoting *Strickland,* 466 U.S. at 689.

Second, and most importantly, Higgs cannot establish prejudice under the second prong of *Strickland* which would warrant habeas relief. To do so, he would have to show that his counsel's deficient performance prejudiced his defense to the extent that the result of the proceeding would have been different had his counsel performed effectively. *See Strickland,* 466 U.S. at 687. Even assuming that the district court would have excluded Lundy's testimony if Higgs had provided competing expert testimony in a *Daubert* hearing,[13] the district court nevertheless most certainly would have allowed evidence relating to Higgs' possession of the .38 caliber gun prior to the triple murder, and the use of a .38 caliber weapon when Higgs and Haynes were involved in the Cherry Lane shooting. Indeed, on the direct appeal of Higgs' case, this Court noted the probative value of such evidence without even mentioning the CBLA evidence. *Higgs-I,* 353 F.3d at 312 (noting "intrinsic" relevance of Chaconia evidence and admissibility of Cherry Lane evidence under Rule 404(b)). Thus, the

_____

[13]    It is true, as Higgs points out, that another district judge in Maryland did not admit comparative bullet lead analysis testimony in a 2004 case. *United States v. McClure*, Crim. No. DKC 01-0367 (Mem. Op.) (D.Md. Nov. 29, 2004). It is equally true, however, that the district judge issued this ruling without knowing the FBI would withdraw use of the forensic science the following year. *McClure* is simply an example of how different courts construe the admissibility of evidence under governing standards in light of the unique facts of a particular case.

corroborative value of the CBLA evidence was minimal and its absence would not have affected the admissibility of evidence concerning Higgs' prior possessions and use of a .38 caliber gun.

Finally, counsel's trial strategy was not to challenge the government's proof as to the shooting. Rather, the trial defense was to place blame for the triple murder squarely on Willis Haynes. JA 596 ("We accept and do not dispute that ... Willis Haynes shot each of those young ladies."). Conceding Haynes' guilt was central to counsel's trial strategy. *Compare Haynes*, 451 F. Supp. 2d at 720 ("Challenging the ballistic evidence would at best have confused the jury as to [the defense that Haynes was under Higgs' control].*"); see also Huffington v. Nuth*, 140 F.3d 572, 582 (4th Cir.1998) (noting that because counsel's strategy involved asserting that his client was not even present during the commission of a crime, attacking the expert testimony on ballistic evidence would do nothing to advance that strategy).[14]

Thus, as in *Haynes*, given the other powerful evidence of Higgs' guilt, the effect of the Lundy testimony, even if erroneous, was not material. *See Haynes*,

---

[14] Ironically, the CBLA evidence that the bullet from victim Chinn's head was "analytically indistinguishable" from a bullet in the Cherry Lane shooting arguably bolstered Higgs' defense as Higgs never denied Haynes' guilt in the shootings and wanted to put the .38 caliber gun in Haynes' hand.

451 F. Supp. 2d at 720 (noting same "bogus science" contention has "no succor" when inconsistent with reasonable trial strategy).

In sum, Lundy's testimony was minimized by cross-examination, and the jury would have heard evidence, even absent her testimony, that Higgs had possessed a .38 caliber weapon on two prior occasions, and had contemporaneous possession of .38 caliber ammunition. As such, no reasonable probability exists that the defense would have obtained a more favorable verdict had counsel employed any other strategy in confronting the CBLA evidence.

b.    <u>Failure to Timely Raise New CBLA Evidence</u>

Higgs claims that counsel "failed to timely bring to the attention of the District Court" the "new" CBLA evidence by timely filing a motion for new trial. App.Br. 44. Higgs cannot so easily circumvent the strict rules for Section 2255 motions by raising a new argument on appeal. Higgs never claimed in his Section 2255 Motion that counsel was ineffective in failing to "timely raise new CBLA evidence." Higgs' claim in this regard has been forfeited. *Pettiford,* 612 F.3d at 281 ("an argument not presented to the federal district court in a habeas petition is forfeited and cannot be advanced at the merits stage, on appeal"), *citing McDaniel v. Brown*, __ U.S. __, 130 S. Ct. 665, 675 (2010); *see also Rodriguez v. United States,* 286 F.3d 972, 978-79 (7th Cir. 2002) (Movant was procedurally barred

-42-

from raising challenge to his sentence, under *Apprendi v. New Jersey*, [530 U.S. 466(2000)] and thus would not be permitted to expand certificate of appealability in order to raise that issue on appeal from denial of motion to vacate sentence, where claim was not raised before the district court, despite movant's awareness of claim's availability).

