No. 10-7

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DUSTIN JOHN HIGGS,
*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the District of Maryland
Criminal No. PJM-98-0520, Hon. Peter J. Messitte, U.S.D.J.

_____

**REPLY BRIEF OF APPELLANT**

Leigh Skipper, Esq.
Chief Federal Defender
Angela Elleman
Matthew Lawry
Michael Wiseman
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
5 Roland Mews
Baltimore, MD 21210
410-532-8405

Dated:      June 13, 2011

# PRELIMINARY STATEMENT

Citations will be the same as those used in *Initial Brief of Appellant.* The *Joint Appendix* is cited as "A" followed by the page(s). The transcripts of the trial proceedings are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceeding transcripts are cited as "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The District Court's *Opinion*, filed April 7, 2010, is cited as *DCO*, followed by a page citation to the *Joint Appendix*.

Appellant's *Initial Brief* will be cited as *IB*, followed by a page citation. The Government's brief, *Brief of Appellee, United States,* will referred to as *Government's Brief* and will be cited as *GB*, followed by a page reference.

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   MR. HIGGS'S CONVICTIONS AND SENTENCES WERE
      OBTAINED THROUGH SCIENTIFICALLY UNSOUND
      EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Counsel's Failure to Move to Exclude the CBLA Evidence
            or Present Expert Witnesses to Challenge it Constituted
            Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.    Counsel's performance was deficient. . . . . . . . . . . . . . . . 5

            2.    Counsel's deficient performance prejudiced Higgs.. . . . . . 12

      B.    The Government Suppressed Evidence Discrediting CBLA.. . . . . 17

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Compliance with Typeface and Length Limits,
Pursuant to FRAP 32(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

Arredondo v. United States, 178 F.3d 778 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ciak v. United States, 59 F.3d 296 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 3

Fontaine v. United States, 411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Harrington v. Richter, 131 S. Ct. 770 *GB*, 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kyles v. Whitely, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sinisterra v. United States, 600 F.3d 900 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Berry, 624 F.3d 1031 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Davis, 103 F.3d 660 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Matthews, 239 Fed. Appx. 806, 807 (4th Cir. 2007).. . . . . . . . . . . . . . . . . . . 2

Winston v. Kelly, 592 F.3d 535 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## STATE CASES

State v. Noel, 697 A.2d 157 (N.J. Super. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. Noel, 723 A.2d 602 (N.J. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

**FEDERAL STATUTES**

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 12

Fed.R.Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARGUMENT**

## I.     INTRODUCTION

In our *Initial Brief*, we showed that Mr. Higgs's convictions and death

sentences are tainted by supposedly "scientific" but actually inadmissible and

now-discredited evidence purporting to "match" bullets taken from Higgs's

apartment with those found at the scene of the homicide, and two unrelated

shooting incidents.  The Government responds with a variety of internally

contradictory and meritless arguments.  According to the Government, counsel at

the time of trial had no reason to question or challenge the admissibility of the

evidence, but the Government also had no duty to disclose *its own studies* that

refuted the hypotheses about bullet composition on which its expert relied.  The

proper way to resolve the primarily factual arguments raised by the Government is

through a remand to the District Court for an evidentiary hearing.

Higgs was improperly denied an evidentiary hearing in the court below.

Section 2255 provides that "[u]nless the motion and the files and records of the

case conclusively show that the prisoner is entitled to no relief, the court shall ...

grant a prompt hearing thereon ...."  28 U.S.C.  2255.  If a district court summarily

dismisses a  2255 motion in the absence of such a showing, reversal and remand

for a hearing is required.  See, e.g., Fontaine v. United States, 411 U.S. 213, 215

(1973) (reversing summary dismissal and remanding for hearing); <u>Winston v.</u>

<u>Kelly</u>, 592 F.3d 535, 552-53 (4th Cir. 2010) (district court properly granted

hearing where petitioner had not previously had hearing on his claim and "it was

not implausible that Winston would succeed if he proved the facts alleged in his

petition.").[1]

It is indisputable that the record does not conclusively show that Higgs is

not entitled to relief. Rather, he has "alleged facts, which, if found to be true,

would have entitled him to habeas relief." Higgs's claims related to Comparative

Bullet Lead Analsysis ("CBLA") require an evidentiary hearing for their full and

fair resolution. Accordingly, this case should be remanded, with directions to

allow a full and fair evidentiary hearing.