More importantly, even if counsel below *had* timely filed a motion for new trial, this Court can properly note it would have been denied by the district court because Higgs' arguments "falls far short of ....[the] high threshold" for a new trial. *Higgs-III,* 711 F. Supp. 2d at 501. The district court specifically found that the evidence against Higgs at trial was "extensive and strong." *Id.* This Court should credit the findings the district court made in this regard. His protestations notwithstanding, Higgs was justly convicted in this case based on credible and powerful evidence. First and foremost, the eyewitness testimony of Victor Gloria established Higgs' guilt. Gloria's testimony, particularly in light of the other corroboration including witness testimony and physical evidence, was powerful. Beyond Victor Gloria's testimony, however, the district court found additional injurious evidence to include:

> 1. Enidsia Darby's statement that Higgs told her that the victims were killed because Tanji Jackson was "snitching on one of them [Higgs or Haynes]...";

2. Higgs' attempt to manufacture alibis for himself by urging Phyllis Smith and Enidsia Darby to lie to investigators as to his whereabouts at the time of the murder ...;

3. Higgs' statement to Dominick [sic] Williams that he could not plead guilty to the Chaconia Nightclub shooting because he feared that the bullets found at that crime scene could be linked to those used to kill Black, Chinn, and Jackson - a statement tantamount to a confession ...;

4. Higgs' admission to Williams that the women were killed because they were "tripping,";

5. Higgs' suggestion to Williams that his friends would stop Gloria from testifying, presumably by intimidating or killing him; and

6. Testimony from various witnesses that Higgs owned and had previously fired a .38 caliber gun, the same caliber used in the murders.

*Id.* at 500-01.  Of course, this is not all the evidence admitted at trial.  Indeed, the "sufficiency of the evidence" findings made by this Court on direct appeal of this case speak volumes as to the compelling case against Higgs without any mention of the Chaconia shooting, the Cherry Lane shooting or, most importantly, the CBLA.  Relying substantially on the well-corroborated testimony of Victor Gloria, this Court determined the evidence sufficient to convict Higgs of premeditated murder, kidnapping, and use of a firearm in connection with the crimes of

violence. *Higgs-I*, 353 F.3d at 313-14. There is absolutely nothing about the CBLA testimony, which was brief, cumulative, and vigorously challenged at trial, that casts doubt in the slightest on the validity of Higgs' convictions.

There would be no merit to a claim of actual innocence here. The CBLA evidence did not directly concern Higgs' culpability, much less did it provide extant evidence of his innocence. At most, it was impeachment material as to Lundy. But even the absence of Lundy's testimony would not likely have produced an acquittal because that evidence was collateral, cumulative, and only intended to enhance the probity of other evidence. The district court properly would have admitted the evidence that Higgs possessed a .38 caliber gun on two recent prior occasions (once when he was with co-defendant Haynes) when the bullets from those shootings bore forensic similarities with (and nothing distinguishable from) the bullets used to kill the three women. *Higgs-III*, 711 F.Supp.2d at 498 (noting other evidence presented at trial that provided a "firm link" between Higgs and the bullets found at the murder scene).

In *Berry*, the defendant was convicted of armed bank robberies and bombings based, in part, on bullet lead analysis proffered by the same government expert here. 624 F.3d at 1035-36. Following affirmance of his conviction, the defendant in *Berry* also learned that Lundy had perjured herself in a different

proceeding and that the FBI had discontinued use of CBLA evidence. On appeal

of the district court's denial of his habeas motion (treated as a motion for new

trial), the Court found that "the new evidence was both 'merely impeaching' and

unlikely to result in an acquittal on retrial." *Id.* at 1043. The Court explained:

> [W]e conclude that the National Research Council report and the
> FBI's discontinued use of CABL [CBLA] evidence were no more
> than impeaching evidence of the CABL testimony introduced at
> Berry's trial. We also reject Berry's contention that the evidence of
> Lundy's false statement was more than "merely impeaching." The
> false statement occurred almost five years after Berry's trial and
> related to a bullet-manufacturing process that was not at issue in his
> case. Further, Lundy was not accused of fabricating the results of any
> tests in this case, and there is no evidence that she committed perjury
> at Berry's trial. Thus, there is little doubt that the new evidence
> would only serve to impeach her credibility on retrial.
>
> ***
>
> Finally, the new evidence would not "probably" result in an acquittal
> if a new trial were granted. As outlined above, significant
> circumstantial evidence connected the defendants to the robberies and
> bombings. In fact, even without the CABL evidence, there was
> sufficient evidence to support Berry's conviction. The district court
> did not abuse its discretion by finding that Berry's new evidence
> would not have made any difference in the outcome of his trial.

*Id.* at 1043-44.

As in *Berry*, the CBLA testimony here was probative only to explain and

enhance independently admissible (and independently inculpatory) facts – Higgs'

prior possession of .38 caliber weapons and ammunition.  Higgs is not actually

innocent.  In short, there are no grounds for granting relief to Higgs here.

## CONCLUSION

Based on the foregoing reasoning and authority, the Government

respectfully urges this Court to affirm the district court's denial of Higgs' Section

2255 Motion.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By: _____/s/_____

Sandra Wilkinson
Deborah Johnston
Assistant United States Attorneys

# STATEMENT WITH RESPECT TO ORAL ARGUMENT

The Court has previously indicated that this case will be selected for oral argument.

# CERTIFICATE OF COMPLIANCE

1.　This brief has been prepared using:

**WordPerfect, Times New Roman, 14 Point**.

2.　EXCLUSIVE of the corporate disclosure statement; table of contents; table

of citations; statement with respect to oral argument; any addendum

containing statutes, rules, or regulations, and the certificate of service, the

brief contains:

10,772　words;

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions.  If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.


_____/s/_____
Sandra Wilkinson
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2011, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF System, which will send

notice of such filing to the following registered CM/ECF users:

Stephen H. Sachs, Esq.  at Stephen.Sachs@wilmerhale.com
Michael Wiseman, Esq. at Michael_Wiseman@fd.org
Angela Elleman at Angela_Elleman@fd.org


          /s/

Sandra Wilkinson
Assistant United States Attorney