---

[1]<u>See</u> <u>also</u> <u>United States v. Matthews</u>, 239 Fed. Appx. 806, 807 (4th Cir. 2007)
(similar); <u>Sinisterra v. United States</u>, 600 F.3d 900, 906 (8th Cir. 2010) (remanding
for evidentiary hearing because the the motion and the files and records of the case
**did not** conclusively show that petitioner was entitled to no relief.); <u>Arredondo v.</u>
<u>United States</u>, 178 F.3d 778, 782, 788-90 (6th Cir. 1999) (district court abused
discretion in refusing to hold hearing, where petitioner's allegations were not
"'contradicted by record, inherently incredible, or conclusions rather than statements
of fact'") (quoting <u>Engelen v. United States</u>, 68 F.3d 238, 240 (8th Cir. 1995)); <u>Ciak</u>
<u>v. United States</u>, 59 F.3d 296, 306-07 (2d Cir. 1995) (district court should have held
hearing where movant "alleged facts, which, if found to be true, would have entitled
him to habeas relief").

**II.  MR. HIGGS'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH SCIENTIFICALLY UNSOUND EVIDENCE.**

    **A.  Counsel's Failure to Move to Exclude the CBLA Evidence or Present Expert Witnesses to Challenge it Constituted Ineffective Assistance.**

The Government does not seriously dispute that the CBLA evidence it introduced at Higgs's trial was unreliable, discredited "junk" science that today would be inadmissible under <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993).  The Government could not take any other position since the FBI, in 2005, in the wake of the NRC report debunking CBLA "science," has discontinued using CBLA analysis for any purpose.  Instead, the Government speculates that there might have been a valid reason for defense counsel's failure to challenge the admissibility of the CBLA evidence, and asserts that Higgs was not harmed by counsel's failure to dispute the evidence.[2]

_____

[2] The Government contends that Higgs failed to raise below his claim that counsel ineffectively failed to make a <u>Daubert</u> challenge to the CBLA evidence. *GB*, 26-27.  The Government is mistaken.  Higgs specifically alleged in his *2255 Motion* that CBLA evidence was inadmissible and that counsel failed to effectively challenge it. *2255 Motion* at 8, 18.  In his Brief in Support of his 2255 Motion Higgs elaborated over the course of 11 pages on the available evidence that indicated CBLA would have failed a <u>Daubert</u> challenge, and specifically argued that trial counsel was ineffective for his failure to seek to "exclude the admission of CBLA." *Brief in Support* at 23.

The Government makes a similar and erroneous argument that Higgs "never

The Government's argument fails. First and foremost, it fails because, in the absence of a hearing, there is no evidence of counsel's actual basis for failing to challenge the inadmissible evidence. Moreover, the speculative reasons advanced by the Government simply do not make sense in light of the record, and certainly do not "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 – hence the need for evidentiary resolution. Counsel's deficient performance was prejudicial, moreover, because the CBLA evidence provided a critical link between Higgs and the murder weapon, and his alleged use of the

---

claimed in his Section 2255 motion that counsel was ineffective for failing to litigate the CBLA claim in the district court. *GB*, 42. In his § 2255 motion, Higgs alleged the fact that trial counsel did not litigate the CBLA questions in the district court. Then, in his Brief in Support, he argued that one of those means of litigating these issues was through a motion for new trial:

> Counsel failed to timely bring to the attention of this Court the new evidence discussed above, demonstrating that CBLA is unscientific and unreliable. As this evidence began to mount, effective counsel would have brought that evidence to this Court's attention through the filing of a Motion for a New Trial pursuant to Fed.R.Crim.P. 33. A Rule 33 Motion had to have been filed within three years of the verdict. Id. 33(b)(1).

Brief in Support at 26. The Government's waiver argument is without merit.

Finally, the Government suggests that Higgs has abandoned on appeal the newly discovered evidence claim. *GB*, 26, n 10. This is incorrect. See *IB*, 64-65.

Because the Government does not make any substantive arguments, Higgs relies on his *Initial Brief* for a discussion of the merits.

4

murder weapon in two unrelated shootings.

### 1. Counsel's performance was deficient.

With respect to deficient performance, the Government first argues that CBLA evidence was "a widely accepted scientific technique in federal and state courts" at the time of trial, *GB*, 38, and therefore that counsel would have had no reason to question its validity. In support of this assertion of wide acceptance, the Government cites only two decisions – United States v. Davis, 103 F.3d 660 (8th Cir. 1996), and State v. Noel, 723 A.2d 602 (N.J. 1999).

Those two decisions do not constitute wide acceptance. Moreover, assuming trial counsel reviewed those decisions, reasonable counsel would have been encouraged to challenge the post-Daubert acceptance of CBLA. In Davis, there was an evidentiary hearing regarding the admissibility of CBLA. The hearing consisted of extensive direct testimony from a government witness, who was briefly crossed by defense counsel using a book critical of an earlier version of CBLA testing. Given the government expert's essentially unchallenged testimony concerning scientific acceptance of CBLA, the district court allowed the evidence and the Eighth Circuit affirmed. Davis, 103 F.3d at 673-74. Defense counsel who read Davis would have learned only that CBLA could not be successfully challenged using an out-of-date text, not that CBLA was "widely

accepted" or that consulting an expert would be pointless.

Further, defense counsel familiar with <u>Noel</u> would have realized that serious issues could be raised about the admissibility and probative value of CBLA. In <u>Noel</u>, the New Jersey Supreme Court held, in a split decision, that CBLA evidence was admissible. <u>Noel</u>, 723 A.2d at 148-50. In so doing, it overruled the Appellate Division, which had ruled in a 2-1 decision that CBLA was not admissible. <u>State v. Noel</u>, 697 A.2d 157 (N.J. Super. 1997). Two Justices of the New Jersey Supreme Court vigorously dissented from the reversal of the Appellate Division, arguing that CBLA should be inadmissible. <u>Noel</u>, 723 A.2d at 608-10 (O'Hern, J., dissenting). Far from learning of wide acceptance of CBLA, counsel who reviewed <u>Noel</u> would have learned that three appellate judges in New Jersey thought it should be excluded.

Moreover, the Government and the District Court agree that at least one of two key Government studies attacking the reliability of CBLA was "publicly available at the time of trial." *GB*, 29 (<u>citing</u> <u>Higgs v. United States</u>, 711 F. Supp. 2d 479, 498 (D. Md. 2010)). The fact that information undercutting CBLA was available at the time of trial demonstrates that counsel, regardless of any prior court rulings on admissibility, was deficient for failing to utilize this information and to hire an expert to explain to the court and the jury why CBLA was

6

unreliable.

The Government next speculates that counsel may have had various reasons for failing to mount a Daubert challenge to the admissibility of CBLA – that counsel may have preferred to attack the CBLA testimony on cross examination, and even that the trial court might have allowed inadmissible scientific evidence so that counsel could expose the flaws in the evidence on cross-examination. *GB*, 27-28. This is utter speculation, without any foundation in the record, that makes no sense. The thought that trial counsel would have preferred to challenge evidence before the jury instead of keeping it from the jury is nonsensical – before this Court could accept such reasoning it would certainly have to hear it from the trial lawyers, which of course can only happen at an evidentiary hearing. This Court should reject the Government's invitation to speculate about unlikely theories that are not supported by the record. Indeed, this Court has specifically held that in evaluating a claim of ineffective assistance of counsel, it is inappropriate to rely on speculative strategic reasons in the absence of record support that counsel actually relied on such reasons. In Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992), the state supreme court had denied the petitioner's ineffective assistance of counsel claim on the grounds that counsel had a "tactical" reason for not presenting a witness whom counsel had never interviewed. This

Circuit described the state supreme court's ruling as an "exercise[] in retrospective sophistry" and "thoroughly disingenuous" because counsel "did not even talk to [the witness], let alone make some strategic decision not to call him." Id. at 1358. This Court further explained:

> [C]ourts should not conjure up tactical decisions an attorney could have made, but plainly did not. The illogic of this "approach" is pellucidly depicted by this case, where the attorney's incompetent performance deprived him of the opportunity to even make a tactical decision about putting [the witness] on the stand. A court should "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another.

Griffin, 970 F.2d at 1358-59, accord Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (hindsight cannot be used to supply a "tactical" reason for counsel's errors); Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) (reviewing court should "not construct strategic defenses which counsel does not offer"); Thomas v. Lockhart, 738 F.2d 304, 309 (8th Cir. 1984) ("just as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it"). The way to resolve these disputed factual issues is to hold a hearing to determine what investigation counsel made, what choices counsel made, and whether there was a reasonable basis for those choices.

The Government also contends that the "record is clear" that counsel

actually consulted an expert on metallurgy, citing their own brief below for this point. *GB*, 38 (citing A - 594, Gov't *Motion to Strike*). The record is anything but clear on this matter. Higgs alleged below that counsel did not retain, provide materials to, or consult such an expert. In support of that allegation, Higgs proffered a declaration from the alleged expert, attesting that he was not retained in this case or provided any materials.[3] In view of the expert's declaration, if anything is "clear" in the record, it is that counsel did not consult with this expert. However, to the extent that there is a dispute about such reliance, it can only be resolved at an evidentiary hearing. The Government speculates nonetheless that after supposedly consulting this expert, counsel adopted a strategy of cross-examining the Government's expert rather than seeking to exclude the CBLA evidence. *GB*, 38. Aside from the fact that the supposed "strategy" is pure speculation and makes no sense, the actual cross-examination conducted by counsel belies any suggestion that it was the product of reasonable investigation and preparation.

---

[3]We are submitting with this brief an unopposed motion to file a short Supplemental Joint Appendix containing this declaration, as well as a letter sent by defense trial counsel to the Government's trial counsel concerning this expert, a curriculum vitae of the expert and defense trial counsel's witness list. Higgs submits that these documents show that his counsel did not retain this expert. Any other conclusion could only be made following evidentiary resolution.

Counsel's cross examination consumed only twenty-one (21) pages of testimony, most of which concerned the smelting process. Despite counsel's efforts, the Government's expert, Kathleen Lundy, maintained her position that each melt of lead is unique, and that no other melt of lead would have the same composition. TT 10/6/00 at 42, 44. On that central point she was not successfully challenged. We now know, however, that this testimony was untrue. There was never any scientific support for the notion that each melt of lead is unique. Had counsel explored the matter at the time by hiring an expert and/or obtaining studies that the Government says were publicly available, counsel would have discovered and could have used at trial the lack of such scientific support for this notion. Further, the Government knew it to be untrue at the time of Ms. Lundy's testimony through the FBI's own unpublished studies disproving this point. See Part B, below.

The other points counsel attempted to make on cross examination were irrelevant to the real flaws in CBLA. Counsel tried to point out imprecision in the chemical analysis. Ms. Lundy responded that the ability to detect the composition of the six measured elements were measured in parts per million to five decimal points, but acknowledged that any measurement has some variation. TT 10/06/00 at 55-58. This line of questioning entirely missed the point about CBLA. There is

no question that one can measure the composition of bullet lead elements, but counsel completely failed to challenge the lack of probative value of the compositional similarities. Cf. *IB*, 31 (1991 FBI study showed matches in boxes of ammunition purchased months apart from different manufacturers).[4]

Trial counsel did not cross examine Ms. Lundy on the core issues that led to CBLA being discredited: the lack of homogeneity in the vats of molten lead; the lack of uniqueness from one melt to another; the problematic and unreliable practice of "data chaining" to reach her results; her inconsistent use of standard deviations in this case; the lack of studies supporting the testability of CBLA; the lack of any peer reviewed articles supporting the FBI's practice; the lack of an error rate for "expert" findings about CBLA conclusions;[5] or the lack of general acceptance of CBLA in the scientific community.

The Government's reliance on <u>Harrington v. Richter</u>, 131 S. Ct. 770 (2011), *GB*, 36, 38-9, is also misplaced. There, the Court ruled that counsel's decision not

---

[4]For this reason, the Government's assertion, *GB*, 39, that Ms. Lundy's testimony about the bullet elements was accurate, is true, but irrelevant, like counsel's cross-examination.

[5]This should not be confused with Ms. Lundy's inability to state the error rate for the ICP instrumentation. TT 10/06/00 at 58. There is a known error rate for the instrument, despite Ms. Lundy's lack of knowledge about it. There has never been, and cannot be, a known error rate for CBLA findings, since there is no scientific foundation for the analysis.

to seek expert blood testimony was reasonable, since pursuing such evidence carried a devastating risk of backfiring – in that case, serological analysis of the blood evidence could have exposed the defendant's story "as an invention." Id. at 789. As the Court explained, "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." Id. at 789-90.[6] Here, trial counsel faced no such risk regarding the CBLA evidence. Lundy's testimony provided the only unchallenged direct link between Higgs and the bullets used in the murder, and breaking this link was crucial to the defense that Haynes did the killing on his own volition. There would have been no risk to the defense in showing that CBLA was unreliable junk science that could not be used to show that bullets from the murder and from the Cherry Lane shooting came from the same source. Thus, there was no strategic reason for counsel's failure to obtain expert assistance regarding CBLA, and counsel's performance was deficient under the first prong of Strickland v. Washington, 466 U.S. 668 (1984).

### 2. Counsel's deficient performance prejudiced Higgs.

The Government argues that Higgs cannot establish prejudice under

---

[6]Portions of Richter discussing review under 28 U.S.C. § 2254(d) in general, and of ineffective assistance claims under § 2254(d) in particular, are inapplicable to this proceeding under 28 U.S.C. § 2255.

Strickland because even if the CBLA evidence had been shown to be junk science, the District Court could still have properly permitted introduction of evidence that Higgs owned and used a .38 caliber gun during the Cherry Lane and Chaconia nightclub shootings. *GB*, 40 (citing, *inter alia*, F.R.Evid. 404(b)). The Government further asserts that counsel's defense was to blame Haynes for the shootings, even arguing that the CBLA evidence bolstered that defense. Id. at 41 & n.14.

The Government's argument misses the critical point about all of this evidence. The most critical trial issue was whether Higgs gave the murder weapon to Haynes and told him to shoot the decedents, or whether Haynes had the weapon and shot them for reasons of his own. The Government therefore felt it was imperative to place the actual murder weapon in Higgs's possession before the killings: "[I]t is absolutely imperative that we put **that** gun in Higgs's hands before the shooting. **There is no other way to do it.**" PTT 9/22/00 at 123.

In addition to CBLA, the Government tried to put the weapon in Higgs's possession in two other ways. First, they offered Victor Gloria to testify that he saw the gun exchange hands. This was a thin reed upon which to secure a capital conviction, particularly since Gloria initially told the authorities he was asleep and

13

saw nothing. His testimony was subject to significant impeachment at trial.[7]

Second, the Government offered traditional ballistics evidence in an attempt to show that the rifling characteristics connected Higgs to the murder weapon. The ballistics evidence, however, at most showed only that the .38 caliber gun Higgs allegedly used at Chaconia and Cherry Lane was consistent with the murder weapon because it was the same caliber and created the same general rifling characteristics – five lands and grooves with a right twist. But these characteristics, which are shared with millions of .38 caliber guns, were not – unlike the purported CBLA match – unique identifiers and did not establish that the gun Higgs used earlier was the murder weapon. This caliber handgun is one of the most common handguns available, and there was no testimony that the rifling characteristics were unusual.[8] Thus, the ballistics evidence was fully consistent

---

[7] Gloria at first told the FBI that he was asleep during the murders, then later recanted that statement and testified to the Government's theory at trial. He also was impeached on the basis of his criminal record and propensity to lie to authorities. See Higgs, 711 F. Supp. 2d at 507.

[8] See TT 10/5/2000, at 175 (FBI Examiner Rosati conceding that there were at least 1.5 million .38 caliber handguns – and likely more – with five lands and groves with a right twist). Higgs also proffered to the lower court a declaration from William Conrad, a ballistics expert, who shared Rosati's view about the number of such handguns. Conrad said it is estimated that there are between 2 and 3 million such .38 caliber handguns with similar rifling characteristics in circulation at the time of these killings. Conrad Report, page 3, proffered to lower court along with his § 2255 motion (district court document #492).

with Haynes having used his own .38 caliber gun, and did nothing to undermine the defense theory that Haynes acted on his own initiative. The CBLA evidence, to the contrary, was offered to establish a direct match through unique identifiers to establish that Higgs possessed the murder weapon.

The Government's argument that the other crimes evidence would have been admitted even if the CBLA evidence was not considered, thus misses the point. Even if the other crimes evidence was admitted, it would not have established the unique "match" ostensibly made through CBLA. Thus, even assuming that evidence of the Chaconia and Cherry Lane shootings would have been admitted, there is a crucial and material difference between evidence of those other shootings and the CBLA evidence. The eyewitness evidence as to those shootings did not connect Higgs to the actual murder weapon. To bolster Gloria's testimony, the Government had a critical need not just to show that Higgs had owned and used **a** .38 gun in the past, but that he owned **the actual** murder weapon. In that context, the CBLA evidence was critical, because if true, valid and reliable, it would have connected Higgs to the bullets used in the homicide, as well as to those used at Chaconia and Cherry Lane. The CBLA evidence, with the false imprimatur of "science," appeared to close this hole in the Government's case by establishing identity, albeit, based on false, unreliable

15

"junk" science. The CBLA evidence purported to establish that a .38 caliber bullet found at the Cherry Lane shooting was "analytically indistinguishable" from a bullet recovered from one of the homicide victims. According to CBLA theory, this match in turn established that the two bullets were manufactured during a single process by the same manufacturer and therefore evidently came from the same box of bullets purchased by the same person – Higgs. It was this evidence of apparent identity, based on unreliable, discredited "junk" science, that was most devastating for the defense. Without the CBLA evidence, the probative value of the ballistics evidence was infinitesimal, i.e., literally one chance in millions.

The Government next argues that "counsel's trial strategy was not to challenge the Government's proof as to the shooting," but instead to place the blame for the murders "squarely on Willis Haynes." *GB*, 41. In fact, that is precisely why it was important to break the link between the bullets and Higgs. Since the defense was that Haynes did the shooting on his own volition, the CBLA "evidence" linking Higgs to the bullet that killed Chinn appeared to provide powerful support to the Government's theory that Higgs had provided the gun. Without the CBLA, there was no forensic link. Instead, there was only the testimony of Gloria, which was inherently unreliable since he originally said he had not seen anything. Accordingly, had the CBLA evidence either been excluded

16

during a <u>Daubert</u> hearing, or debunked through expert testimony, there is a reasonable probability that the result either at the guilt phase or the penalty phase would have been different, and thus the prejudice prong of <u>Strickland</u> is satisfied.

**B.      The Government Suppressed Evidence Discrediting CBLA.**

Although defense counsel ineffectively failed to marshal known facts in support of a challenge to CBLA, there is no question but that the Government also suppressed information in its possession that would have assisted counsel in showing that CBLA evidence was false and unreliable pseudo science.

An underlying assumption of CBLA is that each pour from melted lead has a unique composition.  For there to be any validity to Ms. Lundy's testimony in this case indicating that bullets "originated from the same melt of lead at an ammunitions [sic] plant," TT 10/06/00 at 29, each melt must be unique.

Ms. Lundy repeated this testimony frequently:

Q:    Yet you are still able to reach the opinion that bullets taken from two different scenes can contain the same chemical composition?

A:    Yes.

Q:    What does that tell you?

A:    In my experience, that tells you that those would have originated from the same melt of lead at that particular manufacturer.

TT 10/06/00 at 35.  See also id. at 8 ("[T]he bullets from that melt will all have the same composition.  But the bullets from different melts will have different compositions.  Therefore, you can make a determination whether or not two bullets are from the same melt of lead of a manufacturer or different melts of lead."); id. at 18 ("But these three different compositions would represent three different melts of lead.").

Counsel was ineffective for failing to develop evidence undermining this theory of uniqueness, see Part A, supra, but the FBI had in its hands a study it conducted that disproved the theory of uniqueness.  In 1991 the FBI conducted a study that demonstrated that bullets had compositional "matches" even though they were made by different manufacturers and originated from different melts of lead.  This alone debunked uniqueness and with it CBLA and was in direct contradiction to Ms. Lundy's testimony.

The 1991 study was not revealed to trial defense counsel.  In fact, the Government has still not released this study to undersigned counsel.  It was requested as part of Petitioner's Motion for Discovery, which was denied.  A- 72 Petitioner has still not had access to this study, as it has never been published or released to the public.  Petitioner is aware of the 1991 study because, as the District Court pointed out, other government employees have since cited it in their

18

published articles.  The only such article that predates Higgs's trial, the 1999 Keto article cited by the District Court, mentions the study but does not detail its contents or otherwise reveal its rejection of CBLA's underlying hypothesis.  The 1991 FBI study was not publicly available at the time of Higgs's trial.

The 1999 Iowa study focused on a different area of CBLA.  Instead of challenging the uniqueness of each melt of lead (the study presumed uniqueness without endorsing it), the study focused on two other problems:  the lack of homogeneity in the vats of molten lead from which bullets are made (such that even bullets made from the same melt may vary, which of course, increases the unlikelihood of the uniqueness hypothesis); and the problem of geographical distribution (such that all available bullets in a given geographical area may have similar composition because of the nature of wholesale distribution), as problems that challenge the conclusions drawn by Lundy and other FBI CBLA examiners.  The Iowa study alone also would have significantly weakened the CBLA evidence, excluding and/or impeaching the conclusions of Lundy.  The Government does not challenge that the 1999 Iowa study was not reasonably available to defense trial counsel.

The Government makes no serious argument that the studies themselves were not significant factors in demonstrating the failures in the "science" of

CBLA, given that the 1991 study affirmatively demonstrated the falseness of uniqueness. Instead, the Government merely attempts to argue that they were not material, because the evidence of the other shootings could have been received even without the CBLA evidence. *GB*, 32. This argument is without merit.

We have already shown that exclusion of the CBLA evidence would have deprived the Government of – in its words – the "imperative link" supporting its theory that Higgs owned the murder weapon and gave it to Haynes. See Part A.2, above. Because the standard for Brady materiality is the same as the Strickland prejudice standard, Kyles v. Whitely, 514 U.S. 419, 434 (1995), the suppressed evidence undermining CBLA was material, for the same reasons it was prejudicial in the context of the Strickland claim.

Finally, the Government contends that a "similar" due process argument was rejected in United States v. Berry, 624 F.3d 1031 (9th Cir. 2010). *GB*, 34. The supposed similarity ends with the fact that Berry concerns CBLA evidence.

Berry was a case in which the defendant presented an untimely Rule 33 motion alleging that the discrediting of CBLA demonstrated that his convictions were obtained in violation of due process. He did not raise a Brady claim, but rather a claim that the CBLA "evidence used at his trial was so arbitrary as to render his trial fundamentally unfair." Berry, 624 F.3d at 1039. The fact that

20

Berry was unable to meet that due process standard says nothing about whether Higgs has satisfied <u>Brady</u>'s required showings of suppression and materiality.

Moreover, the facts of <u>Berry</u> are utterly distinguishable from those here. In <u>Berry</u>, the connection between the buckshot in Berry's shop and that found in the pipe bomb was supported not only by CBLA, but by facts showing that the buckshot at issue was relatively unique (a total of 436 bags of the buckshot at issue were manufactured, of which only 32 were shipped to the relevant area). <u>See</u> <u>Berry</u>, 624 F.3d at 1036. Here, by contrast, there was nothing unique about the bullets at issue. <u>See</u> <u>e.g.</u> Tobin Decl., ¶ 18, A - 476. Only the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents. Accordingly, the Government's suppression of evidence that would have enabled the defense to debunk CBLA was material. At a minimum, this Court should remand for an evidentiary hearing on this issue, as well as the ineffective assistance claim.

## CONCLUSION

For all of the above reasons, those contained in our *Initial Brief* and based on the entire record of this case, Petitioner requests that the Court reverse his convictions and sentences and remand for a new trial. Alternatively, the Court

21

should remand to the District Court for provision of discovery and an evidentiary

hearing on disputed aspects of his CBLA claim.

Respectfully Submitted

/s/     Michael Wiseman

_____

| | |
|---|---|
| Michael Wiseman | Stephen H. Sachs |
| Angela Elleman | Wilmer Cutler Pickering Hale & Dorr, |
| Matthew Lawry | 5 Roland Mews |
| Assistant Federal Defenders | Baltimore, MD 21210 |
| Federal Community Defender Office | 410-532-8405 |
| Eastern District of Pennsylvania | |
| Suite 545 West – The Curtis Center | |
| Philadelphia, PA 19106 | |
| 215-928-0520 | |
| Counsel for Appellant, Dustin John Higgs | |

Dated:     June 13, 2011

**Certificate of Compliance with Typeface and
Length Limits, Pursuant to FRAP 32(a)(7)(C)**

I, Michael Wiseman, hereby certify pursuant to FRAP 32(a)(7)(C) that this brief complies with the typeface and length requirements of FRAP 32(a)(7)(C) in that it is composed in 14 point proportional (Times New Roman) typeface, and is 5081 words.

/s/ Michael Wiseman

_____

Michael Wiseman

Dated:       June 13, 2011

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 13th day of June, 2011 I served a copy of the foregoing upon the following persons through ECF filing and by placing two copies in the United States Mail, First Class, postage prepaid:

Deborah A. Johnston
Sandra Wilkerson
Assistant United States Attorneys
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

/s/ Michael Wiseman

_____

Michael Wiseman